EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAMÓN ANTONIO FOURNIER SAMPEDRO, acusado y apelante.

Número 15318.

*Sometido:* 6 de abril de 1953. *Resuelto:* 5 de noviembre de 1954.

226

*Benicio Sánchez Castaño, Ricardo Lacosta, Jr., Félix Ochoteco, José R. Fournier, Juan A. Pedrosa, Santos P. Amadeo* y *Juan B. Soto,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge, J. Rivera Barreras, Fiscal del Tribunal Supremo* (en el alegato), *Rafael L. Ydrach Yordán, Fiscal Auxiliar, Tribunal Supremo,* y *Jaime García Blanco, Fiscal Especial,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

Contra Ramón Antonio Fournier Sampedro se radicó ante el anterior tribunal de distrito una acusación de asesinato en primer grado. Se le imputaba que el día 7 de septiembre de 1950 había dado muerte a su ex-esposa, Iris Nereida Her-

nández Matos, estrangulándola. Se le juzgó ante un jurado, fué declarado culpable y sentenciado a reclusión perpetua.

El problema que nos atañe principalmente en esta apelación es si las confesiones del acusado fueron indebidamente admitidas en evidencia. A fin de discutir adecuadamente esta cuestión, debemos primero exponer en detalle la evidencia presentada durante el juicio.

I

Resumen de la Evidencia Presentada durante el Juicio

El Dr. Donald F. Babbs declaró que el día 8 de octubre de 1950 a las 11:30 de la mañana, él estaba en el Cementerio Fournier en Isla Verde y vió cuando de una excavación de la fosa número 4 extrajeron el cadáver de una mujer, posteriormente identificada como Iris Nereida. El cadáver aparecía completamente vestido, con un traje, dos enaguas, un sostén y dos *panties*. La ropa interior aparecía en su sitio normal y corriente, pero la falda del traje cubría la cabeza de la mujer y una bufanda aparecía amarrada cubriéndole la boca y la cara. En el traje se encontraron una cartera de mujer y una caja de *Kleenex*. En un brazo tenía una pulsera y una sortija de brillantes en una mano. Alrededor del cuello aparecía un cinturón de mujer en forma de torniquete. El cinturón daba dos vueltas alrededor del cuello y había sido torcido. El cinturón tenía un nudo y en el nudo había un clavo de 4½ pulgadas. El testigo identificó todos estos objetos los cuales luego fueron admitidos en evidencia. Al día siguiente el testigo practicó la autopsia del cadáver. La muerte había ocurrido dentro de 4 a 6 semanas antes de la fecha de la autopsia. La laringe mostraba dos fracturas y la tráquea había sido oprimida. Las lesiones a la laringe y a la tráquea habían sido causadas por presión fuerte desde afuera. El testigo cree que esto fué resultado de las dos vueltas que tenía el cinturón alrededor del cuello y luego apretando aquél, lo que causó dos profundas marcas en la carne del cuello. La finada medía 5′ 2″ y parecía pesar 110 lbs. La causa de la

muerte fué estrangulación por garrote con un cinturón. El testigo es de opinión que las lesiones y la estrangulación no podían haberse producido por la propia finada: antes de que el cinturón estuviera lo suficientemente apretado para causarle la muerte, ella se habría desmayado y entonces se hubiera aflojado el cinturón.

El testimonio de los tres o cuatro testigos siguientes, que eran empleados del Cementerio Fournier, estableció con evidencia circunstancial no controvertida, que el 7 de septiembre de 1950, aproximadamente a las 11 de la noche, el acusado había enterrado el cadáver de Iris Nereida en las condiciones y con los objetos descritos por el Dr. Babbs en la tumba núm. 4 del Cementerio Fournier, que administraba y del que era socio el acusado.

Juan Ponce López declaró que es celador del Cementerio Fournier, radicado en Isla Verde, en la carretera de Santurce a Carolina. Como celador guarda las llaves del cementerio. Abre los portones de éste a las 7:00 a. m. y los cierra a las 6 p. m. El 7 de septiembre de 1950, a las 11 de la mañana, el acusado estaba en el cementerio y recibió una llamada telefónica, la cual le había dicho el acusado que estaba esperando. El acusado entonces dijo al testigo que la llamada había sido hecha por Lucy, hermana de Iris Nereida, diciéndole al acusado que "Iris se había ido con el novio". El acusado se fué seguida en su Cadillac. Fournier regresó al Cementerio como a las 3:30 p.m., el mismo día, y ordenó a Gregorio Fargas, empleado del cementerio, que hiciera un hoyo en la fosa núm. 4 para ver si salía agua. Gregorio hizo un hoyo como de dos pies cuadrados y el testigo se fué a hacer su trabajo. A las 11 de la noche del mismo día Fournier vino en su Cadillac a la casa cerca del cementerio donde vivía el testigo. El acusado dió a este un poco de ron y empezó a leer un periódico. Entonces Fournier le pidió las llaves al testigo para entrar al cementerio ya que tenía una cita con una enfermera. El testigo le dió las llaves al acusado. Fournier había estacionado su automóvil frente a la

casa del testigo. Este pudo ver que no había mujer alguna
en el automóvil. El testigo se fué a dormir. Como a la hora
regresó Fournier para devolverle las llaves. El acusado es-
taba un poco sudado. Fournier dijo al testigo que si éste se
levantaba al otro día primero que él, que mirara a ver si
encontraba un zapato blanco de mujer que el acusado había
perdido en el cementerio. Cuando el testigo llegó al cemen-
terio a las 6:40 al día siguiente, ya Fournier estaba allí. El
7 de septiembre, cuando el testigo cerró el cementerio, el hoyo
que Fargas había cavado se quedó abierto; temprano en la
mañana siguiente, cuando el testigo lo vió por primera vez,
ya había sido llenado con arena. El acusado le dijo a Pedro
Andino, otro empleado del cementerio, que hiciera una mezcla
de concreto para tirar los pisos de las fosas de la parcela F,
que incluía la núm. 4. Cuando los empleados fueron a tirar
el piso de concreto en la fosa núm. 4, ya ésta había sido lle-
nada y nivelada. Fournier nunca antes había pedido al tes-
tigo las llaves a fin de entrar al cementerio con una enfer-
mera. Una mañana, mientras el testigo y otros empleados
trabajaban en el cementerio, llegó el fiscal Viera Martínez
con algunos detectives y puso a Fargas y a Andino a trabajar
cavando en la fosa núm. 4. Lo primero que encontraron
fué el zapato entre las fosas 5 y 6. Entonces encontraron
el cadáver de Iris Nereida en la fosa 4. En la mañana del
día 8 de septiembre, el testigo notó una mancha de sangre
en el guardalodo trasero derecho del Cadillac de Fournier.
Posteriormente, pero antes de desenterrarse el cadáver, Four-
nier dijo al testigo que ya no tenía que darle dinero a Iris
Nereida por que esta se había ido con un "macho".

Agapito Rosa García, empleado del cementerio, corroboró
la declaración de Juan Ponce López con respecto a la orden
de Fournier de tirarle el piso a la fosa núm. 4 en la mañana
del 8 de septiembre. También vió la mancha de sangre en
el guardalodo del automóvil de Fournier aquella mañana.
Fournier se fué del cementerio aquella misma mañana y re-
gresó como a las 9 a.m. trayendo un paquete envuelto en pa-

pel de bolsas de cemento. El propio acusado hizo un hoyo con una pala entre las fosas 5 y 6, tiró el paquete en el hoyo, y lo tapó. El testigo también corroboró la declaración de Ponce López al efecto de que el fiscal Viera y algunos detectives estaban presentes en la mañana del 8 de octubre de 1950 cuando Fargas y Andino, cavando por órdenes del fiscal entre las tumbas 5 y 6, encontró un zapato blanco de mujer con pedazos de papel de bolsas de concreto en el mismo sitio en que Fournier había hecho el hoyo donde había tirado el paquete. El testigo también declaró que siguieron cavando y encontraron el cadáver de Iris Nereida en la fosa 4. Un día después del 8 de septiembre, Fournier estaba en la oficina leyendo un periódico y dijo: "Mira, Iris Nereida está desaparecida y se fué con un macho".

Pedro Andino Villalongo, también empleado en el cementerio, declaró al mismo tenor que Ponce López y Rosa García, o sea que a la fosa 4 se le había tirado el piso de concreto el 8 de septiembre por órdenes de Fournier. Éste, luego de hacer un hoyo entre las fosas 5 y 6, había enterrado un paquete en él. El testigo identificó el zapato que estaba en el hoyo cuando se desenterró el 8 de octubre. Otros dos empleados del cementerio, Ernesto Santana Alicea y Gregorio Fargas Ayala, corroboraron el testimonio de los otros testigos con respecto a estos hechos.

Dos hermanas de Iris Nereida declararon. Identificaron toda la ropa, la cartera, las prendas y otros objetos que aparecieron con el cadáver de Iris Nereida, como pertenencias de ésta. Iris Nereida salió de su casa a las 7 a.m. el 7 de septiembre de 1950 para ir al trabajo y nunca más regresó. Tres o cuatro días después de haber desaparecido su hermana, fueron a ver a Fournier al cementerio. Éste estaba temblando cuando les hablaba. Una de las hermanas le dijo que ellas temían que el acusado hubiese dado muerte a Iris Nereida y la hubiese enterrado. Fournier negó esta acusación. Éste les ofreció ayudar a buscarla. Les dijo que haría el cheque correspondiente a octubre y que si Iris Nereida estaba con

alguien, ella enviaría a alguna persona a buscar el cheque y en esa forma averiguarían dónde estaba. En presencia de una de las hermanas, el fiscal le preguntó al acusado qué sabía sobre la muerte de su ex-esposa. Fournier contestó cínicamente que ésa era "una pregunta de $64". El fiscal dijo: "Gáneselos, usted sabe dónde está. Díganos dónde está". Y el acusado contestó: "Yo no sé, si supiera ya me los hubiera ganado . . .". Fournier dijo al fiscal en presencia de las hermanas que había visto a Iris Nereida en un banco de San Juan el lunes siguiente a su desaparición. En su testimonio las hermanas describieron los disgustos habidos entre Iris Nereida y Fournier durante su matrimonio. Iris Nereida se divorció de Fournier en 1949 por la causal de trato cruel e injurias graves. La custodia de su hijita le fué concedida a Iris Nereida. Fournier venía obligado a pasarle $150 mensuales para alimentos de la niña. Antes de casarse con Iris Nereida, Fournier tuvo tres hijos: dos de su primera esposa, de quien se divorció, y un hijo natural reconocido en una señora procedente de los Estados Unidos continentales. Se admitió en evidencia una denuncia radicada por Iris Nereida en 1949 ante el anterior tribunal municipal antes del divorcio. En esta denuncia Iris Nereida imputaba a Fournier acometimiento y agresión grave.

Enrique Ramírez Brau, periodista, declaró que como a las 11:30 de la mañana del 10 de octubre de 1950, varios otros periodistas y fotógrafos y él, fueron a una casa en construcción propiedad de Fournier en el Barrio San Antón, cerca de St. Just, por invitación del fiscal. Había allí también varios detectives y policías. El testigo identificó varias fotografías que se tomaron allí del exterior e interior de la casa y del acusado mostrando la forma en que había dado muerte a Iris Nereida. El acusado puso una hoja de puerta sobre la bañera y dijo que "ahí en esa hoja de puerta había colocado a Iris . . . que le había quitado el cinturón que tenía ceñido a la cintura, se lo había puesto por el cuello y la había estrangulado". El acusado dijo además que ". . . había cargado

el cadáver y con cierta dificultad lo había podido sacar por la ventana para colocarlo en el baúl del automóvil." Tanto dentro como fuera de la casa, el acusado explicó a todos los allí presentes cómo había estrangulado a su ex-esposa. El testigo identificó varias fotografías de estos hechos, incluyendo una fotografía en que el fiscal informaba a la prensa, con la aquiescencia del acusado, que Fournier había confesado el crimen de haber dado muerte a Iris Nereida mediante estrangulación.

En este momento surgió la cuestión de la naturaleza voluntaria de la confesión del acusado en San Antón. Se retiró al jurado y Ramírez Brau fué interrogado por el fiscal sobre este punto. Declaró el testigo que Fournier estaba en "actitud . . . de persona tranquila", se expresaba en voz apacible, hablaba normal. Sus manos estaban libres; no estaba esposado. Su comportamiento era "muy correcto" y uno de "decidida cooperación" con el fiscal, los detectives y la prensa. El acusado hizo su declaración en forma espontánea y nadie ejerció presión alguna contra él para que declarara. No solamente confesó voluntariamente, si que también espontáneamente describió actuando la escena de sacar el cadáver por la ventana. El fiscal llamó a los periodistas fuera de la casa y les dijo, en presencia de Fournier, que éste había confesado voluntariamente, sin que mediara presión alguna ni ofrecimiento de ninguna clase. Cuando el fiscal hizo esta manifestación Fournier movió la cabeza y asintió. El fiscal dijo que Fournier le había dicho que si el crimen no se había esclarecido para el mes de diciembre, él lo hubiera "declarado" *motu proprio,* a las autoridades.

En el contrainterrogatorio del abogado del acusado sobre la cuestión de la naturaleza voluntaria de la confesión en San Antón, Ramírez Brau declaró que había visto a Fournier en una cama una noche en el cuartel de la policía como 24 a 36 horas antes. En esa ocasión Fournier dijo al testigo que se encontraba allí porque le había pedido al fiscal que lo mandara a su casa o lo mandara para otro sitio porque quería descan-

sar, que estaba muy incómodo en el sitio donde estaba sentado todo el tiempo en fiscalía. El testigo le pidió a Fournier un retrato de Iris Nereida. El acusado le dijo que buscara el anuario de la Escuela Superior Central del año 1945 donde ella aparecía en un retrato muy bonito. Dijo que si el fiscal lo seguía molestando le iba a dar una "galleta". El hombre que el testigo vió primero en el cuartel de la policía y luego en San Antón eran dos personas distintas. El primero era un hombre lleno de pasión; el segundo en San Antón no tenía en el semblante huellas de pasión cuando "describía las escenas" y confesaba su crimen. En la ocasión en el cuartel, como a las 2 de la mañana, el testigo le dijo al acusado que el fiscal iba a destapar las fosas porque creía que Iris Nereida estaba enterrada en el Cementerio Fournier. El acusado contestó que el fiscal podía ordenar que se destaparan todas las 1,800 fosas que había en el cementerio, pero que tendría que pagar $10 por cada fosa que destapara. Esa noche el acusado nada le declaró en relación con los hechos del caso. Sin embargo, confesó en San Antón, asintiendo a todo lo que el fiscal manifestó.

Luis Casanave, fotógrafo de prensa, también declaró en ausencia del jurado sobre la cuestión de la naturaleza voluntaria de la confesión oral hecha por el acusado el 10 de octubre de 1950 en una casa en construcción en San Antón propiedad del acusado. Declaró que estaba presente cuando los hechos antes descritos tuvieron lugar. El testigo tomó allí varias fotografías que identificó. Las "actuaciones" del acusado eran "completamente libres", posaba "libremente", indicando a petición del fiscal, dónde y cómo habían ocurrido los hechos. El acusado estaba completamente sereno y tranquilo; nadie se produjo en forma irrespetuosa con él.

Sobre la cuestión de la voluntariedad de las "actuaciones y declaración del acusado", el fiscal ofreció una certificación de la transcripción taquigráfica de las manifestaciones hechas la tarde del 10 de octubre de 1950 durante la vista de una petición de hábeas corpus radicada contra el fiscal en repre-

sentación del acusado. Las manifestaciones hechas por el abogado Rubén Gaztambide Arrillaga, quien representaba a Fournier en esos momentos, son las siguientes:

"Queremos anunciar nuestra protesta del hecho que no se nos haya permitido ver al acusado por más de 80 horas desde que fué detenido. Afortunadamente nos ha expresado el propio acusado que en todo momento fué tratado con todo el respeto necesario por el Fiscal Viera Martínez y que en ningún momento fué forzado a decir o hacer absolutamente nada en contra de él y que su declaración o confesión fué enteramente voluntaria, que lo único que él solicitó del Fiscal Viera fué ver a su abogado y el Fiscal Viera le expresó que tratándose de una investigación no era necesaria la presencia de su abogado.

"Nosotros, claro, entendemos lo contrario y sencillamente nos limitamos a protestar de que con anterioridad a esta fecha no se nos permitiera haber hablado con él; pero reafirmando que su declaración o confesión fué absolutamente voluntaria y a pesar de que protestamos sobre el hecho expresado, felicitamos al compañero del ministerio público por la forma decente y limpia de haber conducido esta investigación.

"Queremos expresar además que el cuerpo de la defensa desiste en este momento del hábeas corpus y solicita, si es que ya se ha hecho acusación, que se le fije fianza."

El abogado del acusado se opuso a la admisión en evidencia de la certificación de la transcripción de las manifestaciones del Lic. Gaztambide. No expuso fundamento alguno para ello. Cuando el juez sentenciador le preguntó, "¿Quieren discutirla?", contestó "No, señor". Dicha certificación se admitió solamente para la cuestión de la voluntariedad de la confesión.

El Pueblo no ofreció ningún otro testimonio sobre la cuestión preliminar ante el tribunal con respecto a la naturaleza voluntaria de la confesión oral de San Antón. Todavía en ausencia del jurado, el acusado sentó al fiscal Ángel Viera Martínez en la silla de los testigos en un esfuerzo por probar en la vista preliminar de esta cuestión, que la confesión había sido involuntaria. El 7 de octubre de 1950 el testigo tuvo "necesidad de realizar simultáneamente varias actividades

en distintos lugares, San Antón de Carolina, Cementerio Fournier . . ." y por consiguiente no sabe a que hora Fournier "fué detenido para investigación" el 7 de octubre de 1950; pero puede decir que fué en horas de la mañana. (Más tarde se estipuló que el acusado fué "detenido para investigación" y traído a la fiscalía a las 8 de la mañana del día 7 de octubre.) Fournier prestó declaración ante el testigo, empezando a las 10 de la noche del 9 de octubre y terminando aproximadamente a las 4 de la mañana del día 10. El testigo tiene dos declaraciones juradas por escrito hechas por el acusado durante la noche del 9 al 10 de octubre de 1950; el acusado también hizo otras declaraciones orales durante la misma noche. Después que el acusado prestó estas declaraciones escritas y orales al testigo durante la noche del 9 al 10 de octubre, éste llevó al acusado a San Antón "para yo seguir interrogando sobre el terreno y con las cosas a la vista . . . respecto de todos los hechos físicamente vistos." Desde que el acusado fué "detenido" en la mañana del 7 de octubre hasta la fecha el acusado "no ha recobrado su libertad". Esto incluye el período durante el cual el acusado hizo en San Antón las manifestaciones orales a que Ramírez Brau se refirió. Al acusado no se le permitió ver a un abogado durante las 80 horas más o menos que estuvo detenido. El acusado vió y conferenció en la oficina del fiscal con su abogado Lic. Gaztambide y con un familiar—su tía—por primera vez a su regreso de San Antón el día 10 de octubre e inmediatamente antes de la vista sobre la solicitud de hábeas corpus celebrada ese mismo día. Este abogado fué a ver al fiscal el día 9 de octubre para llevarle ropa al acusado y preguntar por él; el fiscal le dijo al abogado que el acusado estaba muy bien. Independientemente del hecho de que otras personas preguntaron al acusado cómo se sentía y que si deseaba alguna cosa de comer o beber, el acusado no fué interrogado por nadie, con excepción del testigo, sobre los hechos del caso. El acusado permaneció incomunicado desde la mañana del 7 de octubre hasta que hizo sus declaraciones el día 10 de oc-

tubre en San Antón. El acusado fué llevado al Cementerio Fournier el 8 de octubre a las 2 p.m. En San Antón había más de 10 personas, incluyendo los periodistas y los fotógrafos. Se tomó allí "una tormenta de relámpagos" fotográficos.

El fiscal Viera entonces "a manera de repregunta" de él mismo declaró lo siguiente: El acusado fué detenido en la mañana del 7 de octubre de 1950 a los fines de investigación. No intervino directamente en la detención porque la labor de la investigación se había distribuído para hacerse simultáneamente en las primeras etapas entre distintas personas en distintos sitios. Tenía que irse a la funeraria, a la casa de San Antón, al cementerio y a otros lugares. Desde el momento en que se le detuvo hasta que el acusado hizo su declaración, no tuvo asistencia de abogado porque en opinión del testigo el acusado no tenía derecho a tal asistencia. No fué hasta la noche del 9 de octubre y las primeras horas de la madrugada del día 10 que finalmente examinó al acusado en relación con la desaparición y muerte de Iris Nereida. Cuando fué al cementerio el 7 de octubre, el fiscal recogió a todas las personas que le parecieron que podían saber algo del caso para interrogarlas. Cuando estaban en el cementerio cayó un fuerte aguacero. Tuvo que regresar a fiscalía, con todos los testigos, lo cual atrasó la investigación. Durante todo este tiempo el acusado estaba en fiscalía, sin mojarse, como se habían mojado los otros. Fué necesario habilitar local para todos los testigos y permitirle a algunos cambiarse de ropa. No fué por tanto posible empezar la investigación hasta esa noche. El acusado mientras tanto permaneció muy tranquilo en la fiscalía, en una butaca, con periódicos y libros de texto a su disposición. A tenor con las órdenes del testigo, se complació al acusado con respecto a sus deseos de comida, bebida y sueño. Examinó testigos toda la noche del día 7 de octubre hasta la mañana del día 8 sin comer ni dormir, mientras que el acusado había comido y dormido durante todo ese período. Una vez que se orientó con el tes-

timonio de estos testigos, el día 8 regresó al Cementerio Fournier para desenterrar el cadáver, los objetos personales y el zapato de Iris Nereida. Esta labor en el cementerio duró un largo rato. La exhumación del cadáver hubo que hacerla con gran cuidado a fin de no causarle daño. Toda esta labor hubo que realizarla a pesar de la peste tremenda que despedía el cadáver debido al tiempo que llevaba enterrado. Mientras se hacía todo esto, había dado órdenes de que se llevara al acusado a dormir cuando quisiera en una cama con *mattress* que se había habilitado en el cuartel, donde se le daban las comidas que ordenara cuando las quisiera. Se le instaló un abanico eléctrico para que recibiera fresco. El acusado estuvo sumamente tranquilo durante ese período. Tuvo el testigo que interrogar testigos adicionales que le surgían con motivo de la investigación para entonces poder interrogar al acusado. No fué hasta la noche del 9 de octubre que estuvo listo para interrogarlo. Su interrogatorio del acusado duró hasta el amanecer del día 10. Fué una de las investigaciones más largas y difíciles que jamás haya practicado el testigo, ya que ni siquiera sabía dónde estaba el "cuerpo del delito". Le tomó muchas horas poder averiguar esto. El acusado en momento alguno protestó de nada ni exigió nada. Más bien siempre estuvo dispuesto a cooperar. Después de la noche en que se interrogó al acusado el fiscal le dijo que tenían que ir al campo. Aquél contestó, "cuando usted quiera". El fiscal le indicó que lo iba a dejar para mañana, pero el acusado le dijo "no, cuando usted quiera". El 10 de octubre fueron a San Antón y en ese sitio, en presencia de los representantes de la prensa a quienes el testigo había invitado a fin de que estuvieran informados, el acusado explicó la manera en que había cometido el crimen y posó para fotografías de las distintas etapas del crimen tal y como lo había cometido. Cuando regresaban del cementerio tomaron agua de coco en la carretera. El acusado le dijo al fiscal que quería ver a algún pariente. El testigo le permitió ver a su tía y hablar con ella en presencia suya en su oficina. El acusado

también vió a su abogado, Lic. Gaztambide Arrillaga, y conversó con él.

Las partes en esa etapa de los procedimientos sometieron al tribunal sentenciador la cuestión de la voluntariedad de la confesión oral hecha por el acusado en San Antón, sobre la cual Ramírez Brau y Casenave declararon. El tribunal sentenciador resolvió que no podía decidir como cuestión de derecho que esta confesión era involuntaria. Por consiguiente ordenó a las partes que sometieran la cuestión al jurado. Esto exigía que se repitiera el testimonio sobre la voluntariedad de la confesión en presencia del jurado. A tenor con ello, se trajo al jurado a la sala y Ramírez Brau y Casenave declararon nuevamente, delante del jurado, tanto en cuanto a la naturaleza voluntaria de la confesión de San Antón como en cuanto a los detalles de la misma.

Ángel Luis Torres, miembro de la detective adscrito a la Fiscalía declaró que formaba parte del grupo de periodistas y detectives que acompañaron al fiscal y a Fournier en la visita que se hizo a la casa de Fournier en San Antón el 10 de octubre de 1950 aproximadamente como a las 11 de la mañana. El testigo encontró unas fibras de un cinturón en un terrón de barro dentro de un tubo en el sumidero en el baño de la casa. El terrón con las fibras no se veía pero él las buscó en el sumidero porque Fournier le había dicho que él había tirado las fibras en el tubo el día en que mató a Iris Nereida y que dichas fibras eran parte del cinturón con que él la había matado. Mientras Fournier le decía esto estaba en "actitud tranquila". Nadie lo obligó a decir que las fibras estaban en el tubo. Lo dijo voluntariamente porque él quería cooperar con las autoridades. Fournier manifestó allí en presencia de todo el mundo que cogió el cadáver, lo subió por una ventana y lo puso en el baúl de su automóvil, lo cerró y se fué.

En este momento el testigo empezó a declarar sobre lo que Fournier había dicho en la fiscalía en su presencia la noche anterior. Se retiró al jurado. En su ausencia se estipuló por las partes que se permitiría al testigo declarar sobre

las distintas manifestaciones hechas por el acusado, pero que la cuestión de la voluntariedad de las mismas sería sometida al jurado; que el jurado determinaría esta cuestión a base de (1) el testimonio que ya había oído sobre la voluntariedad de las confesiones del acusado, (2) la parte del testimonio que sobre esta cuestión oyó la corte pero no el jurado, la cual sería leída al jurado en vez de ser repetida por los testigos, y (3) el interrogatorio y contrainterrogatorio de este testigo. Entonces regresó el jurado a sala y el testigo declaró que en la fiscalía la noche anterior y en presencia del testigo, el acusado dijo que el 7 de septiembre de 1950 él fué a la casa de su novia y la llevó al trabajo con el cadáver de Iris Nereida todavía en el baúl del automóvil. Luego, se fué para su casa a almorzar. Después de almorzar, fué al Cementerio Fournier como a las 3 de la tarde. Salió del cementerio y fué a buscar a su novia al trabajo llevándola a su casa. Luego se fué para la suya, se bañó y vistió, y fué por la noche a visitar a su novia. Como a las 11 de la noche fué al Cementerio Fournier.(¹)

En el contrainterrogatorio, Torres declaró que vió al acusado el sábado 7 de octubre de 1950, cuando se le trajo a la fiscalía para interrogarlo. Se le dijo al acusado que esperara en lo que el fiscal tenía tiempo para interrogarlo. Mientras el fiscal practicaba su investigación, el acusado permaneció en la oficina del fiscal Mieres Calimano. El acusado conversaba con todo el mundo y leía novelas detectivescas pero no se le permitía hablar ni con abogados ni con familiares "porque estaba en proceso de investigación". Se dejó al acusado en dicha oficina todo el día del sábado. Se le llevó temprano en la noche del sábado al cuartel de la policía donde durmió en una cama que se le había habilitado. El domingo por la mañana un policía trajo al acusado a la ofi-

---

(¹) Notamos de paso que durante el contrainterrogatorio el testigo aparentemente declaró que Fournier había hecho también estas mismas manifestaciones en San Antón. Sin embargo, en vista del resultado a que más adelante llegamos sobre la cuestión de la voluntariedad, es inmaterial dónde Torres oyó al acusado hacer estas manifestaciones.

cina del fiscal Mieres, donde permaneció todo ·el día. Estuvo bajo vigilancia y no se le permitió comunicarse con nadie excepto con los oficiales de la policía o con miembros de la fiscalía. En la noche del domingo el acusado fué llevado al cuartel, todavía bajo vigilancia, y se le permitió que durmiera allí. El lunes por la mañana volvió a traérsele a la oficina del fiscal Mieres. Se le mantuvo incomunicado—es decir, sin poder hablar ni con abogados ni con familiares—durante todo el día del lunes. El lunes por la noche, como a las 7:30 p.m., el fiscal Viera comenzó a interrogar al acusado. Nadie lo había interrogado hasta ese momento, aun cuando varios detectives le preguntaron sobre su ex-esposa y él les dijo que ella había desaparecido. El fiscal Viera interrogó al acusado en presencia del Teniente Soto, de un taquígrafo y del testigo, hasta las 4:30 de la madrugada del martes. Nadie más interrogó al acusado durante este período. Luego de haber terminado el fiscal su interrogatorio, enviaron a buscar café que bebieron todos, incluyendo el acusado. Posteriormente decidieron ir a San Antón, a solicitud del acusado. Esto no se hizo a solicitud del fiscal; se hizo a solicitud del propio acusado, que quería que ellos fueran allá. La declaración que hizo el acusado durante la noche se tomó taquigráficamente. Se transcribió por el taquígrafo y el acusado la firmó cuando regresaron de San Antón. Cuando el acusado hacía su confesión en San Antón, estaba tranquilo y posaba para los fotógrafos. El fiscal le pidió al acusado en San Antón que explicara cómo había dado muerte a su ex-esposa. El acusado tomó una hoja de puerta, la puso sobre la bañera y explicó cómo la estranguló. El acusado explicó que había golpeado a Iris Nereida, ella se quedó inconsciente, y por este motivo fué que pudo ponerla en la hoja de puerta y estrangularla. Dijo que la había agarrado por el cuello, hizo un torniquete con un clavo y la estranguló con el cinturón. Sacó el cadáver por una ventana, lo puso en el baúl y se fué. El acusado fué voluntariamente a San Antón. Los llevó él; ellos no sabían dónde era. Todos los allí presentes fueron a San Antón in-

vitados por el acusado. Los llevó allí para explicarles cómo y dónde había dado muerte a su ex-esposa. El testigo no puede decir exactamente a qué hora de la mañana fueron a San Antón. Cuando regresaron, el acusado fué llevado a la corte para la vista de la solicitud de hábeas corpus a las dos de la tarde. Ya había firmado la declaración jurada. El domingo 8 de octubre, luego de encontrarse el cadáver de Iris Nereida enterrado clandestinamente en una fosa en el Cementerio Fournier, el fiscal ordenó que se trajera al acusado al cementerio y el acusado fué llevado durante la tarde a la referida fosa. Había allí periodistas y fotógrafos. El fiscal preguntó al acusado "¿de quién es ese cadáver?" El acusado "miraba hacia la tumba, se mantenía nervioso y turbado." Cada vez que se le pedía que identificara el cadáver, él temblaba y miraba hacia la tumba.

En el examen redirecto el testigo declaró que Fournier le había dicho que había empezado un curso de premédica en un colegio, que había tomado y terminado un curso de embalsamamiento y que había recibido lecciones de jiu-jitsu. La objeción del abogado del acusado al efecto de que estas cuestiones estaban comprendidas en una declaración escrita del acusado fué declarada sin lugar. El fiscal entregó al abogado del acusado en ese momento dos declaraciones escritas que habían sido hechas por el acusado pero que aún no habían sido presentadas en evidencia. En el examen redirecto, el testigo también describió en detalle todas las actividades ya indicadas en la declaración del fiscal Viera Martínez las cuales, de conformidad con el fiscal y con este testigo, hicieron necesario que se suspendiera el interrogatorio del acusado hasta la noche del 9 al 10 de octubre. También manifestó que nadie había dormido durante los días y las noches aquí envueltos, con excepción de Fournier.

El fiscal ofreció entonces en evidencia una declaración jurada de 23 páginas hecha por el acusado ante el fiscal la noche del 9 al 10 de octubre de 1950, tomada taquigráficamente y luego transcrita por el taquígrafo y firmada por el acusado.

El abogado del acusado se opuso por el fundamento de que ésta fué hecha involuntariamente. La declaración fué aceptada en evidencia, sujeta a que la misma fuera sometida al jurado con respecto a la cuestión de su voluntariedad, y se marcó Exhibit 48. La defensa solicitó que se ordenara al fiscal que presentara la otra declaración jurada hecha por el acusado la misma noche, que consistía de 84 páginas. El fiscal se negó a presentarla, pero anunció que no se opondría a su admisión de ser la misma ofrecida en evidencia por el acusado.

La declaración jurada y suscrita por el acusado, comprendida en el Exhibit 48, que fué luego leída al jurado, puede sintetizarse como sigue: El fiscal advirtió al acusado que lo acusaba de asesinato en primer grado por haber dado muerte a Iris Nereida el 7 de septiembre de 1950. Le hizo saber al acusado que tenía el derecho de no declarar y que cuanto dijera podría ser utilizado en su contra. [2] El acusado contó entonces la historia de su fracasado matrimonio con Iris Nereida, incluyendo la oposición de sus padres al mismo y la amenaza de su madre de desheredarlo si se casaba con ella. Después del divorcio Iris Nereida siguió llamándolo por teléfono insistiendo en que tenía algo que arreglar con él y expresando su determinación de destruir cualquier felicidad que él pudiera conseguir en el futuro. Le echaba la culpa de la separación a la madre del acusado y le dijo que haría sufrir a la madre haciéndolo infeliz a él. Como le había indicado dos días antes, Iris Nereida le telefoneó el 7 de septiembre a las 10:30 de la mañana al cementerio. Díjole ella que tenía que hablar con él sobre un asunto muy importante para su futuro. Le indicó que su hijita había celebrado su cumpleaños días antes y le dijo que le llevase el dinero para el regalo a la oficina donde trabajaba ella. Cuando se acercó a la oficina, Iris Nereida bajó al automóvil. El le ofreció el dinero pero ella se subió a su automóvil Cadillac diciendo que tenía que arreglar un asunto ese mismo día. La llevó a su casa en construcción en San Antón. Durante el viaje Iris Nereida

---

[2] Véase el escolio 21, *infra*.

se iba quitando su vestimenta pieza a pieza. Ella entró primero a la casa, por la ventana lateral del lado derecho y directamente al cuarto de baño. Cuando el acusado entró a la casa por el mismo sitio encontró a Iris Nereida completamente desnuda. Tenía alrededor de la garganta el cinturón de tela plateada que llevaba puesto con el vestido. Ella se puso el cinturón en el cuello, agarrando las dos extremidades, diciéndole al acusado que el propósito de ella por venganza a la madre de él era que se quisiese nuevamente con ella. Le dijo que si no se quería de nuevo con ella cometería suicidio. Iris Nereida procedió entonces a acostarse provocadoramente sobre una tabla puesta sobre la bañera. Mientras tenía una risa de locura seguía haciendo presión con el cinturón en su garganta. Completamente descontrolado por su conducta y sus palabras, el acusado se abalanzó sobre ella, agarrándole las manos y echándoselas para los lados. El cinturón quedó en una de las manos del acusado. "Yo me tiré sobre ella y agarré con una mano las puntas del cinturón, no sé qué cosas hice, pero me encontré torciendo el cuello de ella, de Iris Nereida Hernández, el cinturón y con el clavo en la mano, como si fuera un torniquete, pero no sé decir si yo cogí el clavo o ya estaba o si yo cogí el cinturón y le hice un nudo, cómo yo cogí con las dos manos las dos puntas. Lo cierto es que yo cerré los ojos y me encontré con el clavo como un torniquete con el cinturón atado al cuello de Iris Nereida Hernández. Que las manos de ella quedaron a su lado cuando yo solté las puntas del cinturón y el clavo torciendo el cinturón y allí mismo se quedó Iris Nereida Hernández Matos. No me percaté si en ese momento ya estaba muerta y seguida procedí a vestirla porque ella estaba completamente desnuda. Inmediatamente después y desesperado sin poder razonar lo que había ocurrido me dirigí al automóvil por la misma vía que entramos, la ventana, y dejándola descansada sobre el marco de la ventana abrí el baúl de mi automóvil y cargándola hasta dentro de él y cerrándolo inmediatamente. Al montarme en el automóvil encontré sobre el asiento su cartera y una caja

de *Kleenex* los que inmediatamente procedí a encerrar en el baúl junto a ella." El acusado recogió luego del piso uñas hebras del cinturón y las tiró al tubo del sumidero. Vistió a Iris Nereida con su sostén, los *panties*, dos enaguas y el vestido. Empleó una badana en colores para cubrirle la cara porque la expresión no era muy agradable. Esto ocurrió a las 12:45 p.m. y el cadáver permaneció en el baúl de su automóvil hasta las 11:45 p.m. Regresó al cementerio después de almuerzo y como a las 4 de la tarde le dió órdenes a Gregorio Fargas para que hiciera un hoyo de 27 pulgadas de hondo. Le dijo a Fargas que quería ver si salía agua a la fosa. Se fué para su casa, se bañó, se vistió y a las 10:30 p.m. fué a la casa de Juan Ponce López, celador del cementerio. Tomó prestadas las llaves del cementerio a Ponce, diciéndole que quería entrar al cementerio con una muchacha. Tomó una onza de ron con Ponce en ese momento. Llevó el automóvil al cementerio, sacó el cadáver del baúl, lo echó en el hoyo de la fosa núm. 4 y lo llenó con la arena que se había sacado del hoyo y la cual estaba depositada dentro de la misma fosa. Hizo esto aproximadamente a las 11:45 p.m. Después de bajar el cadáver a la fosa núm. 4, regresó al automóvil, recogiendo la cartera y los *Kleenex* y depositándolos igualmente al lado de la cabeza. Notó que al cadáver le faltaba un zapato. Al hacer presión sobre el cadáver al sacarlo del baúl, el mismo expidió gases por la boca y la nariz. Entonces cubrió la cara con parte del vestido y de la bufanda para evitar la salida de los gases. En todo lo ocurrido y en todo lo ordenado por él el 7 de septiembre, actuaba como un autómata y en un completo descontrol de sí mismo. Encontró el zapato que faltaba a la mañana siguiente cuando lo fué a buscar a la casa de San Antón. Se levantó a las seis de la mañana y llegó al cementerio a las 6:30 a.m. Fué a buscar el zapato a las 9 a. m. y volvió con el mismo como a las 10:30 de la mañana. No había informado de esos hechos a ninguna otra persona y ésta era la primera vez que los narraba. La gente le hacía muchas preguntas durante varios días sobre la des-

aparición de Iris Nereida y él evitaba dar explicaciones por miedo de confesar la verdad. Trató de confesar los hechos a un cura pero no dió tal confesión, lo que había deseado hacer, hasta ese momento. Había dejado todo dispuesto para si en un término en o antes de diciembre no se había esclarecido el hecho, notificarlo a las autoridades correspondientes. Nadie tenía conocimiento de la comisión de este crimen antes de que el mismo ocurriera, "ni yo mismo". Todo lo declarado es la verdad y toda la verdad. Esta es su declaración espontánea, voluntaria, hecha voluntariamente, sin promesa de clase alguna, sin coacción, sin amenazas, sin nada que le haya quitado su libertad de pensamiento para ponerla en todos sus detalles. El acusado acepta la responsabilidad que el hecho realizado por él conlleva.

Esto completó la presentación de la prueba del Pueblo. Entonces el abogado del acusado se dirigió a la corte y al jurado como sigue: "La teoría de la defensa es la siguiente: El acusado ha hecho alegación de inocencia del delito que expresamente el Fiscal lo acusa, esto es, de asesinato en primer grado. El acusado admite que la muerte de Iris Nereida Hernández Matos se produjo en la forma que se consigna en la declaración presentada por el Fiscal, prestada el día 10 de octubre de 1950 y ofrecida por el ministerio público como prueba de El Pueblo y marcada 'exhibit' 48 que ustedes acaban de oir. Alegamos además que el acusado, al actuar como actuó y en la forma que se expresa en la mencionada declaración, lo hizo en un estado de cólera, hija ésta de la pasión. Al probar nosotros los hechos que hemos anunciado, en su oportunidad solicitaremos del Hon. Tribunal los instruya sobre el veredicto aplicable a los hechos y dentro tanto de la prueba de El Pueblo como de la prueba de la defensa." En este instante el fiscal dijo: "¿Qué veredicto dijo que iba a pedir?" El Lic. Sánchez Castaño, quien había expuesto la teoría de la defensa, contestó: "Esa es la teoría". El Lic. Ochoteco, otro de los abogados del acusado, añadió: "Cuando aportemos nuestra prueba lo pediremos".

En apoyo de su teoría el acusado ofreció testimonio al efecto de que tenía parientes que habían sido hospitalizados en instituciones de psiquiatría sufriendo de demencia precoz de tipo paranóico. Esta enfermedad mental, según los peritos médicos que declararon por el acusado, consistía de trastornos de la personalidad que afectaba las esferas emotivas y las intelectuales, causaba manías de persecución, inestabilidad emotiva, pobreza de juicio, ideas de grandeza y la impresión de que no se está enfermo.

La declaración jurada de 84 páginas hecha por el acusado fué entonces admitida en evidencia como Exhibit A del acusado. Esta declaración jurada pero no firmada fué hecha por el acusado en la noche del 9 de octubre de 1950 antes de hacer la declaración que se admitió como Exhibit 48 del Pueblo. En el Exhibit A el acusado dijo que tenía 23 años y ocho meses de edad. Fué repreguntado extensamente por el fiscal sobre varias cuestiones aparentemente irrevelantes. Describió sus viajes a los Estados Unidos y sus experiencias educativas. Manifestó haber agredido a un Mayor del Ejército en un sitio público, tumbándole cuatro dientes, porque se incomodó con un comentario hecho por el Mayor sobre los puertorriqueños. Describió sus gustos en los deportes y en la literatura, incluyendo la lectura de historias de crímenes. Dijo que sus padres se habían opuesto a su matrimonio con Iris Nereida. Admitió que había pegado tanto a su primera esposa como a Iris Nereida en dos ocasiones. Describió en detalle sus relaciones con su primera esposa, con la señora que era madre de su hijo natural reconocido y con Iris Nereida, y cómo sus dos matrimonios habían finalizado en divorcio. El fiscal lo llevó a una extensa discusión en relación con religión y con otros asuntos, gradualmente girando alrededor de la muerte de Iris Nereida. El fiscal le recordó al acusado que él había visto el cadáver de Iris Nereida en la fosa núm. 4. Le mostró a Fournier una fotografía y le preguntó si podía identificar el clavo y el cinturón alrededor del cuello del cadáver. Esta declaración terminó con la siguiente serie

de preguntas y respuestas: "P. ¿Por qué razón aparece como tapada la boca de Iris Nereida con un pañuelo? R. No puedo decirle. P. ¿Y aparece con un cinturón atado al cuello por usted? R. No señor. P. Y se le ha atado un clavo. R. ¿Por qué tengo que ser yo? P. Porque no puede ser otro, sino usted, porque los muertos no caen a las tumbas, aparece con un cordón atado al cuello, con un cinturón, haberla llevado en el baúl del carro, haberle pedido las llaves a Juan Ponce. R. Ya me está haciendo insinuaciones directas. P. Lo estoy acusando a usted. R. Y yo con todos mis derechos si es que los tengo no estoy obligado a contestar a esas preguntas. P. Si usted cree que se perjudica no tiene derecho a contestar. R. No me perjudico, pero me niego a contestar. P. ¿Por qué se niega a contestar? R. Porque es una acusación directa. P. ¿Por qué usted va donde Juan Ponce a buscar las llaves por la noche? R. Yo no tengo nada más. Ahora todas las preguntas suyas son acusaciones hacia mí. P. Le estoy preguntando. R. Yo no tengo nada más que contestar, si usted cree que tiene base para una acusación contra mí . . . P. ¿Usted se perjudica? R. No me perjudico. P. Yo le pregunto si se incrimina. R. No me incrimino. P. Si no se perjudica en nada me va a contestar. R. Ahora no quiero contestar porque ya es una acusación directa. P. ¿No me va a contestar las preguntas? R. De ninguna especie. P. ¿En ninguna forma, ni invitándolo con alguna contestación? R. Depende de lo que quiera. P. ¿De qué otra cosa va a ser? R. Yo creo que ya esto es una acusación directa, lo que falta que me acuse directamente. P. Si usted no se incrimina en nada. R. Eso usted cree pero puede ser perjudicial para mí. P. Eso lo determina usted. R. Y usted. P. ¿Usted cree que es perjudicial? R. Yo no creo que es perjudicial. P. ¿Tiene en mente mandar al fiscal al infierno? R. Ahora está actuando como un fiscal. P. Yo le pregunto a usted, ¿por qué usted fué a buscar donde Juan Ponce la llave? R. No tengo que contestar nada más. J. ¿Porque se incrimina? R. No me incrimino. P. ¿Por qué usted mandó a Gregorio Fargas a

hacer un hoyo? R. No tengo que contestar. Ahora guardaré silencio hasta las buenas noches. P. ¿Por qué hasta las buenas noches, porque se perjudica? R. Porque no voy a hablar nada más. P. Tiene que contestarme las preguntas una por una. R. Yo vine a contestar sus preguntas voluntariamente contrario a opiniones de abogados que siempre me han dicho todas las cosas y yo creo que tengo derecho a no contestar nada más. P. ¿Usted va esa noche del 7 de septiembre de 1950 al cementerio suyo, contésteme? R. De ahora en adelante no tengo que contestar. P. ¿Le perjudica? R. No me perjudica en nada. P. ¿Ni se incrimina? R. No me incrimina. P. Tiene obligación de contestarme. R. No voy a contestar nada más. P. Dígame, ¿por qué como a las nueve de la noche del día 8 de septiembre lleva un paquetito como así de largo (el fiscal indica el tamaño) y lo tiró entre la fosa número 5 y número 6 y con una pala que le pidió a Gregorio Fargas enterró ese paquete que llevaba? Hon. Fiscal: Van dos minutos y no contesta. P. Dígame, ¿por qué usted enterró el zapato blanco, uno de los zapatos que llevaba Iris Nereida puesto, entre la fosa número 5 y la número 6? Hon. Fiscal: Van dos minutos y no contesta. P. Dígame, ¿por qué usted mandó a Gregorio Fargas que le hiciera un hoyo de mayor profundidad en la fosa número 4 y le alegó que era a ver si salía agua? Hon. Fiscal: Van dos minutos y no contesta. P. Dígame, ¿por qué usted le pidió a Gregorio Fargas que dejara abierto ese hoyo en la fosa número 4? Hon. Fiscal: Pasa el tiempo y tampoco contesta. P. Dígame, ¿por qué Agapito Rosa dijo 'ahí acaban de enterrar una cosa de un embalsamamiento'? Hon. Fiscal: Tampoco contesta. P. Dígame, ¿por qué por la noche usted fué donde Juan Ponce y se dió un palo con él y le dijo, 'préstame las llaves del cementerio que es fácil que con una nercita que tengo entre ahí al cementerio'? R .... Hon. Fiscal: No contesta. No quiere decir tampoco por qué no contesta. P. Dígame, ¿por qué antes de las siete de la mañana, mucho antes, ya usted estaba frente al portón del cementerio esperando que abrieran el por-

tón? ¡ R. .. Hon. Fiscal: No contesta y ni quiere decir por qué no contesta. P. Dígame, ¿por qué en la parte derecha de su carro después de la puerta había una mancha de sangre ese mismo día 8 de septiembre de 1950? Hon. Fiscal: Tampoco contesta. P. Dígame, ¿por qué fué que al otro día 8 de septiembre de 1950 el hoyo que usted había mandado a Gregorio Fargas que abriera para ver si salía agua amaneció cubierto con arena y había la punta de una pieza de ropa con sangre? Hon. Fiscal: No contesta ni quiere. P. Dígame, ¿por qué sobre ese piso de arena en esa fosa número 4 donde usted había mandado a hacer el hoyo el día antes que quedó abierto y que por la mañana lo tapó usted o que se tiró un piso de concreto? Hon. Fiscal: No contesta porque es culpable del asesinato de Iris Nereida Hernández. No contesta porque estranguló a Iris Nereida. R. Usted es quien hace esa conclusión. P. ¿Usted estranguló a Iris Nereida Hernández? R. No señor. P. Su ex-esposa. R. No señor. P. ¿Y la enterró en la forma que usted la vió? R. No señor. P. .. ¿creyendo que usted iba a hacer el crimen perfecto? R. Usted me ha dado a entender que el crimen perfecto no existe. P. ¿Contesta o no contesta? R. Contesto que no, que no es lo que usted dice. P. ¿Por qué usted mandó a abrir ese hoyo en la fosa número cuatro, más abajo del fondo, como de dos pies y medio, por qué? R. Porque usted dijo que para ver si salía agua. P. Eso usted le dijo a Gregorio Fargas que se enterró allí el cuerpo de Iris Nereida Hernández? R. Lo que le digo que no. P. ¿Contestó? ¿Por qué en su carro apareció una mancha de sangre? R. Eso yo lo ignoro. P. En su carro el día 8 de septiembre de 1950 había una mancha de sangre sobre el lado derecho en la parte atrás. D. Lo ignoraba. P. ¿Ignoraba también que usted el día 8 de septiembre del 1950 como a las nueve de la mañana enterró un zapato? Hon. Fiscal: No contesta. P. ¿De trabilla en forma de sandalia, de tacón? ¿Quiere que le enseñe el clavo que usted utilizó para estrangular a Iris Nereida? Hon. Fiscal: No contesta. P. ¿Quiere que le enseñe el cinturón que ella usaba

el día 7 de septiembre de 1950 que usted le ató al cuello y con el clavo metido por el cinturón, le torció hasta estrangularla destrozándole la laringe? Hon. Fiscal: Pasan minutos y no contesta. P. ¿Quiere que le muestre el pañuelo que Iris Nereida usaba el día 7 de septiembre de 1950 y que usted utilizó para taparle la boca y la nariz para que no gritara y luego la estranguló? Hon. Fiscal: No contesta y pasa tiempo. P. ¿Quiere que le traiga aquí el otro zapato que le quedó puesto a ella cuando usted la tiró dentro de la fosa de su propio cementerio, el otro zapato compañero del que usted enterró como a las 9 de la mañana entre la fosa quinta y la sexta. Hon. Fiscal: No contesta. P. ¿Quiere que le traiga aquí también una pulsera que usaba ella? ¿Quiere que le traiga además una caja de *Kleenex* que ella tenía el día 7 de septiembre de 1950 porque tenía gripe, y que usted para que no se quedara fuera se la puso también al lado de la cabeza, cerca del cuello después que usted la estranguló y la enterró en esa fosa número cuatro? Hon. Fiscal: no contesta. P. ¿Quiere que le traiga también la cartera que ella usaba, que usted se la acomodó al lado de la caja de *Kleenex,* después que usted la estranguló y la enterró boca abajo en su propio cementerio? Hon. Fiscal: No contesta; y no contesta porque es culpable del asesinato de Iris Nereida Hernández por estrangulamiento. R. Esas son palabras suyas. P. ¿Por qué no contesta, contésteme entonces si son palabras mías; por qué usted mandó a echar los pisos en ese momento del 8 de septiembre de 1950 a esa fosa? D. Ese es el trabajo del día, llenar todos los pisos. P. Usted sabía que allí había un cadáver. ¿Mire a ver si era costumbre hacer un hoyo en el fondo de la fosa para ver si salía agua en verdad o es que usted es culpable del asesinato por estrangulamiento de Iris Nereida Hernández a quien enterró en una fosa de su propio cementerio y guarda silencio porque usted conoce el sitio y sabe que allí no salía agua? Le voy a traer el clavo que usted utilizó y me va decir de dónde lo encontró. ¿me lo va a decir? R. Yo no tengo nada más que decir.

P. ¿No tiene nada más que decir? ¿Por qué? R. Yo se lo he dicho todo. P. ¿Usted ha hablado todo? R. Yo lo he dejado. Tengo mis derechos de no contestar. P. ¿Yo lo estoy acusando a usted? R. Sí, son acusaciones. P. ¿Del asesinato de Iris Nereida Hernández que fué su ex-esposa? R. Usted me está acusando y como yo no tengo palabras en término como contestarle. P. Contésteme. R. Tiene que ser un abogado. P. Usted no tiene derecho a estar asistido de abogado en este acto. Contésteme si fué a casa de Juan Ponce para buscar la llave, para eso no tiene que tener abogado. Contésteme ahora si se dió unos palos con Juan Ponce. R. Usted me está acusando. P. Para contestarme lo de la llave no tiene que decirme . . . Hon. Fiscal: No contesta. P. ¿De qué color es el cinturón que tenía al cuello? Hon. Fiscal: No contesta."

La demás prueba ofrecida por el acusado consistió de declaraciones de psiquiatras. A éstos se les hicieron preguntas hipotéticas sobre la condición mental y emocional del acusado basadas en el historial de las enfermedades mentales en su línea materna y en su conducta según revelados por los hechos expuestos en los Exhibits 48 y A. Contestaron los psiquiatras que el acusado tenía menos resistencia emocional que una persona normal y estaba expuesto con más facilidad a reacciones y explosiones emocionales. Ninguno de estos médicos examinó al acusado y todos dijeron que estaba cuerdo.

## II

*¿Era la confesión escrita—Exhibit 48—inadmisible en evidencia por el solo fundamento de que la misma se hizo mientras el acusado estaba detenido ilegalmente?*

Sostiene el acusado que aun cuando fuere voluntaria su confesión escrita—Exhibit 48 del Pueblo—la misma no debió admitirse en evidencia porque fué hecha durante la detención ilegal. (3) El acusado descansa aquí en *McNabb*

(3) Por los motivos expuestos más adelante en la Parte III(*b*), surge claro que el acusado hizo la confesión escrita mientras estaba detenido ilegalmente.

v. *United States*, 318 U. S. 332; *United States* v. *Mitchell*, 322 U. S. 65; y *Upshaw* v. *United States*, 335 U. S. 410. En estos casos la Corte Suprema resolvió que aun cuando fuere voluntaria una confesión, la misma no puede admitirse en evidencia si se hace durante la detención ilegal en violación de un estatuto y de la regla federal al efecto de que una persona arrestada debe llevarse "sin demora innecesaria" ante el juez instructor más cercano. Pero los casos en cuestión no fueron resueltos por motivos constitucionales; exponen una regla de evidencia creada judicialmente para las cortes federales, conocida como la regla *McNabb*. En consecuencia estamos en entera libertad de establecer nuestra propia regla de evidencia sobre esa cuestión. *Stein* v. *New York*, 346 U. S. 156, 187–8; *Gallegos* v. *Nebraska*, 342 U. S. 55, 63–4. Como cuestión de hecho, casi todas las cortes estatales que han considerado la cuestión se han negado a seguir la regla *McNabb*. Anotaciones 19 A.L.R. 2d 1331, 1337 et seq.; 97 L. Ed. 1555, 1557; 96 L. Ed. 57, 58, escolios 11–12; Wicker, *Some Developments in the Law Concerning Confessions*, 5 Vand. L. Rev. 507, 515, escolio 28; Allen, *Due Process and State Criminal Procedures: Another Look*, 48 N.W.U.L. Rev. 16, 34; casos citados en *Upshaw* v. *United States*, supra, opinión disidente, págs. 434–5, escolio 29.(⁴)

Al examinar la cuestión de si debemos adoptar la doctrina McNabb como una regla local de evidencia, es importante indicar que nuestra ley con respecto a los jueces instructores es única en su género. Antes de la fecha de vigencia de la Constitución—25 de julio de 1952—en Puerto Rico tanto los fiscales como los jueces eran magistrados con facultades para expedir órdenes de arresto, para fijar las cuantías de las fianzas y para ordenar la libertad de los acusados bajo fianza.

---

(⁴) La regla McNabb todavía es una criatura de la jurisprudencia aun para las cortes federales. La misma fué incluída en el primer borrador de las Reglas Federales de Procedimiento Criminal, pero fué eliminada antes de que se adoptaran dichas Reglas. Dession, *The New Federal Rules of Criminal Procedure*, 55 Yale L. J. 694, 707, escolio 48; Orfield, *Criminal Procedure from Arrest to Appeal*, pág. 65.

Arts. 12, 13, 44(a), 97, 99, Código de Enjuiciamiento Criminal, ed. de 1935. Las causas criminales se originaban en las anteriores cortes de distrito mediante acusaciones radicadas por el fiscal luego de encontrar causa probable basada en testimonio jurado ante él o ante un juez instructor. Arts. 3, 72, 98 a 100, Código de Enjuiciamiento Criminal; *Jiménez v. González, Alcaide de Cárcel,* 71 D.P.R. 118. A virtud del Artículo II, Sección 10, párrafo 3 de la Constitución y de las leyes que la implementaron, se privó a los fiscales de la facultad que tenían de expedir órdenes de arresto y de fijar fianzas. Un fiscal puede aún citar testigos, tomarle declaraciones, y radicar acusaciones basadas en éstas; pero una orden de arresto sólo puede ser expedida ahora por un juez después de hallar causa probable para ello. *Pueblo v. Tribunal Superior,* 75 D.P.R. 535; *Pueblo v. Quiñones,* 76 D.P.R. 955; Ley núm. 22, Leyes de Puerto Rico, 1952, Sesiones Extraordinarias, enmendando los artículos 13, 44a y 100 del Código de Enjuiciamiento Criminal. Sin embargo, hasta el presente no es necesaria una vista formal ante el juez a fin de que éste expida una orden de arresto; éste puede hacerlo a base de testimonio jurado previamente ante el fiscal o ante cualquier otro funcionario autorizado. *Pueblo v. Tribunal Superior,* supra; *Guadalupe v. Bravo, Alcaide Cárcel,* 71 D.P.R. 975, 982.

Con anterioridad al 1952, como el fiscal ejercía facultades como magistrado cuando expedía órdenes de arresto y fijaba fianzas, es obvio que el art. 44 del Código de Enjuiciamiento Criminal, copiado de California, no encajaba completamente en nuestro sistema y jugaba aquí sólo un papel limitado.[5] Es decir, no había necesidad de llevar a un acusado ante un juez instructor que no fuera el fiscal para un examen preliminar cuando el propio fiscal investigaba el caso espe-

---

[5] El art. 44 prescribe como sigue: "El acusado debe ser llevado en todos los casos, a la presencia de un juez de paz, sin ninguna demora innecesaria, con objeto de que sea examinado, pudiendo cualquier abogado, debidamente autorizado para ejercer en los tribunales de Puerto Rico, visitar a la persona arrestada si ésta lo pidiere."

cífico y tenía facultad para desempeñar todas las funciones requeridas de un magistrado, incluyendo la determinación de causa probable, la expedición de una orden de arresto, y la fijación de fianza. *Pueblo* v. *Carmona*, 67 D.P.R. 288; *Pueblo* v. *Montes*, 64 D.P.R. 321; *Pueblo* v. *Travieso*, 60 D.P.R. 530. Hoy día el art. 44 juega un papel algo más amplio ya que solamente un juez puede expedir órdenes de arresto y fijar fianzas después que él mismo determina la existencia de causa probable. Sin embargo, aún bajo nuestra Constitución el art. 44 no es tan importante como lo es en los Estados Unidos continentales en vista del hecho de que aún hoy día no se requiere examen preliminar propiamente dicho ante un magistrado; éste, como hemos visto, puede expedir una orden de arresto basada en testimonio jurado ante el fiscal sin jamás ver a los testigos ni al acusado.

Así vemos que como el presente caso ocurrió en 1950, a ningún fin sustancial hubiera conducido el llevar al acusado ante un juez instructor "sin ninguna demora innecesaria", según lo exige el art. 44 del Código de Enjuiciamiento Criminal. El fiscal, que tenía "detenido al acusado, era por sí mismo un juez instructor, con facultades no sólo para interrogar testigos y para radicar acusación, si que también para expedir órdenes de arresto y fijar fianzas. El propósito detrás de la regla federal—obligar al ministerio fiscal a llevar al acusado prontamente ante un magistrado instructor—no podía por consiguiente cumplirse eficazmente bajo nuestro anterior sistema. En la misma forma, si bien ya un fiscal no tiene facultad para expedir órdenes de arresto y fijar fianzas, aún puede citar testigos, tomarles declaración jurada, y someter ésta a un juez quien expide órdenes de arresto a base del testimonio prestado ante el fiscal sin la celebración de una vista en que estén presentes los testigos y el acusado. Hoy día un fiscal no puede "detener" a un acusado indebidamente y debe solicitar prontamente de un juez una orden de arresto a base de testimonio jurado; pero esto no envuelve el llevar al acusado ante el juez. De esto surge que, a nuestros fines,

el art. 44 aun hoy día bajo nuestro sistema no puede cumplir el objetivo de obligar a un funcionario que practica un arresto a llevar a un acusado ante un juez "sin ninguna demora innecesaria."

En pocas palabras, el art. 44 del Código de Enjuiciamiento Criminal, cuando se lee a la luz de otras disposiciones pertinentes del mismo Código, no requiere necesariamente que el acusado sea llevado personalmente ante un juez instructor. En consecuencia no hay base para que adoptemos como una regla local de evidencia la regla *McNabb* al efecto de que el no llevar a un acusado ante un juez instructor sin demora innecesaria opera en el sentido de que una confesión dada durante tal demora sea inadmisible aun cuando sea una confesión voluntaria. Además, convenimos con el criterio de que la ley de evidencia no debe ser usada como un medio de castigar a funcionarios por dejar de llevar a un acusado ante un juez instructor "sin ninguna demora innecesaria". Wicker, supra, pág. 515; Maguire, *Evidence, Common Sense and Common Law*, pág. 123. Aún en el sistema federal, la corte Suprema ha dicho que ". . . la regla *McNabb* no tuvo por miras ser una penalidad o sanción por la infracción del . . . estatuto sobre el examen preliminar" *United States* v. *Carignan*, 342 U. S. 36, 42.

Más adelante resolvemos en la Parte III(*b*) que la detención ilegal es uno de los factores a ser apreciados al determinar si una confesión fué obtenida mediante coacción. Pero la práctica de detención ilegal debe erradicarse por otros medios que no sean el de permitir que el culpable se libre de su castigo no empece el hecho de que ha confesado voluntariamente su culpabilidad. El punto decisivo es la voluntariedad de la confesión y no la ilegalidad de la detención. *United States* v. *Carignan*, supra, pág. 45. En vista de lo anteriormente expuesto, resolvemos no adoptar en esta jurisdicción la regla *McNabb* al efecto de que aun cuando sea voluntaria una confesión, ésta no es admisible en evidencia simplemente porque la misma se hizo durante la detención ilegal.

## III

*¿Era la confesión escrita—Exhibit 48—inadmisible en evidencia por el fundamento de que la misma se obtuvo mediante coacción psicológica en violación del debido procedimiento de ley?*

*(a) Funciones respectivas del juez y del jurado sobre la cuestión de la admisibilidad de la confesión cuando se trae o colación su voluntariedad.*

"En un juicio criminal en un estado el uso de una confesión del acusado obtenida mediante coacción—ya sea física o mental—está prohibido por [la cláusula del debido procedimiento] de la Enmienda XIV." *Leyra* v. *Denno*, 347 U. S. 556, 98 L. ed. 631, 632–3, y casos citados en la nota 3; *Watts* v. *Indiana*, 338 U. S. 49, y casos citados en la nota 3; *Stein* v. *New York*, supra, y casos citados; *Batalla* v. *Tribunal de Distrito*, 74 D.P.R. 289, 321, notas 4 y 5, y casos allí citados. (6) En este caso el acusado sostiene que el Exhibit 48 del Pueblo

---

(6) Cuando surgió este caso, el problema aquí envuelto se regía por las cláusulas del debido procedimiento de la Carta Orgánica y de la Enmienda V. *Ballester Hnos.* v. *Tribunal de Contribuciones*, 66 D.P.R. 560, 563–4, escolio 2, revocado por otros motivos, 162 F.2d 805 (C.A. 1, 1947). En cuanto a la situación hoy día, véase *Mora,* v. *Mejías,* 206 F.2d 377 (C.A. 1, 1953), que resuelve que el debido procedimiento federal continúa en vigor en Puerto Rico.

En el caso de *Leyra* v. *Denno,* supra, 98 L.ed. a la pág. 633, escolio 3, dice la opinión: "Algunos miembros de la Corte llegan a esta conclusión [que en los juicios criminales estatales las confesiones obtenidas mediante coacción no pueden admitirse en evidencia] con motivo de su creencia que la Enmienda XIV hace aplicable a los estados la prohibición de la Enmienda V contra autoincriminación compulsoria." Sin embargo, la mayoría de los jueces del Tribunal Supremo opinan en sentido contrario: Ellos han resuelto que solamente la cláusula del debido procedimiento ·de la enmienda XIV es de aplicación en tales casos. Véase *Rochin* v. *California,* 342 U. S. 165, 173, nota 6; *Batalla* v. *Tribunal de Distrito,* supra; 60 Yale L. J. 1228, nota 3; *Morgan, Basic Problems of Evidence,* Vol. I, págs. 129–31. Antes de 1952—cuando se celebró el juicio·de este caso—la Carta Orgánica contenía una cláusula contra autoincriminación compulsoria. Es innecesario que nos detengamos a determinar qué efecto tuvo, si alguno tuvo, sobre la cuestión de la voluntariedad de una confesión. *Cf. United States* v. *Carignan,* supra, 41; *Stein* v. *New York,* supra, 190, nota 35; Emerson y Haber, *Political and Civil Rights in the United States,* págs. 106–114. Dejamos para un caso adecuado la cuestión de si debemos apli-

fué indebidamente admitido en evidencia ya que el mismo consistía de una confesión obtenida de él mediante coacción psicológica en violación del debido procedimiento de ley. Pero para poder enfocar bien esta cuestión, es necesario delinear las respectivas funciones del juez y del jurado cuando surge la cuestión de la voluntariedad de una confesión.

■■ Primero—En esta jurisdicción el tribunal sentenciador debe pasar como cuestión preliminar sobre el problema de si una confesión fué voluntaria. La corte oye el testimonio de ambas partes, preferiblemente en ausencia del jurado, en relación con esta cuestión. Si la evidencia establece como cuestión de derecho que la confesión fué involuntaria, la misma se excluye y no se le presenta al jurado. Por otro lado, si la evidencia sobre la voluntariedad es contradictoria, el tribunal sentenciador no pasa sobre su admisibilidad. Por el contrario, se llama al jurado, se repite en su presencia la evidencia sobre la voluntariedad y se le somete la confesión. Sin embargo, se instruye al jurado (a) que el Pueblo tiene el peso de la prueba a fin de establecer la voluntariedad de la confesión; (b) que si el jurado resuelve que la confesión fué hecha voluntariamente, al jurado corresponde determinar qué peso debe darle, como en el caso de toda otra evidencia debidamente admitida; y (c) que si el jurado resuelve que la confesión fué involuntaria, debe rechazarla y hacer caso omiso de ella. *Pueblo* v. *Medina*, 72 D.P.R. 254; *Pueblo* v. *Otero*, 67 D.P.R. 404; *Pueblo* v. *Declet*, 65 D.P.R. 23. (⁷)

---

car el art. II, sec. 11, párr. 3 de nuestra Constitución—que establece el privilegio contra autoincriminación—al problema de la voluntariedad de una confesión. Esto sería, desde luego, en adición a la aplicación al problema del debido procedimiento federal. Véase 52 Mich.L.Rev. 421, 426, nota 28; 50 Mich.L.Rev. 567, 570.

(⁷) La nuestra—sustancialmente similar al procedimiento usado en Nueva York—es la regla de la minoría. Existen por lo menos dos reglas más. En primer lugar, muchos estados y aparentemente las cortes federales han adoptado la llamada "regla humana" bajo la cual el tribunal sentenciador viene obligado a llegar a una conclusión afirmativa con respecto a evidencia contradictoria en cuanto a voluntariedad; pero si el tribunal sentenciador afirmativamente admite la confesión, el acusado tiene una segunda oportunidad sobre admisibilidad, toda vez que la evidencia sobre

■ Segundo—El Tribunal Supremo de los Estados Unidos acepta las conlusiones de hechos de las cortes estatales con respecto a las circunstancias bajo las cuales se hicieron las confesiones. Pero determina por sí, mediante una revisión independiente de los hechos envueltos, si bajo los hechos incontrovertidos, tales confesiones fueron obtenidas mediante coacción. Al hacer esto, el Tribunal Supremo, si bien tomando los hechos tal cual los encontraron probados las cortes estatales determina por sí como cuestión de derecho el efecto de esos hechos sobre la cuestión de la voluntariedad de la confesión. *Leyra* v. *Denno*, supra; *Stein* v. *New York*, supra, pág. 182; *Watts* v. *Indiana*, supra, 50–52; *Lisenba* v. *California*, 314 U. S. 219, 238; *Chambers* v. *Florida*, 309 U. S. 227; Matherne, *Pretrial Confessions—A New Rule*, 22 Tenn. L.Rev. 1011, 1018, nota 55 [8]

■ Tercero—Otro aspecto del problema sobre las respectivas funciones del tribunal sentenciador y del jurado en

---

la voluntariedad se repite ante el jurado y el tribunal debe instruir a éste que si resuelve que la confesión fué involuntaria, la debe rechazar. En segundo lugar, la "regla ortodoxa" exige que el tribunal sentenciador determine final y definitivamente si una confesión fué voluntaria; si el tribunal sentenciador admite la confesión como voluntaria, la evidencia de las circunstancias bajo las cuales se hizo la confesión pueden reproducirse ante el jurado a fin de que éste pueda determinar qué peso debe darle a la confesión, pero no para atacar su admisibilidad, la cual bajo la "regla ortodoxa" es determinada exclusivamente por el tribunal sentenciador. Meltzer, *Involuntary Confessions: The Allocation of Responsability Between Judge and Jury*, 21 U. Chi. L. Rev. 317, 319–25; 3 Wigmore *on Evidence*, tercera edición, sec. 861, págs. 347–8; *Comment*, 52 Mich.L.Rev. 421, 423–24; *Annotation*, 170 A.L.R. 567; McCormick, *Some Problems and Developments in the Admissibility of Confessions*, 24 Tex.L. Rev. 239, 250–51; Morgan, supra, Vol. II, págs. 249–50; Wicker, supra, pág. 510, notas 12 y 13; *Uniform Rules of Evidence*, Regla 63 (6); A.L.I. *Model Code of Evidence*, Regla 505; *United States* v. *Carignan*, supra, pág. 38; *Stein* v. *New York*, supra, pág. 172; *State* v. *Crank*, 142 P.2d 178 (Utah, 1943).

El Comité Consultivo designado por este Tribunal para recomendar Reglas de Evidencia tiene bajo su consideración la posibilidad de adoptar la "regla ortodoxa".

[8] La cuestión de si, al determinar si una confesión es voluntaria, las cortes estatales setenciadoras y de apelación deban respectivamente desempeñar un papel mucho mayor, es un problema de ley local y no de derecho constitucional federal. Véanse los escolios 7 y 10.

relación con las confesiones debe ser indicado aquí. El caso de *Stein* v. *New York*, supra, resuelve que (*a*) si la evidencia sobre la voluntariedad de una confesión es contradictoria y (*b*) si la regla estatal—tanto en Puerto Rico y bajo la "regla humana"—requiere que el jurado bajo dichas circunstancias llegue a la determinación final sobre la admisibilidad de la confesión, el Tribunal Supremo de los Estados Unidos no revocará la convicción de una corte estatal por el motivo de que no hubo el debido procedimiento federal, siempre y cuando que de los autos surja otra evidencia suficiente para sostener el veredicto. La teoría detrás de la negativa del Tribunal Supremo a revocar una convicción estatal bajo tales circunstancias es que resulta imposible determinar si el jurado halló la confesión voluntaria y por consiguiente la apreció junto a la demás evidencia, o si el jurado la rechazó por involuntaria pero eso no obstante declaró culpable al acusado a base de la evidencia restante, sin tomar en consideración la confesión. *Stein* v. *New York*, supra, pág. 170-193. Sin embargo, el caso de *Stein* no ha cambiado la regla de que la admisión en evidencia en una corte estatal de una confesión que bajo los hechos *incontrovertidos* se ha obtenido mediante coacción, viola la cláusula del debido procedimiento de la Enmienda XIV, no empece la existencia de otra evidencia suficiente para sostener el veredicto. Morgan, supra, págs. 250-51; *The Supreme Court, 1952 Term*, 67 Harv. L. Rev. 91, 120-21; Miller, *The Supreme Court's Review of Hipothetical Alternatives in a State Confession Case*, 5 Syrac. L. Rev. 53; *Comment*, 52 Mich. L. Rev. 42; Scott, State *Criminal Procedure, The Fourteenth Amendment, and Prejudice*, 49 N.W.U.L. Rev. 319; *Annotation*, 97 L.Ed. 1555, 1556. *Cf.* Gorfinkel, *The Fourteenth Amendment and State Criminal Proceedings* — *"Ordered Liberty" or "Just Desserts"*, 41 Calif. L. Rev. 672, 682-85.

En este caso, a tenor con nuestra regla local y como en el caso de *Stein*, la corte sentenciadora sometió al jurado el Exhibit 48 y la confesión oral de San Antón, dándole instruc-

ciones de que los considerara solamente si resolvía que eran voluntarios. En vista del testimonio aquí sintetizado, suponemos que la otra evidencia, de haber sido creída por el jurado, fué suficiente sin las confesiones para sostener el veredicto de asesinato en primer grado. (⁹) Bajo tal presunción es imposible decir aquí, como en el caso de *Stein*, si el jurado concluyó que la confesión escrita comprendida en el Exhibit 48 era voluntaria y la apreció juntamente con el resto de la evidencia, o si rechazó tanto esta confesión como la confesión oral por concluir que no fueron voluntarias, y no obstante ello declaró culpable al acusado basándose en el resto de la prueba. De acuerdo con esto, bajo la regla constitucional que no ha sido cambiada por el caso de *Stein*, queda aún la cuestión de si a base de los *hechos incontrovertidos* el tribunal sentenciador cometió error como *cuestión de derecho* al no excluir la confesión escrita comprendida en el Exhibit 48 del Pueblo por el fundamento de que la misma fué extraída del acusado mediante coacción psicológica. (¹⁰) En su consecuencia, examinaremos en detalle en los apartados (*b*), (*c*), (*d*) y (*e*) de esta parte—primero por separado y luego conjuntamente—los hechos incontrovertidos en que descansa el acusado.

(*b*) *¿Fué la confesión escrita—Exhibit 48—obtenida mediante coacción psicológica debido a que el acusado estuvo "detenido para investigación" por más de 70 horas antes de que se le interrogara?*

---

(⁹) En esta jurisdicción prevalece la regla familiar al efecto de que una confesión no es admisible a menos que se pruebe por evidencia independiente el *corpus delicti*. *Pueblo* v. *Declet*, supra; *Comment*, 52 Mich.L.Rev. 421, 428; *McCormick*, supra, pág. 246. Obviamente esta regla fué cumplida con la evidencia en este caso.

(¹⁰) Cualesquiera conflictos en la evidencia con respecto a la voluntariedad de la confesión deben resolverse bajo nuestra actual regla por el jurado, y no por el tribunal sentenciador ni por este Tribunal. Véase escolio 7; *Pueblo* v. *Rivera Escuté*, 66 D.P.R. 216, 219–20; *Stein* v. *New York*, supra. Pero, por los motivos consignados en el texto, el acusado puede alegar en apelación que el tribunal sentenciador cometió error al no excluir la confesión como cuestión de derecho a base de los hechos incontrovertidos.

 No hay controversia alguna en cuanto a que Fournier estuvo "detenido para investigación" durante tres dias. La única explicación que dió el fiscal es que la investigación era difícil y complicada y que Fournier estuvo "detenido para investigación" durante dicho período porque el fiscal no estuvo listo para interrogarle hasta la noche del 9 de octubre.

Ya hemos visto que un fiscal en 1950 podía y puede todavía citar testigos, tomarles declaración y radicar una acusación basada en ésta. Además, hasta el 25 de julio de 1952 un fiscal era un magistrado y tenía facultad para expedir órdenes de arresto y para fijar fianzas. Pero no conocemos disposición alguna de ley en esta jurisdicción por la cual un testigo o un acusado pueda estar "detenido para investigación" por un fiscal durante varios días mientras éste obtiene la prueba que le pondrá en condiciones de enfrentar al testigo o al acusado con la realidad de los hechos. Tal línea de conducta no está autorizada por los arts. 39 a 42 del Código de Enjuiciamiento Criminal, ed. de 1935, que proveen para la fijación de fianza a testigos, o por el art. 527 del mismo Código.

El fiscal Viera ha demostrado ser, en éste y en otros casos, un funcionario público hábil y celoso en el cumplimiento de su deber. Sin duda alguna, fué debido mayormente a sus esfuerzos que se descubrió el horrible crimen cometido en este caso. Pero su conducta al "detener al acusado para investigación" durante tres días fué completamente ilegal. No importa cuál haya sido la práctica en el pasado, el concepto de "detención para investigación" de un acusado potencial es desconocido en nuestro derecho. Sólo tenemos dos clases de personas llevadas ante un fiscal: testigos y acusados. Un testigo es citado; un acusado es arrestado y prontamente se le fija fianza.([11]) Aparte del hecho de que sería impropio "detener

---

([11]) Para discusiones de la alegada conveniencia de un estatuto que fije un corto período de detención para investigación sin una orden formal de arresto, véanse Orfield, supra, págs. 23–25, 38; 60 Yale L.J. 1228, 1230, escolio 8, y autoridades citadas; Warner, *The Uniform Arrest Act*, 28 Va.

un testigo para investigación" durante tres días, difícilmente puede el fiscal alegar que estaba "deteniendo" a Fournier como un testigo, porque esto le habría concedido inmunidad automáticamente después de haber declarado. *Batalla* v. *Tribunal de Distrito*, supra. Cf. Ley núm. 3 de 18 de marzo de 1954 (pág. 109). Desde los comienzos de la investigación, Fournier era un acusado potencial. Una vez "detenido", era el deber del fiscal expedir prontamente una orden de arresto y fijarle fianza. El acusado entonces podía consultar con amigos, familiares, y con su abogado, bien sea en la cárcel o mientras estuviera bajo fianza. · Pero aquí no se expidió orden de arresto alguna imputándole a Fournier ningún delito. Por el contrario, un detective lo trajo a la oficina del fiscal temprano en la mañana del 7 de octubre de 1950. Y se le mantuvo allí o en otros sitios incomunicado sin el más leve indicio de legalidad hasta la tarde del 10 de octubre, fecha para la cual había confesado.

En manera alguna resolvemos que un fiscal no pueda interrogar un acusado, ya sea antes o después de su arresto, durante un período razonable. *Stein* v. *New York*, supra, págs. 184–5; cf. escolio 11. Pero ese derecho y deber del fiscal obviamente no justifica la conducta del fiscal al "detener al acusado para investigación" durante tres días con sus noches sin acusarlo de algo, expedirse orden de arresto contra él o fijársele fianza. (12)

L. Rev. 315; Inbau, *The Confession Dilemma in the United States Supreme Court*, 43 Ill. L.Rev. 442, 448–51, 460; 53 Yale L.J. 758, 769; McCormick, supra, 274; Waite, *The Law of Arrest*, 24 Tex. L. Rev. 279, 296–98; 39 Calif. L. Rev. 96, 99–102. *Cf.* Art. II, Sec. 10, párr. 3 de nuestra Constitución que dispone que "Sólo se expedirán mandamientos autorizando . . . arrestos por autoridad judicial, y ello únicamente cuando exista causa probable . . ."

(12) El fical estaba técnicamente en lo cierto al decirle al acusado que no tenía derecho a abogado durante la investigación que él practicaba para determinar si debía acusarlo o no de asesinato en primer grado. *Pueblo* v. *Carmona*, supra; *Pueblo* v. *Montes*, supra; *Pueblo* v. *Travieso*, supra. Pero esa regla obviamente no quiere decir que un acusado potencial pueda ser "detenido para investigación" durante días sin una orden de arresto o una fianza y sin serle permitido consultar con su abogado. Dentro de un término razonable después de la "detención" del acusado, era el deber del

█ Lo que hemos dicho deja claro que el acusado hizo su confesión escrita mientras estaba bajo detención ilegal. Este hecho, por sí solo, no infringe el debido procedimiento federal. Sin embargo, es un factor importante que se toma en consideración, junto a todos los demás hechos, para determinar si una confesión se ha obtenido mediante coacción y es por tanto inadmisible por motivos constitucionales. *Stein* v. *New York*, supra, págs. 187–8; *Stroble* v. *California*, 343 U. S. 181, 197; *Gallegos* v. *Nebraska*, supra, pág. 65.

Al tratar de determinar si la confesión escrita fué obtenida mediante coacción psicológica, no debemos menospreciar la importancia del hecho de que la misma se hizo mientras el acusado estaba incomunicado bajo detención ilegal durante tres días. Investigaciones imparciales han demostrado que "[un] gran porciento de las confesiones obtenidas indebidamente ocurre mientras el sospechoso está 'congelado' en violación de los estatutos sobre examen preliminar ante un magistrado." Wicker, supra, pág. 511. "Si bien la detención ilegal frecuentemente es una mera forma de ganar tiempo en la investigación, también puede ser eficaz en 'ablandar' al detenido y en inclinarlo a que confiese."[13] Y el Juez Asociado Douglas, concurriendo en *Watts* v. *Indiana*, supra, describe gráficamente a la pág. 57 lo que puede ocurrir en tales circunstancias: "El hombre fué detenido hasta que se quebró su voluntad. Entonces y sólo entonces fué que se llevó a examen preliminar y se le dió la protección que fija la ley para todo acusado. La detención sin examen preliminar es un método usado frecuentemente para tener al acusado bajo el control exclusivo de la policía. Ésta puede entonces funcionar a su conveniencia. El acusado está enteramente a su mer-

---

fiscal expedir una orden de arresto y fijarle fianza en seguida. Y en cuanto esto se hacía, el acusado tenía derecho a consultar inmediatamente con su abogado, bien en la cárcel pendiente de prestar fianza o luego de salir bajo ella.

[13] *National Commission on Law Observance and Enforcement—Report on Lawlessness in Law Enforcement*, según se cita en Emerson y Haber, supra, pág. 107.

ced. No tiene la ayuda de abogados ni la de sus amigos . . . .
El procedimiento genera confesiones por coacción. Es la raíz
del mal. Es el procedimiento sin el cual la inquisición no
puede florecer en el país." ([14])

A la luz de lo anteriormente expuesto, pasemos a la cues-
tión de si hubo en este caso otra evidencia de coacción psico-
lógica en adición a la circunstancia de que la confesión fué
hecha mientras el acusado estaba bajo detención, ilegal.

*(c) ¿Fué la confesión escrita—Exhibit 48—obtenida me-
diante coacción psicológica debido a que el acusado fué inte-
rrogado sin interrupción sustancial desde las 10 de la noche
hasta las 4 de la mañana?*

█ El acusado sostiene que su confesión escrita fué ob-
tenida mediante coacción porque—según demuestran los he-
chos incontrovertidos—en la noche del 9 al 10 de octubre fué
*interrogado ininterrumpidamente por el fiscal desde las 10
de la noche hasta las 4 de la mañana, hora en la cual final-
mente él hizo la confesión contenida en el Exhibit 48.*

El problema aquí es si bajo las circunstancias concurren-
tes la confesión fué "claramente el producto del proceso de

---

([14]) El Juez Asociado Sr. Douglas emplea este lenguaje en apoyo de su
criterio de minoría al efecto de que la confesión debe excluirse por el solo
fundamento de que la misma se hizo mientras el acusado estaba bajo deten-
ción ilegal. Pero es también aplicable en gran parte a la situación cuando
ese hecho es una de las circunstancias que son apreciadas al determinar
si la confesión fué obtenida por coacción. En igual forma su lenguaje disi-
dente en *Stroble* v. *California*, supra, pág. 204, es pertinente aquí: "Mien-
tras la policía . . . mantenga a individuos incomunicados, las confesiones
obtenidas por coacción infestarán nuestros juicios criminales en violación de
los postulados del debido procedimiento de ley."

El Tribunal Supremo recientemente reexpuso este mismo principio.
"Dilatar el examen preliminar, mientras se tiene al sospechoso incomuni-
cado, facilita y de ordinario acompaña el uso de métodos de 'tercer grado'.
Por consiguiente, consideramos tales acontecimientos como evidencia cir-
cunstancial pertinente en la investigación sobre coacción física o psicoló-
gica." *Stein* v. *New York*, supra, pág. 187. (La Corte añadió que el ju-
rado en el caso de *Stein* fué instruído para que considerara esta evidencia
de detención ilegal como una de las circunstancias que tienden a demostrar
coacción. En el presente caso no se dió tal instrucción, lo que, según más
adelante indicamos en la Parte VI, constituyó un error de parte del tribunal
sentenciador.)

succión del interrogatorio y por tanto el reverso de la voluntariedad". *Watts* v. *Indiana*, supra 53. O, dicho en otras palabras, si el acusado, al momento de confesar, gozaba de "libertad mental" para admitir o negar su participación en el crimen. *Ashcraft* v. *Tennessee*, 322 U. S. 143, 154; *Lyons* v. *Oklahoma*, 322 U. S. 596, 602; *Lisenba* v. *California*, supra, 241. Obviamente, sobre esta cuestión, no hay dos casos exactamente iguales en sus hechos. En cada caso debe determinarse si, bajo todas las circunstancias, el acusado específico —no ninguna otra persona que hubiera reaccionado en forma distinta— fué de hecho coaccionado. Debe haber ". . . una apreciación de las circunstancias frente a la capacidad de resistencia de la persona que hace la confesión. Lo que sería demasiado para el débil de voluntad o de mente, podría ser ineficaz contra un criminal de experiencia." *Stein* v. *New York*, supra, pág. 185. Esta es tarea difícil y a menudo elusiva, ya que envuelve la apreciación de la habilidad subjetiva del confeso específico para soportar las alegadas presiones de coacción.

■■■ Si el acusado descansó en este caso únicamente en el hecho de que el fiscal le interrogó durante 6 horas, no podríamos a la luz de los casos del Tribunal Supremo, resolver que la confesión escrita fué obtenida mediante coacción psicológica como cuestión de derecho. En el caso de *Ashcraft* el acusado fué interrogado continuamente durante treinta y seis horas con una luz sobre su cabeza por una serie de funcionarios que no le permitieron dormir o descansar. Se resolvió que esto era "coacción inherente". Pero los hechos en este caso son diferentes: Fournier durmió el 7 y el 8 de octubre y comió cuando quiso; se le interrogó durante sólo seis horas en la noche del 9 de octubre por una sola persona, el fiscal Viera, que estuvo ocupado practicando la investigación y quien aparentemente no durmió ni el 7 ni el 8 de octubre. El caso de *Haley* v. *Ohio*, 332 U. S. 596, envolvía un muchacho de color de quince años de edad, timorato e ignorante, que fué arrestado a la medianoche e interrogado por

una serie de policías desde esa hora hasta las 5 de la mañana. Al declarar que la confesión fué producto de la coacción, como cuestión de derecho, la Corte Suprema dió gran énfasis al hecho de que el acusado era "sólo un muchacho". Por el contrario, Fournier era un próspero hombre de negocios, experimentado, maduro, educado e inteligente. En los casos de *Watts* v. *Indiana*, supra; *Turner* v. *Pennsylvania*, 338 U. S. 62; y *Harris* v. *South Carolina*, 338 U. S. 68, se mantuvo a los acusados incomunicados en violación de la ley estatal y fueron expuestos a largos períodos de interrogatorio por funcionarios que se alternaron durante varios días. El acusado en el presente caso no estuvo sujeto a esa clase de presión física y mental.

En el caso de *Lisenba* v. *California*, supra, se resolvió que una confesión no se obtuvo mediante coacción psicológica, como cuestión de derecho, no empece el hecho de que el acusado, hombre maduro e inteligente, con considerable experiencia en los negocios, había estado detenido ilegalmente y estuvo sujeto a un interrogatorio prolongado durante períodos de tiempo mayores que el de este caso.([15]) Y el Tribunal Supremo dijo recientemente que ". . . nunca hemos ido tan lejos como para resolver que . . . el interrogatorio prolongado de un prisionero automáticamente hace que la evidencia que él aporte en sus contestaciones sea evidencia constitucionalmente prohibida." *Stein* v. *New York*, supra, pág. 185. Véase también *Stroble* v. *California*, supra; *United States* v. *Carignan*, supra; *Gallegos* v. *Nebraska*, supra 65–68; *Ward* v. *Texas*, 316 U. S. 547, 555; *State* v. *Vaszorich*, 98 A.2d 299 (N.J., 1953); *Reeves* v. *State*, 68 So.2d 14 (Ala., 1953); *Grear* v. *State*, 71 A.2d 24, 31 (Md., 1950); Miller, supra, pág. 58.([16])

([15]) Debe notarse, sin embargo, que la Corte dijo que las "prácticas fuera de ley" de los funcionarios trajeron este caso "cerca de la línea" (pág. 240).

([16]) Es difícil reconciliar la decisión en *Ashcraft* v. *Tennessee*, 322 U. S. 143, al efecto de que 56 horas de interrogatorio es "coacción inherente" con la manifestación del caso de *Stein* v. *New York*, supra, pág. 184, de que "El interrogatorio no es inherentemente coercitivo, como lo es la sanción

En vista de los casos del Tribunal Supremo de los Estados Unidos sobre esta cuestión, no podemos decir que el mero hecho de que Fournier fuera interrogado insistentemente durante seis horas en una noche, hizo de por sí que su confesión escrita fuera obtenida mediante coacción psicológica *como cuestión de derecho.* Pero debe recordarse que el acusado no descansa únicamente en lo prolongado de este interrogatorio. Descansa también (1) en el hecho de que la confesión se hizo después de su detención ilegal durante tres días, y (2) en otro—el más importante—factor, al cual pasamos ahora.

*(d) ¿Fué la confesión escrita—Exhibit 48—obtenida por coacción psicológica debido a la manera y a la naturaleza del interrogatorio que la precedió, según surge del Exhibit A del acusado?*

 Alega el acusado que la confesión escrita contenida en el Exhibit 48 fué inducida indebidamente por la manera y naturaleza del interrogatorio prolongado—según la evidencia el Exhibit A del acusado—al cual estuvo sujeto durante un número de horas antes de que hiciera las manifestaciones halladas en el Exhibit 48.

Como hemos visto, cuando el fiscal ofreció en evidencia la declaración jurada que luego pasó a ser el Exhibit 48, el acusado solicitó que se obligara al fiscal al mismo tiempo a ofrecer la declaración jurada anterior hecha por el acusado la misma noche. El tribunal sentenciador se negó a esto. En su consecuencia, el acusado fué obligado a presentar dicha declaración más tarde como su Exhibit A. El resultado fué que el tribunal sentenciador no tenía ante sí el Exhibit A en el momento en que resolvió que el Exhibit 48 no era una confesión obtenida mediante coacción como cuestión de derecho. Convenimos con el acusado en que éste fué un serio

---

física." Podría ser, sin embargo, que en la segunda afirmación la corte se estuviera refiriendo solamente al interrogatorio sin ningún otro factor que, adicionado al interrogatorio, resultaría en coacción como cuestión de derecho. De cualquier modo, a nuestros fines, basta decir que 6 horas de interrogatorio, sin más, no sería inherentemente coercitivo en un hombre como Fournier.

error ya que el contenido del Exhibit A era altamente pertinente a la cuestión de si el Exhibit 48 fué una confesión obtenida mediante coacción como cuestión de derecho. ([17]) Y es nuestro deber examinar el Exhibit 48 a la luz del Exhibit A, no empece el hecho de que el tribunal sentenciador no lo hizo.

De ordinario el interrogatorio preliminar por un funcionario que ejerce presión sobre un acusado para obtener una confesión de él no se toma taquigráficamente. Afortunadamente para el acusado, parte—aparentemente casi todo—de este incidente anterior fué tomado por el taquígrafo y se halla en el Exhibit A. Un examen de éste demuestra de su faz que el fiscal ejercía gran presión sobre el acusado a fin de obtener la confesión contenida en el Exhibit 48. Por motivaciones propias, el fiscal invirtió largas horas en una discusión extensa e impertinente con el acusado. Entonces recordó a éste que lo había llevado al Cementerio Fournier la tarde del 8 de octubre para ver el cadáver de Iris Nereida luego de haber sido éste hallado en la fosa núm. 4 en la mañana de dicho día. (Debe recordarse que el Detective Torres declaró que en la fosa el fiscal le preguntó al acusado "¿de quién es ese cadáver?"; que mientras el acusado "miraba hacia la tumba, se mantenía nervioso y turbado"; y que cada vez que se le pedía que identificara el cadáver, él temblaba y miraba hacia la tumba.) Y procedió a mostrarle al acusado una fotografía del cadáver de Iris Nereida. Esta fotografía consta en autos y obviamente surtió un efecto espeluznante en el acusado, exesposo de Iris Nereida. En el caso de *Lyons* v. *Oklahoma*, supra, se condena una conducta similar, dirigida a intimidar, aterrar y en última instancia forzar testimonio incriminato-

---

([17]) Como más adelante se verá, el mismo procedimiento defectuoso tuvo lugar con referencia a la confesión oral de San Antón. El fiscal invirtió su prueba y ofreció la confesión oral de San Antón antes de ofrecer el Exhibit 48. Hizo esto no empece el hecho de que la declaración contenida en el exhibit 48 se hizo por el acusado antes de hacer la declaración de San Antón. Como resultado de ello, otra vez el tribunal sentenciador pasó sobre la cuestión de si una confesión fué obtenida mediante coacción, como cuestión de derecho, sin tener todas las circunstancias concurrentes ante sí. Véase el escolio 33.

rio de un sospechoso. En dicho caso era un hecho (págs. 599–600) ". . . incontrovertido que la investigación continuó hasta las 2 y media de la mañana antes de que se obtuviera una confesión oral y de que los que lo interrogaban le pusieron a Lyons en el regazo un platón con los huesos de la víctima para *sacarle la confesión*." (Bastardillas nuestras.) A la pág. 602 la Corte califica esta conducta como ". . . métodos impropios . . . empleados para obtener una confesión . . ." Y la opinión disidente demuestra que la Corte estuvo unánime sobre este punto—cosa rara en este campo.([18])

A raíz de este macabro episodio—calculado deliberadamente para quebrarle la voluntad al acusado—el fiscal inmediatamente se enfrascó en una serie de preguntas agresivas que hemos expuesto al pie de la letra en nuestro resumen en la Parte I del Exhibit A. Aun los impasibles autos reflejan vivamente el martilleo de estas preguntas mientras el fiscal fustigaba al acusado entre otras cosas sobre el clavo y el cinturón hallados en el cadáver; sobre la fosa que él mismo cavó; sobre el cadáver, con el cinturón amarrado en el cuello, y el cual transportó en su automóvil y enterró en la fosa; y sobre las manchas de sangre en su automóvil. El fiscal ofreció enseñarle al acusado, uno a uno, el clavo, el cinturón y el pañuelo que, según el fiscal, había usado el acusado para estrangular a Iris Nereida. Del mismo modo, le ofreció mostrarle los dos zapatos, el brazalete, los *Kleenex* y la cartera propiedad de Iris Nereida que fueron enterrados con ella. Y después de cada pregunta hecha en la forma antes descrita, el fiscal manifestaba que el acusado no contestaba. Además, durante este coloquio—el cual en su etapa final puede mejor describirse como un monólogo del fiscal—éste hacía las sorprendentes manifestaciones como "Tiene que contestarme las preguntas una por una" y "Tiene obligación

---

([18]) En el caso de *Lyons* la confesión en cuestión no se usó en el juicio. El Tribunal Supremo caracterizó esta confesión según se indica en el texto al considerar su posible efecto coercitivo sobre una confesión posterior que fué presentada en evidencia. Véase la Parte IV.

de contestarme." ([19]) Y cuando el acusado afirmaba que "Tengo mis derechos de no contestar", ocurrió lo siguiente: "P. ¿Yo lo estoy acusando a usted? R. Sí, son acusaciones. P. ¿Del asesinato de Iris Nereida Hernández que fué su ex-esposa? R. Usted me está acusando y como yo no tengo palabras en término como contestarle. P. *Contésteme.* R. Tiene que ser un abogado. P. Usted no tiene derecho a estar asistido de un abogado en este acto." ([20]) (Bartadillas nuestras.)

El Exhibit A consta de 84 páginas, mientras que el Exhibit 48 sólo tiene 23. El fiscal y el detective Torres declararon que el acusado hizo también algunas manifestaciones orales durante la noche. Obviamente el coloquio entre el fiscal y el acusado que aparece en el Exhibit A tomó la mayor parte de la noche del 9 al 10 de octubre de 1950, y la confesión—Exhibit 48—surgió al amanecer o cerca de éste. De los autos no surge qué intervalo de tiempo, si alguno hubo, transcurrió entre las dos declaraciones. Y esto no se establece por el mero hecho de que el fiscal, a sus propios fines, ordenara a su taquígrafo que las transcribiera separadamente e hiciera al acusado firmar sólo el Exhibit 48. Tampoco hubo explicación alguna ofrecida por el Pueblo sobre por qué el acusado súbitamente cambio su actitud desafiante que se desprende del Exhibit A y humildemente hizo la confesión contenida en el Exhibit 48. De los autos ante nos no es posible concluir otra cosa que no sea que la confesión en el Exhibit 48 fué un producto directo de la naturaleza y contenido del

---

([19]) El acusado, como se ha indicado en la Parte III (*b*), no era un testigo, sino un sospechoso arrestado, que tenía derecho a invocar el privilegio contra la autoincriminación.

([20]) La regla a la cual el fiscal se refirió—que un acusado no tiene derecho a abogado durante una investigación—no disculpa su conducta al mantenerlo incomunicado durante tres días y al insistir en que el acusado contestara sin el consejo de un abogado. Si hubiera sido un testigo, Fournier hubiera tenido derecho a inmunidad por su testimonio. *Batalla* v. *Corte de Distrito*, supra; *cf*. Ley núm. 3 de 18 de marzo de 1954. Como acusado, no podía ser obligado a contestar en vista del privilegio contra la autoincriminación, y tenía derecho a que se le fijara. fianza prontamente, con derecho a asistencia de abogado inmediatamente. Véase el escolio 12.

interrogatorio del Exhibit A y que ambas declaraciones fueron, a los fines de determinar la voluntariedad de la confesión contenida en el Exhibit 48, una sola y continua transacción.

El Exhibit 48 evolucionó directamente y fué parte de la misma línea de conducta del fiscal que tan patentemente se refleja en el Exhibit A. De conformidad con esto, surge la cuestión de si el Exhibit 48, debido a esta conducta, fué una confesión obtenida mediante coacción que infringe el debido procedimiento federal. Podría aducirse un argumento formidable, por los motivos aquí expuestos, al efecto de que— aun sin ninguna de las otras circunstancias de este caso—el Exhibit 48 era una confesión obtenida mediante coacción porque, según se desprende del Exhibit A, la misma fué producida por el "proceso de succión del interrogatorio" en el cual el acusado fué privado de su "libertad mental" para hacer una "elección razonada" en cuanto a si debía hablar o permanecer callado. *Lee* v. *Mississippi*, 332 U. S. 742, 745, y casos citados en el escolio 2. Sin embargo, dejamos a un lado esta cuestión. Preferimos basar nuestra decisión en todos los factores de este caso, incluyendo aquellos descritos en los apartados (*b*), (*c*) y (*d*) de esta Parte de nuestra opinión.

*(e) ¿Fué la confesión escrita—Exhibit 48—obtenida mediante coacción psicológica debido a la combinación de circunstancias de que el acusado, luego de estar detenido ilegalmente durante tres días, fuera interrogado ininterrumpidamente durante 6 horas en la forma que surge del Exhibit A?*

Para mayor claridad, hemos discutido cada una de las tres preguntas envueltas en los apartados (*b*), (*c*) y (*d*) por separado. Pero estos incidentes no pueden aislarse y tratarse como si cada uno ocurriera sin conexión alguna con los otros. En análisis final, debemos examinarlos conjuntamente como constitutivos de una cadena de circunstancias de las cuales debemos sacar nuestra conclusión.

Cada uno de estos episodios que hemos discutido en los apartados (*b*), (*c*) y (*d*) es un formidable eslabón en la cadena de eventos sobre los que descansa el acusado en apoyo

de su contención de que el Exhibit A constituye una confesión obtenida por indebida coacción. El hecho de que se haga una confesión mientras se está bajo detención ilegal no vicia, por sí solo, por los motivos expuestos en la Parte II, la confesión. Pero la detención ilegal tiende a germinar confesiones por coacción, y el mero hecho de la detención ilegal es un factor importante para determinar si una confesión fué obtenida por coacción. Véase el texto de la opinión antes del escolio 14. Aquí dicho factor se agravó por el largo período de la detención ilegal—más de tres días. No importa cuán consideradamente se trate a una persona en relación con comidas y con su sueño, la detención ilegal durante tres días, combinada como en este caso con la negativa a no dejarle ver a sus amigos, familiares o abogados, es por sí misma una forma de presión que, junta con las otras cicunstancias, puede resultar en una confesión inducida indebidamente.

▮ Tampoco, el hecho escueto del interrogatorio ininterrumpido de este acusado durante 6 horas durante una noche —hombre educado, maduro, de experiencia y con buena posición social—no haría por sí misma constitucionalmente vulnerable la confesión producto de tal interrogatorio. Pero la situación se torna más seria precisamente porque este interrogatorio fué la culminación de una línea de conducta que empezó con la detención del acusado por instrucciones del fiscal sin la más leve sombra de legalidad. De suerte que tenemos a un acusado que es intensamente interrogado durante un período ininterrumpido de 6 horas una noche frente a 3 días de detención ilegal que, como se ha visto en el párrafo anterior, es de por sí una forma de presión.

▮ Finalmente, y lo más importante de todo, tenemos la clase de interrogatorio que encontramos en el Exhibit A que hemos descrito en detalle en el apartado (d) y que inmediatamente precedió a la confesión hallada en el Exhibit 48. Un hombre es detenido ilegalmente durante tres días. Se le interroga por toda una noche. Esto ocurre después de haber sido llevado a un cementerio y enseñádole el cadáver de su

ex-esposa, estrangulada y enterrada clandestinamente un mes antes. Se le enseñan fotografías del cadáver y de otros objetos usados para matarla y que fueron enterrados con el cadáver. Se le acusa una y otra vez en la forma más agresiva de haber asesinado a su ex-esposa y se le confronta paso por paso con la detallada teoría de cómo supuestamente asesinó y enterró a su ex-esposa. En las últimas etapas del interrogatorio el fiscal hace constar en el récord que el detenido no contesta ninguna de estas imputaciones eufemísticamente puestas en forma de preguntas. Se le dice por el fiscal —contrario a la ley—"tiene obligación de contestarme" y de que no tiene derecho a asistencia de abogado. Y entonces súbitamente—sin explicación alguna en el récord—el detenido se torna dócil y sumiso y aparentemente hace una completa admisión de su culpabilidad.([21])

Si bien cada caso depende de sus propios hechos, el Tribunal Supremo en los casos aquí citados ha intentado formular una norma para determinar si una confesión ha sido obtenida mediante coacción psicológica. Por ejemplo, en *Watts* v. *Indiana*, supra, la opinión del Juez Asociado Sr. Frankfurter dice como sigue a las págs. 53, 54: "Para que una declaración sea voluntaria no tiene necesariamente que ser espontánea. Pero si es el producto de una presión continua de la policía la misma no surge de una libre elección. Cuando un sospechoso hable porque está agobiado, es inmaterial si ha sido objeto de sanción física o mental. La rendición eventual al interrogatorio bajo tales circunstancias es claramente

---

([21]) En *Haley* v. *Ohio*, supra, la opinión de cuatro jueces dió escasa significación a una manifestación al efecto de que bajo las circunstancias de dicho caso un confeso fué advertido de sus derechos constitucionales (pág. 601): "Además, no podemos dar peso alguno a disposiciones que meramente formalizan requisitos constitucionales. Fórmulas de respeto hacia salvaguardas constitucionales no pueden prevalecer sobre los hechos de la vida que las contradicen. Las mismas no pueden convertirse en un disfraz para prácticas inquisitoriales y hacer ilusorio el debido procedimiento de ley . . .".

el producto del proceso de succión del interrogatorio y por tanto el reverso de la voluntariedad. Tendríamos que cerrar nuestros ojos al significado escueto de lo que surge aquí para poder negar que esto fué un plan premeditado para conseguir una confesión mediante la presión de un interrogatorio implacable. La misma calidad de implacable de tal interrogatorio implica que es mejor para el detenido contestarlo que insistir en la negativa a contestar que es su derecho constitucional. Convertir la detención de un acusado en un procedimiento de extraerle evidencia que no podría sacársele en corte abierta con todas sus salvaguardas, es tan grave abuso del poder de efectuar arrestos como para infringir las normas procesales del debido procedimiento." (22)

Los hechos incontrovertidos de este caso—examinados a la luz de la anterior fórmula—demuestran que la voluntad del acusado fué abrumada y que su confesión—Exhibit 48—le fué extraída y no representaba la expresión de su elección libre y razonada. Véase *People* v. *Leyra*, 98 N.E. 2d 553, 559 (N. Y. 1951).(23) Es inescapable la conclusión de que la forma y naturaleza del interrogatorio según se desprende del Exhibit A—viniendo después de (*a*) la detención ilegal y su incomunicación durante tres días, y (*b*) del interrogatorio continuo durante seis horas por toda la noche, durante el cual el fiscal le dijo al acusado que venía obligado a declarar y que no tenía derecho a asistencia de abogado—produjeron al amanecer una confesión, Exhibit 48, que era obtenida me-

---

(22) Dos jueces concurrieron en esta opinión; otros tres concurrieron en la decisión de que la confesión de que se trataba fué obtenida mediante coacción.

(23) En el caso de *Leyra* se revocó una convicción por la Corte de Apelaciones de Nueva York, porque ésta llegó a la conclusión que una confesión presentada en evidencia fué obtenida mediante coacción como cuestión de derecho. Si bien los hechos de dicho caso son un poco diferentes, el mismo principio aquí envuelto le fué aplicado porque la confesión (pág. 559) ". . . tuvo lugar en un ambiente de presión extrema. . . [con] . . . la intención deliberada de extraer una confesión mediante presión incesante . . . [de] . . . un interrogatorio continuo del agotado acusado." Para la historia posterior del caso de *Leyra*, véase el escolio 37.

diante coacción psicológica como cuestión de derecho.([24]) Resolver lo contrario sería eludir nuestra responsabilidad.([25])

Sabemos que los autos contienen sustancial evidencia corroborativa que, de ser creída por el jurado, tiende a demostrar que muchas de las afirmaciones de la confesión escrita son ciertas. Pero el Tribunal Supremo una y otra vez ha enfatizado que tal comprobación no subsana las infracciones del debido procedimiento de ley que producen una confesión obtenida por coacción. ". . . El debido procedimiento de ley es una garantía constitucional sintetizada del respeto hacia aquellas inmunidades personales que, como dijo por la Corte el Juez Asociado Sr. Cardozo en dos ocasiones, están 'tan arraigadas en las tradiciones y en la conciencia de nuestro pueblo que son consideradas como fundamentales', *Snyder* v. *Massachusetts*, 291 U. S. 97, 105, o se encuentran 'implícitamente en el concepto de una libertad ordenada'. *Palko* v. *Connecticut*, 302 U.S. 319, 325." *Rochin* v. *California*, supra, pág. 169. De conformidad con esto, el debido procedimiento de ley no ". . . ignora los medios por los cuales se obtiene evidencia que de otro modo es pertinente y digna de crédito." *Id.*, pág. 172. Por el contrario, como se dijo en *Lisenba* v. *California*, supra, pág. 236: "El propósito del requisito del debido procedimiento no es excluir evidencia presuntamente falsa, sino evitar injusticias fundamentales en el

([24]) La manifestación del Lic. Gaztambide que hemos citado en nuestro resumen del testimonio fué admitida en evidencia en el momento en que se presentaba prueba en cuanto a la voluntariedad de la confesión oral de San Antón. En su consecuencia discutimos su admisibilidad en la Parte V. Pero debe indicarse que el efecto perjudicial de la misma indudablemente se extendió no solamente a la confesión oral si que también al Exhibit 48, que como hemos visto fué admitido después que el tribunal sentenciador admitió la confesión oral no empece el hecho de que la confesión en el Exhibit 48 fué hecha antes que la oral.

([25]) La Corte Suprema recientemente insinuó que algunas cortes estatales ". . . sienten un sentido menos fuerte de responsabilidad para proteger a los acusados en los casos de confesiones" bajo la teoría de que la Corte Suprema tomará acción correctiva si el caso eventualmente llega a ella. *Stein* v. *New York*, supra, pág. 180. Pero, como se dijo en el caso de *Stein*, la responsabilidad primaria en salvaguardar los derechos constitucionales de tales acusados descansa en las cortes estatales.

uso de evidencia, bien sea ésta cierta o falsa." Y en *Rochin* v. *California,* supra, a las págs. 172–73 la corte se refirió a ". . . la serie de casos recientes que han puesto en vigor el principio constitucional de que los Estados no pueden basar convicciones en confesiones, no importa cuán comprobadas sean, obtenidas mediante coacción . . ." Añadió a la pág. 173: ". . . El uso de confesiones orales involuntarias en los juicios criminales estatales es constitucionalmente detestable no sólo porque no se puede depender de ellas. Son inadmisibles bajo la cláusula del debido procedimiento aun cuando las manifestaciones en ellas contenidas puedan ser probadas independientemente como ciertas . . .". Al mismo efecto, *Haley* v. *Ohio,* supra; *Watts* v. *Indiana,* supra; *Ward* v. *Texas,* supra; *Ashcraft* v. *Tennessee,* 322 U. S. 143; *Turner* v. *Pennsylvania,* supra; *Harris* v. *South Carolina,* supra; Allen, supra, pág. 19; Miller, supra, pág. 55.

▇▇▇ Si bien el Pueblo no levanta la cuestión, hemos considerado la posibilidad de que el acusado "adoptó" el contenido del Exhibit 48 y con ello eliminó del caso la cuestión de si ésta era una confesión voluntaria. Como hemos visto, cuando el Pueblo terminó su caso, el abogado del acusado manifestó que su teoría era que el acusado admitía que la muerte de Iris Nereida ocurrió como aquélla se describe en el Exhibit 48. Además, la forma en que se condujo la defensa demuestra con bastante claridad que el acusado trataba de establecer no que él era inocente sino que a lo sumo era culpable de homicidio voluntario porque había dado muerte a Iris Nereida en un arrebato de cólera. Todo el testimonio del acusado se dirigió a estos fines: la única evidencia ofrecida a favor del acusado, aparte del Exhibit A, fué testimonio que pretendía probar que él era emocionalmente inestable y que por consiguiente estaba más propenso a realizar un acto en un arrebato de cólera que una persona emocionalmente normal.[26]

[26] Al anunciar esta teoría del acusado y al limitarse a un intento de obtener un veredicto de homicidio en vez de asesinato en primer grado, los abogados del acusado, bajo las circunstancias concurrentes, no violaron

Wigmore expresa el criterio, citando *State* v. *Johnny*, 87 Pac. 3, 7 (Nev., 1906), y *Parker* v. *State*, 238 S.W. 943, 948-9 (Tex., 1922), al efecto de que "Una confirmación posterior por el reconocimiento *del propio acusado* de la corrección de la confesión debe . . . relevar . . . de efectuar investigación alguna . . . con respecto a la voluntariedad en general de la confesión .. . .". Y, a nuestros fines, no vemos diferencia sustancial entre un caso en que un acusado sube a la silla testifical y repite parte del contenido de una confesión y este caso donde el acusado en efecto hace la misma cosa, admitiendo la veracidad de parte de una confesión a través de su abogado sin subir a la silla testifical y con ello evadir el contrainterrogatorio. Sin embargo, el Tribunal Supremo no ha pasado sobre esta cuestión. Y no está claro si convendría con Wigmore. Existe la posibilidad de que la corte pudiera resolver—contrario al criteiro expresado por Wigmore—que se comete error que da lugar a la revocación como cuestión de debido procedimiento de ley si se admite en evidencia una confesión obtenida mediante coacción, aun cuando el acusado luego la "adopte" durante la presentación de su prueba. *Cf. Chambers* v. *Florida*, supra, escolio 2, en el que la sentencia revocada incluía a tres acusados que se declararon culpables; *Ashcraft* v. *Tennessee*, 327 U. S. 274. En vista de lo incierta que es la ley sobre este punto, dejamos esta cuestión específica sin resolver.[27] Por el contrario, suponemos, sin decidirlo, que el criterio de Wigmore es el correcto y que la "adopción" por un acusado de una confesión elimina la cuestión de su voluntariedad.

---

(*a*) ni las reglas establecidas en *Nieves* v. *Jones, Jefe Interino Penitenciaría*, 72 D.P.R. 287, y *Jiménez* v. *Jones*, 74 D.P.R. 260, (*b*) ni la regla contra las manifestaciones no autorizadas de los abogados a nombre de un acusado, *cf*. Morgan, supra, Vol. II, pág. 237; 4 Wigmore, supra, sec. 1063, pág. 43, Sup. 1953, pág. 23; y Parte V donde discutimos las manifestaciones del Lic. Gaztambide.

[27] *Cf. Lee* v. *Mississippi*, supra; *Ashcraft* v. *Tennessee*, 322 U. S. 143, 153; *White* v. *Texas*, supra, págs. 531-2; y *People* v. *Leyra*, supra, en que se resuelve que un acusado que niega haber confesado no está con ello impedido de sostener que la supuesta confesión se obtuvo mediante coacción.

La principal dificultad aquí es que un examen cuidadoso de la manifestación del abogado del acusado demuestra que él de hecho no adoptó la confesión—Exhibit 48—*in toto*. Por el contrario, meramente admitió que la muerte de Iris Nereida ocurrió como allí se describe. Pero el Exhibit 48 contiene un número de manifestaciones seriamente incriminatorias hechas por el acusado sobre cuestiones tales como la conducta posterior del acusado al disponer del cadáver. Y esta conducta, de haber ocurrido, tiende a sostener la teoría del Pueblo al efecto de que el acusado era culpable de asesinato en primer grado, en contraste con la contención del acusado de que a lo sumo él era culpable de homicidio voluntario. El acusado vigorosamente se opuso a la admisión del Exhibit 48 por el fundamento de que era una confesión obtenida mediante coacción. Que esta cuestión quedó en el caso, aun después de que el acusado expusiera su teoría e introdujera evidencia para sostenerla, lo demuestra la instrucción al jurado en el caso de que resolviera que el Exhibit 48 fué involuntario. [28] El hecho de que el acusado admitiera en su teoría que una parte de la confesión era cierta—la forma en que ocurrió la muerte de Iris Nereida—no eliminó del caso la cuestión de que el Exhibit 48—que contenía otras afirmaciones incriminatorias—era una confesión obtenida mediante coacción en violación del debido procedimiento federal. [29]

[28] Discutimos esa instrucción en la Parte VI. El Pueblo no alega que el Exhibit 48 era una admisión más bien que una confesión, *Pueblo* v. *Dones*, 56 D.P.R. 211, 220. Por tanto no nos detenemos a determinar si la regla que prohibe las confesiones mediante coacción bajo la cláusula del debido procedimiento es de aplicación a admisiones mediante coacción. Compárense *Stein* v. *New York*, supra, págs. 162–3, escolio 5, y *Pueblo* v. *Rodríguez*, 65 D.P.R. 530, con *Ashcraft* v. *Tennessee*, 327 U. S. 274; véase Morgan, supra, Vol. II, 245, 249, Dession, etc., *Drug-Induced Revelation and Criminal Investigation*, 62 Yale L.J. 315, 336. En el contexto de este caso, bajo la teoría tanto del Pueblo como del acusado, el contenido del Exhibit 48 en conjunto puede clasificarse solamente como una confesión.

[29] Aun cuando el Exhibit 48 no fuere objetable constitucionalmente porque el acusado lo adoptó, el hecho de que originalmente era una confesión mediante coacción sería todavía un factor influyente en este caso: aun tendría que determinarse si la coacción que produjo el Exhibit 48 se prolongó y resultó en San Antón en otra confesión oral mediante coacción, que era mucho más incriminadora que el Exhibit 48. Véase Parte IV.

No resolvemos que una confesión ha sido obtenida mediante coacción psicológica porque un fiscal persuada a un acusado para que confiese confrontándolo con la evidencia que ya tiene en su contra. La regla aplicable en tales casos se expone en *Stein* v. *New York*, supra, a las págs. 185, 186: "La conciencia interna de haber cometido un asesinato . . . y de verse confrontados con prueba de culpabilidad que ellos no podían negar ni explicar, es suficiente para explicar el por qué ellos prestaron las confesiones. Estos hombres no eran jóvenes, débiles, ignorantes o tímidos. . . . Por supuesto, esas confesiones no pueden ser voluntarias en el sentido de que los peticionarios deseaban hacerlas o que fueron completamente espontáneas, como las que se hacen al cura, al abogado, o al psiquiatra. Pero en ese sentido ninguna confesión es voluntaria . . . Las confesiones de Cooper y de Stein se hicieron obviamente cuando ellos se convencieron de que había terminado el baile y había llegado el tiempo de pagar al violinista. . . Ambas confesiones fueron 'voluntarias', en el único sentido en que lo puede ser una confesión prestada a la policía por una persona arrestada y sospechada." Ya hemos hecho constar claramente por qué las circunstancias de este caso fueron diferentes.

Fué un hecho poco afortunado el que el tribunal sentenciador no tuviera ante sí el Exhibit A cuando rehusó excluir el Exhibit 48. Quizás hubiera llegado a la misma conclusión a que llegamos nosotros si hubiera examinado los dos exhibits conjuntamente. De cualquier modo, por los motivos ya expuestos, el tribunal sentenciador cometió error al no excluir el Exhibit 48 por el fundamento de que éste era una confesión obtenida mediante coacción psicológica como cuestión de derecho y fué por consiguiente obtenida en violación del debido procedimiento federal. [30]

---

[30] Para la recopilación de casos y discusiones con respecto al problema de confesiones mediante coacción, véanse Emerson y Haber, supra, págs. 106–48; 3 Wigmore, supra, Sup. 1953, págs. 69–78; Wicker, supra, 5 Vand. L. Rev. 507, 515–20; Ladd, *Cases and Materials on Evidence*, págs. 427–8; *Annotation*, 93 L.ed. 115; *Supreme Court, 1952 Term*, 67 Harv. L.

## IV

*¿Era la confesión oral de San Antón inadmisible en evidencia por el fundamento de que la misma fué obtenida mediante coacción psicológica en violación de la ley?*

 El acusado sostuvo ante el tribunal sentenciador que su confesión oral de San Antón era inadmisible por ser una confesión obtenida mediante coacción. Sin embargo, no renueva ese argumento en apelación. La única contención que ahora presenta en relación con ello es que el tribunal sentenciador cometió error al admitirla toda vez que era una declaración oral "contemporánea" con la declaración escrita, Exhibit 48. Arguye el acusado que la confesión oral de San Antón debió haberse excluído en vista del hecho de que él ya había hecho una por escrito.[31] Descansa en *Pueblo* v. *Méndez*, 54 D.P.R. 195; *Pueblo* v. *Saltari*, 53 D.P.R. 893; *Pueblo* v. *Flores*, 17 D.P.R. 178. Pero estos casos claramente hacen constar que si bien testimonio oral no es admisible para demostrar el contenido de una declaración escrita, el hecho de que se hiciera una declaración escrita no excluye testimonio con respecto a otras declaraciones hechas oralmente. El testimonio de Casenave y de Ramírez Brau con respecto a la confesión oral no era por consiguiente inadmisible debido a que el acusado ya había hecho anteriormente una declaración escrita "contemporánea".

El acusado no sostiene en apelación que la confesión oral

Rev. 91, 118–20; Boskey y Pickering, *Federal Restrictions on State Criminal Procedure*, 13 U. Chi. L. Rev. 266, 282–95; Allen, supra, 48 N.W. U.L. Rev. 16; Matherne, supra, 22 Tenn. L. Rev. 1011; Wood, *Due Process of Law*, 1923–1949, págs. 218–37.

[31] El acusado también presenta este mismo argumento en relación con las manifestaciones orales que hiciera en la oficina del fiscal en la noche del 9 al 10 de octubre. Sin embargo, según leemos el testimonio del fiscal y el del detective Torres, las manifestaciones orales del acusado hechas en la noche del 9 al 10 de octubre—con excepción de las que se pusieron por escrito en los Exhibits 48 y A, que hemos considerado en el texto—no eran de significación sustancial alguna. Véase el escolio 1. Además, aun cuando supusiéramos lo contrario, cualesquiera manifestaciones orales incriminatorias hechas por Fournier entre el período en que hizo las de los Exhibits 48 y A serían inadmisibles por los motivos expuestos en la Parte III (*e*).

de San Antón fué obtenida mediante coacción psicológica. No obstante, esa cuestión es tan obvia y tan seria que la examinaremos motu proprio. *Cf. Brown* v. *Allen*, 344 U. S. 443; *Leyra* v. *Denno*, supra.([32]) Visto lo que hemos resuelto en la Parte III (e) al efecto de que la confesión escrita hecha durante la noche del 9 al 10 de octubre debió haberse excluído por obtenerse mediante coacción psicológica, surge ahora el problema con respecto a la admisibilidad de la confesión oral de San Antón. Si una confesión es hecha involuntariamente, una confesión posterior mientras el acusado está todavía bajo los efectos de las mismas influencias es también involuntaria. Además, surge la presunción o la inferencia al efecto de que estas mismas influencias han continuado. Esta presunción o inferencia pueden vencerse solamente probando fuera de duda razonable que las referidas influencias cesaron. *Leyra* v. *Denno*, supra, pág. 634; *Lyons* v. *Oklahoma*, supra, págs. 597, 600-3; *United States* v. *Bayer*, 331 U. S. 532, 540-1; *Malinski* v. *New York*, 324 U. S. 401, 410; *Reeves* v. *State*, 68 So. 2d 14, 18 (Ala., 1953); *People* v. *Thomlison*, 81 N.E. 2d 434 (Ill., 1948); 3 Wigmore supra, sec. 855, Sup. 1953, pág. 82.

La cuestión que se nos presenta aquí es si bajo la fórmula anterior el efecto de las actuaciones coercitivas que produjeron el Exhibit 48 se prolongó e hizo también que la confesión oral de San Antón fuera una obtenida mediante coacción como cuestión de derecho.([33]) Aquí otra vez, como en el

---

([32]) Es particularmente importante que examinemos esta cuestión en vista del hecho de que la confesión oral de San Antón era mucho más incriminadora que su confesión escrita hecha durante la noche anterior. En ésta dijo el acusado en efecto que su ex esposa estaba tratando de estrangularse ella misma con su cinturón y que en un arrebato de cólera él le agarró el cinturón y le dió vueltas. Por otro lado, en San Antón el acusado dijo que cuando él golpeó a Iris Nereida, ésta se quedó inconsciente y que entonces él le puso el cinturón alrededor del cuello y la estranguló empleando un clavo para darle vueltas al cinturón.

([33]) La corte sentenciadora no pasó sobre esta cuestión porque el Pueblo ofreció testimonio en relación con la confesión oral antes de ofrecer el Exhibit 48, no obstante el hecho de que la confesión en dicho exhibit precedió a la confesión oral. Sin embargo, la evidencia aducida ante el tri-

caso del Exhibit 48, debemos tener en cuenta dos proposiciones. La primera, ésta es tarea difícil y elusiva que envuelve la determinación subjetiva en cuanto al impacto de todas las circunstancias en un individuo específico— el acusado. La segunda, sólo los hechos incontrovertidos pueden tomarse en consideración para determinar si la confesión oral fué obtenida mediante coacción como cuestión de derecho.

El interrogatorio que resultó en el Exhibit 48 había concluído al amanecer, o aproximadamente a las 6 de la mañana.([34]) El viaje a San Antón se hizo a petición del acusado, quien tuvo que guiar al grupo que lo acompañaba ya que nadie más sabía dónde era la casa del acusado en San Antón. El acusado no fué esposado durante este viaje. Aproximadamente transcurrieron seis horas entre las dos confesiones.([35]) La confesión de San Antón se hizo en presencia de un número de periodistas, fotógrafos, detectives, policías y del fiscal. Mientras hacía la confesión de San Antón, Fournier estaba tranquilo, se expresaba en voz apacible, hablaba normal, y espontáneamente hizo su historia y describió actuando la escena de sacar el cadáver por la ventana. Mientras estuvo en San Antón las "actuaciones" del acusado eran completamente "libres", y estaba sereno por

bunal sentenciador en ausencia del jurado sobre la cuestión preliminar de la voluntariedad de la confesión oral, claramente demostró que durante la noche anterior el acusado había hecho manifestaciones escritas que tenían estrecha relación con la confesión oral en cuanto a tiempo se refiere. El tribunal sentenciador por consiguiente debió haber exigido al fiscal que produjera los Exhibits 48 y A y debió entonces resolver sobre la admisibilidad de la confesión oral a la luz de esos Exhibits. De cualquier modo, debemos ahora hacer frente al problema de si la confesión escrita obtenida mediante coacción vició la confesión oral posterior como cuestión de derecho.

([34]) Tomamos conocimiento judicial de que el 10 de octubre de 1950 el sol salió en San Juan a las 6:16 A. M.

El fiscal declaró que a las 4 de la mañana él estaba "en las postrimerías del examen directo y oral del acusado"; que todavía a las 4 A. M. él interrogaba al acusado; y que, después que el acusado le dijo que no contestaría sino en presencia de un abogado, continuó contestando, y esto fué al amanecer.

([35]) El testimonio fué que el grupo llegó a San Antón a las 11:30 A.M., y permaneció allí, mientras el acusado hacía su confesión, hasta las 12:30 ó 1 de la tarde.

completo. Los periodistas le hicieron todas las preguntas que quisieron y él las contestó presto. Las fotografías que se tomaron en San Antón para las cuales el acusado posó "libremente" demostraban que aparentemente estaba en calma, con dominio de sí mismo y en buenas condiciones físicas, y describió actuando la manera en que había dado muerte a Iris Nereida y había sacado el cadáver. El detective Torres encontró algunas hebras del cinturón de Iris Nereida en el sumidero después que Fournier le dijo en San Antón que las había puesto allí luego de matar a Iris Nereida. Mientras estuvo en San Antón el acusado fué fotografiado buscando un botón que se había caído del traje de Iris Nereida y que según dijo él había tirado detrás de la casa cuando la mató.

En vista de los hechos incontrovertidos que hemos expuesto en el párrafo anterior, no podemos resolver *como cuestión de derecho* que cuando Fournier hizo su confesión oral en San Antón estaba todavía bajo las influencias coercitivas que produjeron el Exhibit 48. Reconocemos que Fournier no había dormido durante la noche del 9 al 10 de octubre; que aparentemente sólo se le dió café de desayuno; que aún no había consultado con su abogado y permanecía bajo custodia; y que, según el fiscal, fueron a San Antón "para yo seguir interrogando sobre el terreno y con las cosas a la vista . . .". Estos últimos hechos corresponde al jurado apreciarlos para determinar si, *como cuestión de hecho,* la coacción que produjo el Exhibit 48 se había prolongado o por el contrario se había disipado al momento en que el acusado confesó en San Antón. Pero, distintos a las circunstancias bajo las cuales el acusado hizo su confesión escrita, los hechos no indican inequívocamente una sola contestación *como cuestión de derecho.* El tribunal sentenciador en consecuencia no cometió error al someterle al jurado la cuestión de si la confesión oral de San Antón fué obtenida mediante coacción, si bien como aparece de la Parte VI, sus instrucciones con referencia a la misma no fueron adecuadas.

Opinamos que los casos del Tribunal Supremo apoyan nuestra posición. El caso de *United States* v. *Bayer*, supra, no es de estricta aplicación ya que varios meses transcurrieron entre las dos confesiones en el mismo. El de *Lyons* v. *Oklahoma*, supra, se asemeja más al nuestro. En éste, un sospechoso que había estado en la cárcel durante 11 días, fué intensamente interrogado por casi toda la noche. Confesó cuando se le puso en el regazo un platón con los huesos de la víctima. A las 4 de la mañana se le llevó a la escena del crimen y se le continuó interrogando. Volvió a traérsele a la cárcel, y temprano en la tarde del mismo día se le llevó a un pueblo cercano. Luego, el mismo día, se le llevó a la penitenciaría donde entre las 8 y las 11 de la noche el alcaide obtuvo de él una confesión escrita. Sólo se usó en el juicio la segunda confesión y fué declarado culpable. El Tribunal Supremo se negó a resolver que, como cuestión de derecho, los defectos de la primera confesión viciaron la segunda.

El caso de *Lyons* es similar al presente en que el acusado nunca estuvo fuera de la custodia de las autoridades entre la primera confesión que se admite se obtuvo por coacción y la segunda. El hecho de que en el caso de *Lyons* transcurrieran doce horas o más entre las dos confesiones, frente a las seis horas aproximadas que transcurrieron en este caso, no hace que el caso de *Lyons* sea inaplicable a éste. Esto es particularmente cierto cuando añadimos en nuestro caso el factor de que, en vez de confesar el acusado como en el de *Lyons* a un alcaide solamente en una penitenciaría, Fournier lo hizo "libremente" en presencia de periodistas y de fotógrafos, quienes tomaron un número de fotografías de Fournier cuando describía actuando la manera en que cometió el crimen.[36]

---

[36] Si bien este hecho tiende a refutar la contención en cuanto a la voluntariedad, no aprobamos la conducta del fiscal de invitar a los periodistas a San Antón. Véase la Parte VII.

El caso de *Leyra* v. *Denno*, supra, es distinguible.([37]) Allí, un acusado que virtualmente había sido hipnotizado por un psiquiatra del estado para que hiciera una confesión, posteriormente hizo una serie de confesiones. Una de ellas fué hecha aparentemente pocos minutos después a un capitán de la policía; otra fué hecha inmediatamente después de ésta al socio del acusado en su negocio; la última fué hecha a dos fiscales auxiliares ". . . algunas horas después que el psiquiatra se hizo cargo del peticionario." 98 L.ed. pág. 952. El Tribunal Supremo resolvió que como cuestión de derecho, todas las confesiones posteriores adolecían del defecto de la primera. La Corte dijo en 98 L.ed. 952: "Contrario a las circunstancias del caso de *Lyons* v. *Oklahoma*, 322 U. S. 596, 602, 603, los hechos incontrovertidos en este caso son irreconciliables con la libertad mental del peticionario 'para confesar o negar su presunta participación en el crimen', y la relación de las confesiones . . . es 'tan estrecha que debemos decir que los hechos de una controlan el carácter de la otra . . .'. Todas eran simplemente partes de un procedimiento continuo."

En el caso de *Leyra* todas las confesiones se produjeron en ". . . rápida sucesión . . . dentro de un lapso como de cinco horas . . ." como resultado de la ". . . sumisión casi por trance . . ." del acusado a ". . . las artes de un psiquiatra

---

([37]) En el caso de *Leyra* la Corte de Apelaciones de Nueva York revocó la primera convicción por el fundamento de que la confesión hecha a un psiquiatra fué mediante coacción como cuestión de derecho y fué por tanto indebidamente admitida en evidencia. 98 N.E. 2d 553. La misma Corte confirmó una segunda convicción por el fundamento de que la corte sentenciadora no cometió error al negarse a excluir las confesiones posteriores por estar viciadas, como cuestión de derecho, por la primera confesión y al someter dicha cuestión al jurado. 108 N.E. 2d 673. El Tribunal Supremo denegó el certiorari en el último caso. 345 U. S. 918. El acusado radicó entonces una petición de hábeas corpus ante la Corte de Distrito de los Estados Unidos. Bajo la regla establecida en *Brown* v. *Allen*, 344 U. S. 443, la corte de distrito consideró la solicitud de hábeas corpus pero la declaró sin lugar. 113 F.Supp. 556. La Corte de Apelaciones confirmó la decisión de la corte de distrito, 208 F.2d 605. La Corte Suprema luego expidió auto de certiorari y revocó la sentencia de la Corte de Apelaciones denegando la solicitud de hábeas corpus. 347 U. S. 556, 98 L.ed 948.

de gran destreza." 98 L.ed. pág. 952. Eran una secuencia continua de eventos producidos por una sola línea de conducta. En nuestro caso, el intervalo de aproximadamente seis horas entre las dos confesiones fué un poco más que en el del caso de *Leyra.*([38]) Pero, más importante aún, los hechos del caso de autos no eliminan absolutamente la posibilidad de que la clase de influencia empleada para obtener el Exhibit 48—muy diferente al hipnotismo psiquiátrico—se hubiera esfumado y que el acusado hubiera readquirido su "libertad mental" al momento en que habló "libremente" en presencia de un gran número de periodistas. A tenor con esto, el tribunal sentenciador no cometió error al dejarle al jurado el problema de determinar si, como cuestión de hecho, la influencia coercitiva que produjo la primera confesión contaminó también la confesión oral de San Antón.

V

*¿Era la manifestación del abogado del acusado al efecto de que su confesión fué voluntaria admisible en evidencia?*

 El acusado sostiene que el tribunal sentenciador cometió error al admitir en evidencia la manifestación hecha por el Lic. Gaztambide en la vista del hábeas corpus la tarde del día 10 de octubre de 1950 al efecto de que el acusado le había dicho que ". . . su declaración o confesión fué enteramente voluntaria . . .", y "reafirmando" el Lic. Gaztambide que ". . . su declaración o confesión fué absolutamente voluntaria . . ."

Suponemos que con la negativa del abogado del acusado exponer fundamento alguno para su oposición a la admisión de este documento se renunció a la posible objeción de que ésta era prueba de referencia. Pero aparte de la cuestión de

---

([35]) En el caso de *Leyra* la confesión involuntaria hecha al psiquiatra fué seguida de una confesión hecha pocos minutos después a un capitán de la policía. Media hora más tarde el acusado confesó ante su socio en el negocio. Dos horas y media después de la confesión al capitán de la policía, el acusado confesaba al fiscal auxiliar. Véase 98 L.ed. a la pág. 963, opinión disidente.

prueba de referencia, el documento era tan obviamente inadmisible y tan perjudicial al acusado que el tribunal sentenciador debió excluirlo no obstante la negativa del abogado del acusado a exponer fundamentos específicos para su objeción al mismo.

"Es obvio que el abogado tiene alguna autoridad para hablar a nombre de su cliente." Morgan, supra, Vol. II, pág. 237; *Pueblo* v. *Vargas*, 74 D.P.R. 144; *Russell & Co.* v. *Padrón*, 61 D.P.R. 764; *Concepción* v. *Latoni*, 51 D.P.R. 564; *Ex parte Morales*, 30 D.P.R. 907, 913; *People* v. *Peters*, 216 P.2d 145 (Calif. 1950); IV Wigmore, supra, sec. 1063, pág. 43, Sup. 1953, pág. 23. Pero para que el abogado sea el "agente verbal" de su cliente, debe hablar sobre una cuestión pertinente. Durante un pleito—particularmente un caso criminal en que se imputa un asesinato en primer grado—una declaración de un abogado, a fin de que obligue a su cliente, no sólo debe ser precisa y deliberada si que también *pertinente*. Véanse 2 Morgan, supra, pág. 237; IV Wigmore, supra, sec. 1063, pág. 43, Sup. 1953, pág. 23; *Kennedy* v. *Emerald Coal & Coke Co.*, 42 A.2d 398, 407 (Del. 1944). Aquí el abogado hizo la manifestación en cuestión cuando estaba en el proceso de anunciar que desistía de una petición de hábeas corpus y solicitaba que se le fijara fianza. Es innecesario que examinemos la cuestión de si tal manifestación hecha por un abogado sería pertinente—y obligatoria para un acusado—si la vista sobre la petición se hubiera celebrado y la confesión se hubiera ofrecido en evidencia. El hecho es que no se celebró vista alguna. La manifestación fué en consecuencia completamente impertinente a la única gestión que el abogado estaba practicando: desistiendo de la petición y solicitando la fijación de fianza. Y difícilmente puede esperarse que, bajo tales circunstancias, un acusado interrumpa a su abogado y lo desautorice en lo que está diciendo. (39)

___

(39) No nos detenemos a determinar si las manifestaciones del Lic. Gaztambide eran también inadmisibles porque comprendían una conclusión—que la confesión era voluntaria—más bien que los hechos y las circunstancias concurrentes de los cuales el tribunal sentenciador—o el jurado—pu-

No cuestionamos la buena fe del Lic. Gaztambide y estamos seguros de que actuaba en lo que él creía eran los mejores intereses de su cliente—quizás en un esfuerzo para luego obtener algún trato mejor para su cliente. Al momento en que hablaba el Lic. Gaztambide aparentemente no conocía el contenido del Exhibit A, en el cual hemos descansado tanto para resolver que el Exhibit 48 fué una confesión obtenida mediante coacción como cuestión de derecho. De cualquier modo, queda el hecho de que su manifestación fué indebidamente tomada en consideración por el tribunal sentenciador al pasar como cuestión preliminar sobre el punto de si la confesión de San Antón fué obtenida mediante coacción como cuestión de derecho. (⁴⁰)

## VI

*¿Fué el jurado instruído correctamente sobre la voluntariedad de las confesiones?*

No hubo objeciones específicas en relación con las instrucciones dadas al jurado sobre la voluntariedad de las confesiones. Tampoco se queja el acusado de ellas en apelación, excepto con respecto a no haber la corte instruído al jurado que examinara el Exhibit 48 a la luz del Exhibit A. Pero llamamos la atención a ciertos errores en ellas, especialmente ya que la confesión oral puede posiblemente serle sometida al jurado en un nuevo juicio.

diesen llegar a su propia conclusión en cuanto a la voluntariedad. *Cf. United States* v. *Denno,* 208 F.2d 605, 608–9 (C.A. 2, 1953), revocado por otras razones en *Leyra* v. *Denno,* supra, donde a psiquiatras—no a abogados—se les permitió dar sus opiniones en cuanto al efecto de la coacción mental que produjo una primera confesión sobre la voluntariedad de confesiones posteriores.

(⁴⁰) Las manifestaciones del Lic. Gaztambide fueron desde luego también perjudiciales al acusado cuando se le sometieron al jurado con respecto a la cuestión de la voluntariedad de ambas confesiones. En cuanto al Exhibit 48, la cuestión es ahora académica, ya que hemos resuelto que el Exhibit 48 nunca debió haberse sometido al jurado. Véase la Parte III (*e*). En cuanto a la confesión de San Antón, las manifestaciones del Lic. Gaztambide son inadmisibles y deben excluirse en el nuevo juicio tanto en relación con la cuestión preliminar de la voluntariedad, oída sólo por la corte sentenciadora, así como en relación con la misma cuestión si es que se le somete al jurado.

El tribunal sentenciador instruyó al jurado que si encontraba que las confesiones eran voluntarias, que las apreciara conjuntamente con la otra evidencia; y que "si entienden que no fué voluntaria dicha confesión, entonces está dentro de sus facultades rechazarla para resolver el caso en una u otra forma." Aun suponiendo—contrario a la conclusión a que hemos llegado—que el tribunal sentenciador actuara correctamente al negarse a excluir el Exhibit 48 como cuestión de derecho y al someter la cuestión de la voluntariedad de la misma al jurado para que éste determinara ésta como cuestión de hecho, esta instrucción fué errónea en tres aspectos. Primero, el tribunal sentenciador debió haber instruído al jurado que si resolvía que las confesiones eran involuntarias, *debía* rechazarlas; fué un error instruir al jurado que bajo dichas circunstancias está ". . . dentro de sus facultades rechazarla . . .".

Segundo, la anterior instrucción no le dió al jurado pauta alguna en cuanto a qué elementos forman el concepto de voluntariedad. Esta es una importante cuestión, si bien no envuelve el debido procedimiento.([41]) Mientras el jurado en esta jurisdicción continúe pasando sobre la admisibilidad de las confesiones, según ésta se distingue de su peso o credibilidad, véase escolio 7, el tribunal sentenciador debe instruirlo con respecto a los indicios de coacción. Instrucciones que, como aquí, meramente exponen en abstracto que una confesión puede ser considerada si se hace voluntariamente, no instruyen al jurado sobre los factores ". . . que el Tribunal Supremo ha declarado son pertinentes a la cuestión de si la admisión de una confesión viola la Enmienda XIV." Meltzer,

---

([41]) La cuestión de cuán específica debe ser una instrucción en una corte estatal sobre el carácter voluntario de una confesión corresponde, como cuestión de procedimiento o de práctica, únicamente a las cortes del estado. *Lyons* v. *Oklahoma*, supra, pág. 601. Meltzer, supra, censura este criterio, diciendo que el Tribunal Supremo (pág. 328) ". . . austeramente ha limitado, si no abdicado, su responsabilidad con respecto a las instrucciones aprobadas por el estado." De cualquier modo, en este caso establecemos tales normas necesarias como cuestión de ley local.

supra, pág. 328. En el contexto de este caso, el tribunal sentenciador debió por tanto haber instruído específicamente al jurado que sobre la cuestión de si el Exhibit 48 fué una confesión voluntaria, debía tomar en consideración (1) el historial personal del acusado según se reflejaba en el testimonio, (2) el hecho de que estuvo detenido ilegalmente durante tres días sin la oportunidad de consultar con su abogado o sus amigos, (3) el interrogatorio continuo del acusado durante la noche del 9 al 10 de octubre y (4) la naturaleza, forma y contenido del interrogatorio que resultó en el Exhibit 48, según se desprende del Exhibit A. *Leyra* v. *Denno*, supra.

Tercero, el tribunal sentenciador debió haber instruído al jurado que si resolvía que la confesión en el Exhibit 48 fué involuntaria, surgiría una inferencia al efecto de que la confesión oral posterior de San Antón era involuntaria debido a las mismas influencias coercitivas que invalidaron el Exhibit 48 y que esta inferencia sólo podía vencerse si se demostraba fuera de duda razonable que las referidas influencias habían cesado cuando el acusado hizo la confesión oral. *People* v. *Leyra*, 98 N.E. 2d 533, 560, (N.Y., 1951).[42]

Por los motivos consignados en la Parte III (*e*), en vista del hecho de que el Exhibit 48 fué una confesión obtenida mediante coacción como cuestión de derecho, en el nuevo juicio el mismo no será admisible en evidencia para la veracidad de las manifestaciones contenidas en dicho exhibit. Sin embargo, si el Pueblo ofrece la confesión oral en el nuevo juicio, la corte debe evitar errores similares a los tres que cometió en el primer juicio. Bajo estas circunstancias, debe la corte requerir que los Exhibits 48 y A sean presentados en evidencia para un fin limitado: únicamente para demostrar las influencias coercitivas que produjeron el Exhibit 48. Y la

---

[42] "Estas confesiones debieron considerarse por separado a la luz de la coacción que existía al momento en que el acusado hizo las manifestaciones . . . y sólo si el jurado quedare satisfecho, fuera de duda razonable, de que tal coacción cesó de influir al acusado puede éste considerar las confesiones posteriores. Sólo así podría otorgarse al acusado el debido procedimiento de ley." *People* v. *Leyra*, 98 N.E. 2d 533, 560, (N.Y., 1951).

corte debe instruir al jurado que el Exhibit 48 fué una confesión obtenida mediante coacción como cuestión de derecho, no debe considerarla en relación con la culpabilidad, y se admite en evidencia y es pertinente solamente en cuanto a la voluntariedad de la confesión oral; que toda vez que la primera confesión fué obtenida mediante coacción, existe la presunción o la inferencia de que la confesión oral fuera de igual forma obtenida mediante coacción; que esta presunción o inferencia sólo puede vencerse si la evidencia demuestra fuera de duda razonable que las influencias coercitivas cesaron cuando el acusado hizo su confesión oral; y que al determinar si dichas influencias coercitivas se prolongaron como cuestión de hecho hasta la confesión oral, bajo las circunstancias de este caso, el jurado debe tomar en consideración los cuatro factores antes mencionados: (1) el historial del acusado, (2) su detención ilegal, (3) el interrogatorio durante toda la noche, y (4) la naturaleza de dicho interrogatorio.

---

Cada uno de los miembros de este Tribunal ha actuado en el pasado bien como fiscal o como juez de instancia. Por consiguiente conocemos a fondo los problemas de la persecución del crimen y de la deseabilidad de obtener confesiones de los mismos. No resolvemos que un fiscal no pueda interrogar a un acusado, antes o después de su arresto, durante un período razonable. Indudablemente, el interrogatorio tanto de sospechosos como de testigos, es de gran valor social en la detención y convicción de aquellos que son culpables de delitos serios.([43]) Además, "es de conocimiento general que la

---

([43])"Mediante sus propias contestaciones muchos sospechosos se exoneran ellos mismos y la información que suministran con frecuencia señala a otro que es culpable. En verdad, el interrogatorio de aquellos que saben algo de los hechos es el principal método de resolver el crimen. El deber de poner en conocimiento de las autoridades cualquier información que se tenga de un crimen es de todos los ciudadanos. Esto es tan importante que una persona que se sabe que es inocente puede ser detenida, sin prestar la fianza, como un testigo importante." *Stein* v. *New York*, supra, pág. 184.

extracción de confesiones mediante métodos 'del tercer grado' se imputa falsamente y también se niega falsamente." *Stein* v. *New York*, supra, pág. 181.

Existe, sin embargo, el reverso de la medalla. Uno de los signos del totalitarismo es el empleo de confesiones obtenidas mediante coacción para llevar a cabo sus objetivos. El nuestro es un sistema diferente de vida. El debido procedimiento de ley está entretejido en nuestra vida y en nuestra ley bajo la democracia. Estos no son ". . . criterios doctrinarios o sentimentales". *Malinski* v. *New York*, supra, pág. 420, opinión del Juez Asociado Sr. Frankfurter. Para nosotros ningún valor es más sagrado que el de que ningún acusado puede ser declarado culpable de ningún delito, no importa cuán convencidos estemos de su culpabilidad, si se ha admitido en evidencia en su contra una confesión obtenida mediante coacción. Aun cuando supongamos que hoy un acusado que es culpable escape provisionalmente de las garras de la ley, mañana este gran principio protegerá al inocente.

Añadimos que la violencia y la presión nunca podrán ser buenos sustitutos de la investigación científica y minuciosa como instrumentos para descubrir delitos. El jefe de nuestra más grande agencia investigadora gubernamental claramente así lo hizo constar hace poco: "Uno de los medios más rápidos por los cuales cualquier agente del orden público puede ganarse el desprecio público para sí, para su organización y para toda su profesión es el de hallársele culpable de infringir los derechos civiles. . . . Las infracciones de los derechos civiles son aun más desgraciadas porque son tan innecesarias. *Las normas profesionales en el cumplimiento de la ley proveen que se combata el crimen con inteligencia más bien que con la violencia.*" J. Edgar Hoover, *FBI Law Enforcement Bulletin*, septiembre de 1952, pág. 1, citado por el Juez Frankfurter en su opinión disidente en *Stein* v. *New York*, supra, págs. 202, 203. (Bastardillas nuestras.)

El apelante está acusado de un crimen horrible. Luego de un prolongado y arduo juicio, fué declarado culpable por

un jurado de asesinato en primer grado y sentenciado a reclusión perpetua. Pero el acusado no recibió un juicio imparcial porque una confesión que se le extrajo en violación del debido procedimiento de ley fué presentada en evidencia en su contra. Se cumple mejor con la sociedad celebrando un nuevo juicio el cual ordenaremos en este caso.

## VII

*Publicidad con Antelación Al Juicio*

■■ ■ El acusado alega que se le privó de su derecho a un juicio justo e imparcial debido a la excesiva publicidad que alega recibiera su confesión en la prensa. Nuestra conclusión al efecto de que su confesión escrita fué indebidamente admitida en evidencia hará necesario un nuevo juicio en este caso. Por tanto quizás es innecesario discutir esta contención. Sin embargo, en vista de su importancia la examinaremos. [44]

La dificultad con esta contención es que la misma no se suscitó en el tribunal sentenciador. Tampoco solicitó el acusado la suspensión o el traslado por este motivo. En adición, nada hay en los autos ante nos que demuestre el alcance de la publicidad que se le dió a la confesión. El acusado únicamente señala el hecho de que el propio fiscal invitó a los periodistas y fotógrafos a encontrarse con él y con el acusado en San Antón. Sin darnos los nombres y las fechas de los periódicos en cuestión, el acusado meramente nos pide que tomemos conocimiento judicial de las informaciones de la prensa en relación con el caso, y que revoquemos la sentencia por dicho fundamento. El acusado no puso a la corte sentenciadora ni a este Tribunal en posición de considerar esta contención. Por tanto no tenemos base para revocar el veredicto por el motivo de que la publicidad excesiva, estimulada por el fiscal, evitó que el acusado, que fué juzgado a los 3½ meses después de haber confesado, recibiera en ese momento un juicio justo e imparcial.

---

[44] Es innecesario discutir los demás errores señalados por el acusado.

Sin embargo, creemos conveniente indicar que existen circunstancias en que la entrega a la prensa de una confesión o alguna otra evidencia de parte del fiscal con antelación al juicio, sería considerada como que menoscaba el derecho de un acusado a un juicio justo e imparcial. *Cf. Stroble* v. *California*, supra, 191–5, y en particular la opinión disidente del Juez Frankfurter, pág. 198; *Shepherd* v. *Florida*, 341 U. S. 50, opinión concurrente del Juez Jackson y del Juez Frankfurter; memorándum del Juez Frankfurter en *Leviton* v. *United States*, 343 U. S. 946; *Baltimore Radio Show* v. *State*, 67 A.2d 497 (Md., 1949) cert. denegado en *Maryland* v. *Baltimore Radio Show, Inc. et al.*, 338 U. S. 912, opinión del Juez Frankfurter en relación con la negativa de la solicitud de certiorari; *Grammer* v. *State*, 100 A.2d 257 (Md., 1953); Nota, *Inflammatory Pre-Trial Releases by the Prosecutor and the Due Process Clause*, 47 N.W. U.L.Rev. 728; Nota, 63 Harv. L. Rev. 840; Allen, supra, 29, escolio 59; *Delaney* v. *United States*, 199 F.2d 107 (C.A. 1, 1952). En su opinión concurrente en *Shepherd* v. *Florida*, supra, el Juez Jackson describe lo que ocurrió en dicho caso y por qué a su modo de ver se infringió el debido procedimiento, empleando el siguiente lenguaje a las págs. 51 a 53:

"Pero a este jurado se le hicieron llegar influencias perjudiciales fuera de la corte, que se tornan muy típicas de un juicio al cual se le ha dado excesiva publicidad, con tal fuerza que la conclusión es inescapable que estos acusados fueron prejuzgados como culpables y el juicio sólo fué una formalidad legal para anotar un veredicto que ya había sido dictado por la prensa y por la opinión pública que aquélla desarrolló.

"Los periódicos publicaron como un hecho, y le atribuyeron la información a la policía, que estos acusados habían confesado. Nadie, ni aun la policía, repudió la información. Testigos y personas llamadas para servir como jurados dijeron que habían leído u oído esta aseveración. Sin embargo, durante el juicio no se ofreció confesión alguna. Las únicas explicaciones racionales por no haberse presentado en corte son que la información era falsa o que la confesión fué obtenida bajo circunstancias que la hacían inadmisible o que hacían su uso ineficaz.

"Si el fiscal en el juicio le hubiera dicho al jurado que el acusado había confesado pero no ofrecía probar la confesión, la corte indudablemente hubiera declarado un *mistrial* y citado al fiscal por desacato. Si se hubiera ofrecido en corte una confesión, el acusado hubiera tenido el derecho de confrontarse con las personas que alegaban haber sido testigos en la misma, a fin de contrainterrogarlas y contradecir su testimonio. Si la corte hubiera permitido que se llevara al jurado una confesión involuntaria, no vacilaríamos en considerar esto como una negación del debido procedimiento de ley y revocaríamos el caso. Cuando tales cosas suceden en el juicio, el abogado del acusado puede atacarlas con evidencia, argumentos y solicitud de instrucciones, y puede por lo menos llevar sus objeciones al récord.

"Pero ni los abogados ni la corte pueden controlar la admisión de evidencia si 'confesiones' no probadas, y probablemente imposibles de probar, se llevan al jurado mediante la prensa y la radio. Con ello se menoscaban los derechos del acusado a confrontarse con los testigos en su contra y a contrainterrogarlos. Es difícil imaginarse una influencia más perjudicial que una información a la prensa dada por un funcionario del tribunal que tiene a su cargo la custodia de acusados al efecto de que éstos han confesado, y aquí dicha información, sin estar jurada, sin verse, sin contrainterrogarse y sin controvertirse fué trasmitida al jurado por la prensa.

"Esta Corte recientemente ha ido muy lejos para impedir que un juez sentenciador bregue con las intervenciones de la prensa con los juicios, *Craig* v. *Harney,* 331 U. S. 367; *Pennekamp* v. *Florida,* 328 U. S. 331; *Bridges* v. *California,* 314 U. S. 252, aun cuando es de indicarse que ninguno de estos casos envolvía un juicio ante jurado. Y la Corte, mediante una interpretación estricta de una Ley del Congreso, ha resuelto que no constituye desacato cualquier intervención a menos que la misma ocurra en presencia de la corte, *Nye* v. *United States,* 313, U. S. 33, el último lugar donde se intentaría una bien calculada obstrucción de la justicia. No hay duda de que este juez sentenciador se encontró imposibilitado para darle al acusado toda protección efectiva contra esta campaña fuera-del-tribunal para conseguir un convicción. Pero si se abusa tanto de la libertad de prensa que se hace imposible obtener un juicio imparcial en la localidad, el procedimiento judicial debe ser protegido llevando el juicio a un campo fuera de su probable influencia. Los periódicos, en el disfrute de sus derechos constitucionales, no pueden privar

a los acusados de sus derechos a un juicio imparcial. Estas convicciones, acompañadas de tales sucesos, no cumplen con ningún concepto civilizado del debido procedimiento de ley. Eso por sí solo es suficiente, según mi criterio, para justificar la revocación."

No existen soluciones fáciles en la tarea de proteger tanto la libertad de prensa como el derecho de un acusado a un juicio justo e imparcial. Los dos intereses que en alguna forma deben balancearse han sido descritos por el Juez Frankfurter en su opinión en *Maryland* v. *Baltimore Radio Show, Inc., et al.*, supra, como sigue a la pág. 920: "Una de las exigencias de una sociedad democrática es que el público sepa lo que ocurre en los tribunales mediante información de la prensa de lo que allí ocurre, a fin de que el público pueda juzgar si nuestro sistema de derecho penal es justo y correcto. Por otro lado, nuestra sociedad ha separado la corte y el jurado como el tribunal para determinar la culpabilidad o la inocencia *a base de evidencia presentada en corte*, hasta donde sea humanamente posible." (Bastardillas nuestras.) Este problema fué recientemente explorado en un cuidadoso artículo escrito por Jerome H. Spingarn titulado "Newspapers and the Pursuit of Justice" que apareció en *The Saturday Review*, del 3 de abril de 1954, pág. 9. Después de exponer ilustraciones de los sensacionales e incriminatorios incidentes de un caso pendiente en la ciudad de Nueva York, Spingarn indica que "No será fácil . . . encontrar jurados cuya imparcialidad no haya sido violada. Hay muy pocas personas en la ciudad que no hayan leído acerca de la 'confesión', que no sepan o crean que sepan, todo detalle del acto criminal, que no hayan especulado con los motivos. ¿Y habrá algunos que no hayan formado sus opiniones con respecto a la culpabilidad y no hayan aún calibrado la clemencia con la cual calmarían la justicia? . . . Nada malo hay en la publicación de información propiamente dicha. . . . Pero tal lectura antes del juicio y de la convicción podría ser un lujo que no debemos gastarnos si al mismo tiempo vamos a mantener nuestra garantía constitucional de que los acusados se presumirán ino-

centes hasta que se les pruebe que son culpables y de que serán juzgados ante un jurado imparcial."

De los autos ante nos no hay forma de saber hasta qué extremo, de existir alguno, el derecho del acusado a un juicio imparcial fué menoscabado por la alegada excesiva publicación de su confesión. Pero los autos demuestran que los representantes de la prensa estuvieron presentes *a invitación del fiscal* cuando el acusado confesó en San Antón. Bajo dichas circunstancias debe culparse al fiscal más que a la prensa que según se alega publicaron la confesión en detalle antes del juicio. "El que el propio fiscal dé a la prensa evidencia que ningún periódico con disciplina propia deba publicar con anterioridad al juicio, es hacer del propio Estado a través de su fiscal, que maneja su poder, un partícipe consciente en el juicio de prensa, en lugar del juicio por los métodos que siglos de experiencia han demostrado son indispensables a una justa administración de la justicia." El Juez Frankfurter disintiendo en *Stroble* v. *California*, supra, pág. 201. El remedio quizás pueda hallarse en una política bajo la cual el fiscal de ordinario no divulgue confesiones antes del juicio. Dicha política, seguida por muchos fiscales, ha sido adoptada en la ciudad de Nueva York. Véase, Carta al Editor, *New York Times*, Abril 21, 1954, en la cual el fiscal dice que, al negarse a divulgar confesiones antes del juicio, su "único propósito es proteger el derecho de un acusado a un juicio imparcial no divulgando, antes del juicio, que puede haberse incriminado él mismo." Añade, por vía de explicación, lo siguiente:

". . . Parece fuera de toda duda que información ampliamente diseminada al efecto de que un acusado ha 'confesado' tiene el efecto de convencer al público en general que el acusado es forzosamente culpable y que cualquier juicio celebrádole será una mera formalidad. Obtener un jurado imparcial bajo tales circunstancias, en consecuencia, puede resultar en una tarea difícil. En su efecto práctico tal publicación tiende a destruir la presunción de que el acusado es inocente hasta que se le pruebe ante una corte que es culpable fuera de toda duda razonable.

"El vicio inherente a la situación surge aún con mayor relieve cuando la manifestación nunca se recibe en evidencia. Tal manifestación algunas veces es excluída por no ser confesión alguna, mediante una resolución de la corte al efecto de que hubo coacción antes o durante la misma; o que se hizo bajo inducción o promesa de beneficio; o que es resultado de alguna presión irrazonable de carácter psicológico; (45) o que la persona estaba en tal condición de inestabilidad mental en ese momento que evita que se le dé crédito a cualquier aseveración suya. Por éstas o similares razones, en verdad, el propio fiscal puede decidir no ofrecer la manifestación en evidencia durante el juicio." (46)

Casi es innecesario añadir que la política de no divulgar confesiones antes del juicio opera en ambas direcciones. Los casos deben juzgarse en las cortes, no en los periódicos antes del juicio. De esto surge que los abogados de los acusados así como los fiscales normalmente deben abstenerse de dar a la publicidad evidencia que esperan presentar en corte. Canon 20 de *Cánones de Ética Profesional que Regirán la Conducta de los Abogados de Puerto Rico*, 48 D.P.R. VIII, XV. Un periódico notable recientemente ha expresado su aprobación a este enfoque. Editoral, "Trial by Newspaper", *New York Times*, 14 de mayo de 1954. Otros periódicos han asumido una posición diferente. *Time*, del 12 de julio de 1954, pág. 38. Después de presentarse la evidencia durante el juicio, su publicación, como regla general, no infringe ningún derecho constitucional del acusado. *People* v. *Jelke*, 130 N.Y.S. 2d 662 (App. Div., 1954). (47)

---

(45) Esto es exactamente lo que ocurrió aquí. Véase la Parte III(*e*).

(46) La Corte de Apelaciones de Maryland va aún mucho más lejos. La política del fiscal de la ciudad de Nueva York es anunciar que el acusado ha hecho una declaración pero que no divulgará su contenido ni la reputará como una confesión. En *Grammer* v. *State*, supra, la corte dijo a la pág. 261: "Funcionarios del Estado no deben anunciar, o sancionar el anuncio, de que un acusado ha confesado o de que ha hecho una declaración. El término declaración incluye aquéllas que son exculpatorias en diversos grados pero para el público ha venido a ser un eufemismo que no engaña, sino que sugiere, una admisión de culpabilidad."

(47) Spingarn, supra, discute una cuestión diferente a la pág. 62:

"El juicio sobre una cuestión de hecho en una corte puede ser un procedimiento largo. Puede ser lento y tedioso. Los jurados tenderían a perder la ilación del caso de tiempo en tiempo, ya que el testimonio muchas

Como ya hemos dicho, no encontramos base alguna en los autos ante nos para resolver que en este caso ocurrió un error que dé lugar a la revocación debido a la excesiva publicación de las confesiones del acusado antes del juicio. Sin embargo, hemos creído conveniente llamar la atención de los fiscales, del Secretario de Justicia, de la profesión y de la prensa hacia esta cuestión. Todo el problema de lo que ha sido llamado "juicio en los periódicos" es uno muy serio bajo nuestras condiciones modernas de comunicaciones en masa. Véanse Otterbourg, *Fair Trial and Free Press: A New Look in 1954*, 40 A.B.A.J. 838 (Oct., 1954); Phillips y McCoy, *Conduct of Judges and Lawyers, The Challenge of the Press*, págs. 154–87, y autoridades allí citadas; Thayer, *Legal Control of the Press, Trial by Newspaper*, págs. 488–97; McCoy, *The Judge and Courtroom Publicity*, 37 Am. Jud. Soc. J. 167 (Abril, 1954); Howard, *A Newspaper Editor Looks at Canon 35*, id., 166. Sólo por cooperación y entendimiento mutuos

---

veces surge de manera casual y sin orden cronológico. Con qué buenos ojos reciben entonces un reportaje, que en palabras someras, tersas y bien escritas sintetiza lo que está ocurriendo, enfatiza los hechos importantes, ilumina los más significativos y recopila los hechos sueltos en una secuencia fácil de entender. Es de tanta ayuda al jurado como un bosquejo de estudios lo es a un estudiante de colegio la víspera de un examen.

"¡Pero cuán peligroso! Dicho reportaje está escrito por un periodista que no tiene responsabilidad alguna para con la corte, que no tiene entrenamiento alguno en la apreciación de evidencia, que no tiene que estar presente durante todo el juicio, que tiene un motivo imperativo a favor de lo excitante.

"La ley tiene su propia disposición para un bosquejo de todo: los informes de los abogados y las instrucciones del juez. Alrededor de ellas pone varias salvaguardas importantes—como aquélla que permite a los abogados hacer un resumen solamente de aquello que han probado mediante evidencia. Alrededor de la información de prensa no existen tales salvaguardas. Sin embargo, el periódico puede penetrar más adentro en las horas de descanso, puede impresionar más emocionalmente que el juez."

Este es un problema de difícil solución. A la prensa, desde luego, no se le puede prohibir o limitar la publicación de tales incidentes. Es cierto que al jurado se le puede instruir que no lea o que haga caso omiso de lo que publiquen los periódicos acerca del juicio. Pero jueces de renombre han puesto en duda la eficacia de tales instrucciones en un caso notorio. Memorándum del Juez Frankfurter en *Leviton* v. *United States*, supra; *Krulewitch* v. *United States*, 336 U. S. 440, 453, opinión concurrente del Juez Jackson; *Delaney* v. *United States*, supra 112.

entre los abogados y los periódicos pueden ambos principios fundamentales—la libertad de prensa y el derecho de un acusado a un juicio justo e imparcial—ser eficazmente conservados.

*La sentencia del anterior tribunal de distrito será revocada y el caso devuelto para un nuevo juicio.*

Opinión concurrente del Juez Asociado Sr. Negrón Fernández

"Este caso tiene su origen"—escribí en el caso de *Batalla* v. *Tribunal de Distrito*, 74 D.P.R. 289, y repito en éste—"en actos de abominable criminalidad que una sociedad ofendida tiene que repudiar con justificado espíritu de indignación colectiva. Están aquí envueltos, sin embargo, derechos fundamentales del hombre, que se alegan violados en las garantías básicas establecidas por las leyes que los reconocen y en cuya protección descansa la grandeza incomparable de la democracia en los pueblos libres del mundo . . ."

Para mantener inquebrantable la fe de un pueblo en la justicia de la democracia hay que ejercer en sus justas proporciones la autoridad del Estado en la administración de la justicia criminal.

Aun cuando discrepo—más bien en su carga de expresión —de algunos de los conceptos vertidos en la opinión del Tribunal y en la concurrente del Juez Asociado Sr. Sifre, estoy de acuerdo con la esencia y sentido básico de esos conceptos y, desde luego, de acuerdo con la doctrina jurídica sentada.

Deseo consignar—como lo hace el Juez Presidente en la opinión del Tribunal—en reconocimiento a la honestidad profesional del Fiscal investigador en este caso, que la ausencia de doctrinas jurisprudenciales claras en algunos extremos aquí concernidos, y lo horrendo del delito investigado, ofrecían campo propicio para que el celo en el cumplimiento del deber hiciera menos notoria la omisión habida.

Opinión concurrente emitida por el Juez Asociado Sr. Sifre, en la cual concurren el Juez Presidente, Sr. Snyder, y los Jueces Asociados, Sres. Marrero y Belaval

El examen de los autos nos lleva a la conclusión inevitable de que en esta causa se cometieron errores que por su gravedad y serias implicaciones han impuesto al Tribunal el deber ineludible de revocar la sentencia, no empece las crueles características del repugnante crimen imputado al apelante. El requisito del debido procedimiento de ley exige normas esclarecidas de derecho para la protección de todos los hombres, malos o buenos, culpables o inocentes. Esa garantía "Es el producto de una civilización que, al respetar la dignidad aun del ciudadano menos merecedor, eleva la estatura de todos nosotros y crea una atmósfera de fe y confianza . . ."[1]

¿Qué precedente hubiera establecido el Tribunal, de haber confirmado la sentencia apelada? Que puede detenerse ilegalmente a una persona y mantenérsele en esa situación por un período de tres días; llevarle durante ese estado de detención ilegal a un cementerio para enfrentarle al espectáculo de la exhumación del cadáver de su presunta víctima, pidiéndole que lo identifique, aunque ello sea innecesario, espectáculo que le provoca reacciones nerviosas, turbación y temblor; reintegrarle al lugar de su detención a esperar hasta que las autoridades obtengan prueba que justifique, a juicio de ellas, el imputarle que es el asesino; someterle entonces a un interrogatorio agresivo, y hasta cierto extremo torturante, no necesariamente por su duración, sino por su naturaleza—Exhibit A de la defensa—acusándole por un lado de haber cometido el crimen, y por el otro, exigiéndole una y otra vez que conteste preguntas incriminatorias; informarle que tiene que hacerlo; colocarle, debido al carácter y forma del interrogatorio, en la posición de que, aún con el silencio, deje la impresión de que es culpable; mantenerle absolutamente incomunicado, excepto para fiscales y agentes de orden público, y totalmente desamparado, sin ayuda y consejo de familiares y amigos, negándosele la asistencia de abogado, hasta que al fin

---

[1] Opinión disidente del Juez Asociado Sr. Douglas en *Stein* v. *New York*, 346, U. S. 156.

confiese; y que esa confesión no es inadmisible en contra del detenido como cuestión de derecho.

El Tribunal se ha negado a establecer ese precedente, resolviendo que una confesión lograda bajo las anteriores circunstancias, tiene el estigma de involuntariedad. Lo ha decidido así, en una opinión emitida por la voz autorizada del Juez Presidente, Sr. Snyder, con la que estoy enteramente de acuerdo. Considero que ha de ser de trascendental importancia para preservar normas procesales, sin las cuales no sería posible gozar de un sistema judicial esclarecido y ecuánime.

Es innecesario que discuta los precedentes judiciales en que funda el Tribunal su conclusión, porque éste lo hace con claridad y amplitud. Sin embargo, debo referirme, aunque sucintamente, a una que otra decisión pertinente a la cuestión que ha sido resuelta con relación a la confesión prestada por el apelante en la noche del 9 y en las primeras horas de la madrugada del día 10 de octubre del año 1950. Exhibit 48 de El Pueblo.

He leído con sumo interés la opinión mayoritaria en *Stein v. New York*, 346 U. S. 156. Se sostuvo en ese caso que dos de los procesados habían confesado, obedeciendo a coacción o presión física o psicológica. No hubo prueba convincente sobre la primera. Respecto a la segunda, lo que revela la decisión es que aquéllos, estando detenidos ilegalmente, fueron sometidos a largos y prolongados interrogatorios por varios funcionarios al mismo tiempo, y por varios de ellos durante períodos distintos. No constan en ella los interrogatorios que precedieron a las confesiones. Aparentemente no se perpetuaron por escrito, quedando en el tenebroso secreto en que se envuelven generalmente interrogatorios de esa clase.

No es ésa la situación en el de autos. En el Exhibit A de la defensa aparece el interrogatorio a que fué sometido el apelante antes de que confesara. El carácter del mismo, unido a la detención ilegal del apelante, al estado de incomunicación y desamparo en que se le mantuvo, al hecho de

negársele la ayuda de abogado, sobre todo en el momento crucial en que ya se le acusa del asesinato, insistiéndose no obstante y con persistencia implacable, en que conteste preguntas obviamente incriminatorias, en un interrogatorio dirigido única y exclusivamente a lograr que admita su culpabilidad, son circunstancias que, consideradas en conjunto, permiten aseverar que existe marcada diferencia entre ambos casos. Hay dos adicionales que reafirman ese criterio. Cooper, uno de los acusados en el caso de Stein, impuso las condiciones bajo las cuales estaba dispuesto a confesar. Stein, otro de los procesados, al saber que Cooper lo había hecho, manifestó a un agente de policía que si él, Stein, "tenía que irse", refiriéndose indudablemente a que tendría que pagar el crimen con su vida, "yo me lo llevaré conmigo", aludiendo a Cooper, y entonces confesó.

La decisión en *Stein* v. *New York*, supra, no revoca la doctrina de que la confesión ha de ser voluntaria en el sentido de que debe ser consecuencia de la libre elección del procesado, ni el principio de que "convertir la detención de un acusado en un proceso para arrancarle evidencia que no podría conseguirse de él en corte abierta con todas sus garantías, es un abuso tan grave del poder de arrestar, que ofende las normas procesales del debido procedimiento." *Watts* v. *Indiana*, 338 U. S. 49; *Harris* v. *South Carolina*, 338 U. S. 68. Ciertamente que la confesión no tiene que hacerse con la misma espontaneidad con la que el penitente confiesa sus pecados, sus faltas y errores el cliente al abogado, sus fobias y anormalidades el paciente al psiquiatra, *Stein* v. *New York*, supra, pero sin duda alguna ha de ser espontánea, en el sentido que acabo de indicar. La que prestó el apelante, Exhibit 48 de El Pueblo, no representa un acto libérrimo de su voluntad.

Dice el Juez Asociado Sr. Ortiz en su opinión disidente, que el efecto de la decisión del Tribunal, "puede ser el de establecer normas de excesiva pulcritud de los fiscales con respecto a los criminales", añadiendo, que cree "en la pureza en los procedimientos, pero no hasta un punto tan refinado

y excesivo que se haga prácticamente imposible la investigación de los delitos". Discrepo del criterio de mi ilustrado colega. Lo que hace el Tribunal es reiterar normas y principios perfectamente conocidos, que no han sido, ni son considerados excesivos para lograr una recta administración de la justicia penal, y al hacerlo, cumple con la alta misión de velar por que se observen y respeten. De otra suerte, resultaría ilusoria la garantía del debido procedimiento, muro de contención que impide el que una sociedad libre y moderna, pueda degenerar en una sociedad esclavizada por el despotismo judicial. No hay temor alguno de que esas normas "hagan prácticamente imposible la investigación de los delitos". Además, "Bajo nuestro sistema la sociedad tiene el peso de probar sus cargos en contra del acusado no por su propia boca. Debe establecerlos, no por interrogación del procesado aún bajo salvaguardias judiciales, sino por evidencia obtenida independientemente . . . 'La ley no sufrirá el que a un acusado se le convierta . . . en instrumento de su propia convicción. 2 Hawkins, *Pleas of the Crown*, C. 46 sec. 34 (8ª ed., 1824),' " *Watts* v. *Indiana*, supra. Esto, desde luego, no significa que no pueda interrogarse, dentro de ciertos límites, al que está bajo la sospecha de haber cometido un crimen.

Si hubiera razón para el temor que abriga el Juez Asociado Sr. Ortiz, y no creo que lo haya, sin duda alguna que es preferible el mal de que queden impunes algunos delitos, a la calamidad de que todo un pueblo pierda las garantías y derechos que protegen las libertades individuales, sin las cuales no puede subsistir una sociedad democrática como la nuestra.

El Tribunal no se basa en tecnicismos al declarar que la confesión, Exhibit 48, es involuntaria como cuestión de derecho. Lo que hace es reafirmar principios eminentemente fundamentales, y reconocer que no puede haber justicia, aunque existan leyes sabias, si son viciosos los procedimientos para aplicarlas.

Negar en una causa criminal el debido procedimiento de ley, "significa dejar de observar aquella justicia fundamental que es esencial al mismo concepto de justicia", *Lisenba* v. *California*, 314 U. S. 219, y con ello no se logra mayor efectividad en la investigación y castigo de los hechos delictivos. En su opinión concurrente en *Malinski* v. *New York*, 324 U. S. 401, el Juez Asociado Sr. Frankfurter, hace referencia al siguiente párrafo de un informe emitido por un comité de eminentes abogados, que hizo el estudio de este problema; "El remedio para los males que afligen la administración de la justicia criminal . . ., no se encontrará en medidas que violen la ley. Ello, lejos de restaurar salud y vigor al sistema, agrava y prolonga el desorden".

Manifiesta el Juez Asociado Sr. Ortiz que "la protección excesiva de la integridad personal de un criminal puede resultar en un sistema en que esté en peligro la integridad personal del resto de los individuos que forman la sociedad". Al apelante no se le está dando una protección excesiva. Se le están reconociendo derechos concedidos por nuestras leyes a todos los hombres, *no* por blandura o ternura hacia el delincuente, *y sí* porque son esenciales "al mismo concepto de justicia", testimonio de "que hemos alcanzado cierto estado de civilización".([2]) No estoy conforme con que "el contenido de un derecho individual debe variar de acuerdo con los derechos de los demás ciudadanos". Las garantías que son indispensables para la debida protección de los derechos individuales, no son ni pueden ser elásticas. El derecho a un juicio imparcial y justo no puede ser fraccionado. Si ello se hiciera, nos encontraríamos en un verdadero caos en cuanto a las normas que deben observarse en el muy serio proceso de hacer justicia, negando a muchos la igual protección de las leyes, y cayendo en más de una ocasión, en verdadera tiranía judicial.

---

([2]) Véase opinión disidente del Juez Asociado Sr. Frankfurter en *Stein* v. *New York*, supra.

Me es imposible compartir el criterio de que "no hay nada preciso, sistemático y exacto en cuanto a lo que debe ser un debido proceso de ley." Se sabe mucho sobre ello. Por ejemplo, está firmemente establecido el principio de que se viola ese requisito, si se usa una confesión involuntaria para lograr la convicción del acusado, e igualmente lo está el de que debe excluirse "para evitar injusticia fundamental en el uso de evidencia". *Lisenba* v. *California*, supra.

Dice el Juez Asociado Sr. Ortiz que "el significado de esos derechos no debe ser ampliado en forma tan generosa por interpretación judicial hasta el punto de crear una cortina de inmunidad a los acusados y de establecer una muralla contra la investigación y persecución del crimen . . ." El Tribunal no lo está haciendo al negarse a dar acogida en nuestro sistema de administrar la justicia penal, a procedimientos contrarios a las leyes que lo rigen, y los cuales, en lugar de hacerlo más saludable, lo enfermarían hasta el extremo de ocasionarle la muerte. En este mismo caso se encuentra la demostración de que no se establece "una muralla contra la investigación del crimen", con reafirmar la doctrina de que la confesión para ser admisible en contra del procesado, tiene que ser una confesión voluntaria. En la noche del 9 de octubre, cuando el Fiscal dió comienzo al interrogatorio del detenido, tenía en su poder, debido a sus esfuerzos y laboriosidad, prueba suficiente para procesarle.

No me impresiona el argumento de que la evidencia demostró la certeza de afirmaciones hechas por el apelante en la confesión escrita. Lo contesta el Tribunal en términos perfectamente claros, invocando la doctrina claramente establecida en los precedentes judiciales, de que el uso de confesiones involuntarias está prohibido aun cuando resulte ser cierto lo que en ellas se diga. Lo contrario significaría el dar carta blanca para obtenerlas, sin importar los medios. Tampoco me convence el argumento que se esgrime diciéndose que el apelante es "un hombre maduro, educado, inteligente, con experiencia de la vida . . .", y que defendió sus

derechos con energía. Si es culpable del delito que se le imputa, tengo muy serias dudas de que le adornen esas cualidades. La experiencia nos enseña que el crimen no paga, y la regla general es que se castiga tarde o temprano. Además, aunque es positivamente cierto que al considerar si una confesión es o no voluntaria, el grado de desarrollo intelectual, la mayor o menor madurez, la mayor o menor experiencia del acusado, tienen su valor, eso no es necesariamente decisivo en un sentido u otro. La historia demuestra que hombres en verdad maduros, cultos, inteligentes, de experiencia, y con la fortaleza moral que proporciona la fe en doctrinas y principios que se defienden toda la vida, no pudieron resistir la coacción física o psicológica, y sucumbieron por habérseles quebrantado o agotado la voluntad.

Es cierto que el apelante se defendió con energía, pero no es menos cierto que al fin, y en el transcurso del interrogatorio a que fuera sometido durante la noche del día 9 y la madrugada del 10 de octubre, aquélla se trocó en completa y absoluta mansedumbre, como consecuencia de la coacción psicológica, que estigmatiza de involuntaria, como cuestión de derecho, la confesión que prestara por escrito. Exhibit 48.

El Tribunal ha tomado conocimiento del error en que incurrió la corte sentenciadora al instruir al jurado en relación con las confesiones. No es ésta la primera vez que ello se hace, aun sin haberse anotado excepción o apuntado el error. El cometido en el caso de autos, es demasiado grave para dejarlo pasar inadvertido. El jurado no tuvo orientación alguna sobre los principios y factores que debía considerar al determinar si las confesiones eran o no voluntarias.

Lamento que el tiempo no me permita discutir el error cometido al invertirse el orden en la presentación y admisión de las confesiones, lo que dió lugar a que el jurado oyera la prueba sobre la que fué prestada en San Antón, antes de que se resolviera sobre la admisibilidad de la que la precedió, Exhibit 48, a mi juicio, con graves consecuencias para el apelante. Lamento igualmente que no me sea posible discutir

el error en que también incurrió la corte sentenciadora al admitir las manifestaciones que hiciera el letrado que llevó la representación del apelante en el procedimiento de hábeas corpus, como prueba pertinente para demostrar que las confesiones habían sido hechas voluntariamente, error extremadamente serio por varios motivos, e indefendible bajo ningún principio conocido hasta ahora.

Tengo la profunda convicción de que al apelante no se le juzgó de acuerdo con el debido procedimiento de ley, y que la confirmación de la sentencia hubiera establecido un precedente verdaderamente desgraciado, al sancionar la conculcación de derechos que este Tribunal tiene el deber inescapable de proteger, y también estoy absolutamente convencido de que la opinión revocando dicha sentencia, establece con claridad y precisión normas procesales que deben contribuir considerablemente al mejoramiento, desarrollo y progreso de la administración de la justicia criminal en nuestro país.

### Opinión del Juez Asociado Sr. Pérez Pimentel concurriendo en el resultado

A mi juicio el error cometido por la corte sentenciadora al transmitir al jurado las instrucciones sobre las confesiones del acusado, justifica que se anule el veredicto rendido, se revoque la sentencia apelada y se conceda un nuevo juicio al acusado. Sin embargo, y por los fundamentos expuestos en la opinión disidente emitida por el Juez Asociado Sr. Ortiz, no creo que la confesión escrita del acusado comprendida en el Exhibit 48 del Pueblo, sea involuntaria "como cuestión de derecho". En este sentido discrepo del criterio de la mayoría según se expone en la elaborada opinión escrita por el Juez Presidente, Sr. Snyder. Ello no obstante, concurro con el resultado a que se llega en dicha opinión.

### Opinión disidente del Juez Asociado Sr. Ortiz

La opinión de este Tribunal contiene una excelente discusión de todos los problemas y puntos de vista envueltos en esta apelación. Su calidad se manifiesta a través de la forma

serena y objetiva con que se exponen cabalmente todas las autoridades y precedentes judiciales relevantes a la resolución de este caso. No hay margen para la búsqueda de precedentes adicionales. Pero precisamente a base del estudio desarrollado en la opinión mayoritaria, me veo obligado a disentir de las conclusiones formuladas por este Tribunal, de su dictamen final y de los resultados que son consecuencia de 'esa opinión.

Estoy convencido de que la confesión prestada por el acusado en la noche del 9 al 10 de octubre de 1950, lejos de ser involuntaria absolutamente y como cuestión de derecho, fué voluntaria, por ser una expresión auténtica de la voluntad y de los pensamientos del acusado, sin que fuese el resultado de coacción alguna, ya fuese física o psicológica. El acusado, un hombre inteligente, educado, maduro, perspicaz, siempre alerta, y siempre con plena conciencia de sus derechos, fué sometido a un interrogatorio persistente por espacio de seis horas, por una sola persona, el Fiscal, y finalmente confesó. De los autos no surge en forma alguna que, al prestar la confesión, la voluntad del acusado hubiese quedado aniquilada, ni que el acusado hubiese perdido el control de sus facultades mentales, ni que su libertad intelectual hubiese quedado deteriorada al él prestar la confesión, ni que su resistencia mental hubiese quedado destruída por coacción de clase alguna. Para que quede justificada la conclusión formulada por este Tribunal al efecto de que, en forma incontrovertida y como cuestión de derecho, la confesión fué involuntaria, debe haberse establecido que el interrogatorio fué de tal clase, y el ambiente y las circunstancias que rodeaban al acusado eran de tal naturaleza, que la confesión fué involuntaria, esto es, que no respondía a su voluntad, en el sentido de que su libertad mental había sido indebidamente quebrantada y su resistencia mental había sido destruída. Esa es la única investigación relevante en el problema que nos ocupa, si la confesión fué o no fué voluntaria, y no si el fiscal actuó o no en forma impropia, sin afectar la voluntariedad de la

confesión, o si las preguntas del fiscal no fueron justas ni deportistas por el hecho de haber sido agresivas. No debemos olvidar que un jurado, como tribunal que resolvió sobre los hechos, declaró culpable al acusado; que consideró la cuestión de hecho relativa a la voluntariedad de la confesión, bajo instrucciones del tribunal de derecho; que consideró todas las circunstancias relativas a la forma y manera en que se había prestado esa confesión, y, al declarar culpable al acusado, debe presumirse que también resolvió que la confesión era voluntaria. Estamos ahora dejando sin efecto una conclusión sobre los hechos del jurado. Naturalmente, la única forma en que podríamos hacerlo sería resolviendo, como lo hace este Tribunal, que la confesión inherentemente, automáticamente, como cuestión de derecho y no de hecho, y en forma inexorable e incontrovertida, fué involuntaria. Ese es el criterio que yo no puedo aceptar. Anticipando una discusión posterior un poco más amplia, la voluntariedad de la confesión quedó robustecida por varios hechos posteriores, a saber: que el propio acusado, en la vista de este caso, adoptó y ratificó la virtualidad, eficacia y autenticidad de esa confesión al aceptar la certeza de los hechos expuestos en la confesión y utilizarlos como base de su teoría de defensa, subsanando así cualquier posible defecto de la confesión; que un abogado del acusado, hablando en representación del acusado, admitió que la confesión había sido voluntaria y que el propio acusado, varias horas después de haber prestado la confesión que estamos discutiendo, prestó una segunda confesión que este Tribunal admite que fué válida y voluntaria, en la cual, con toda frialdad y soltura confesó el crimen, con lujo de detalles, subsanando esa segunda confesión cualquier posible defecto de la primera, y pudiendo el jurado haber tomado como base esa segunda confesión para declarar culpable al acusado, y, finalmente, también debemos considerar el hecho de que hubo prueba independiente, aparte de la confesión en cuestión, que justificaba un veredicto de culpabilidad.

En vista de las circunstancias enumeradas, me parece que el dejar sin efecto el veredicto de culpabilidad, y la sentencia correspondiente, es contrario a las realidades y a la justicia intrínseca de este caso específico. Especialmente, me preocupa el hecho de que el efecto de la opinión de este Tribunal en lo que se refiere a la intensidad del interrogatorio del acusado, no deseado, naturalmente, por el Tribunal, sea el de destruir cabalmente la efectividad de las investigaciones criminales en Puerto Rico, atando las manos de los fiscales e impidiendo que ellos interroguen en forma adecuada a los que son objeto de sospechas. El efecto de la opinión de este Tribunal, sin que ese sea el móvil de los compañeros jueces que integran la mayoría, puede ser el de establecer normas de excesiva pulcritud de los fiscales con respecto a los criminales. Yo, naturalmente, creo en la pureza en los procedimientos, pero no hasta un punto tan refinado y excesivo que se haga prácticamente imposible la investigación de los delitos. No creo en los guantes de hierro ni en la prueba de fuego para los presuntos criminales, pero tampoco creo en la excesiva ternura. No creo en la inquisición, pero tampoco creo, al igual que tampoco lo creen mis compañeros jueces, en el paraíso para los criminales. No creo en el totalitarismo, pero creo que en una democracia puede y debe haber fiscales efectivos. Tal como se ha dicho en otras ocasiones, el fiscal no debe sentarse en frente de su casa, como el árabe, para desde allí ver pasar a sus enemigos. Ese resultado no es el deseado por este Tribunal pero, a mi juicio, ése puede ser el efecto de la opinión.

Naturalmente, he hablado en términos de categorías extremas, y ni el infrascrito ni los distinguidos magistrados que integran la mayoría de este Tribunal en este caso, están colocados en posiciones extremas. No debe haber principios absolutos y rígidos, y las diferencias de grados se exhiben de acuerdo con las circunstancias especiales de cada caso. Creo que las circunstancias de este caso específico no justifican el que el Tribunal se aproxime, aun sin desearlo,

a la inutilización de la facultad de investigación de los fiscales. La cuestión de la voluntariedad de las confesiones es un aspecto del eterno problema relativo al contraste entre los derechos individuales y los intereses sociales, entre el individualismo romántico extremo y las necesidades sociales básicas. Al hablar de los derechos sociales, no me estoy refiriendo a la sociedad como un concepto intangible, divorciado de las realidades. Quiero decir que el mayor individualismo es el del mayor número posible de individuos, que la libertad más amplia es la libertad individual de la mayoría de las personas que forman la sociedad. Desde ese punto de vista, la protección excesiva de la integridad personal de un criminal puede resultar en un sistema en que esté en peligro la integridad personal del resto de los individuos que forman la sociedad. Comprendo que es función de una Constitución, y de este Tribunal, el proteger los derechos constitucionales de cualquier ciudadano, o grupo de ciudadanos, aunque formen una minoría de la población. Los derechos de los grupos minoritarios deben ser protegidos, aunque sea un grupo de sospechosos criminales. Pero lo que quiero decir es que esos derechos no son absolutos, no están colocados en el vacío de la abstracción intelectual. El contenido de un derecho individual debe variar de acuerdo con los derechos de los demás ciudadanos. Un acusado tiene derecho a que se observe con respecto a él un debido proceso de ley, y a que no se le obligue a incriminarse a sí mismo. Pero no hay nada preciso, sistemático y exacto en cuanto a lo que debe ser un "debido proceso de ley". Sin que ese sea el propósito del Tribunal en este caso, el significado de esos derechos no debe ser ampliado en forma tan generosa por interpretación judicial hasta el punto de crear una cortina de inmunidad a los acusados y de establecer una muralla contra la investigación y persecución del crimen, en perjuicio de la seguridad personal del resto de los individuos. Ello, como cuestión de doctrina general. Hasta qué punto debe llegar la protección de los derechos del acusado y la protección de las funciones legítimas de los servidores pú-

blicos que están a cargo de defender a la sociedad, depende de las circunstancias de cada caso. Es importante que la investigación judicial sea objetiva y realista, sin que medie la pasión por los derechos civiles ni la pasión por los derechos de la sociedad; sin que el resultado sea afectado por una pasión creada por las circunstancias más o menos crueles u horrendas del crimen específico ante el tribunal, ni por la otra pasión creada por un sentido de indignación en virtud de los métodos seguidos por un fiscal, métodos que pueden ser injustos y poco razonables pero que no lleguen, como cuestión de realidad, a la categoría de una coacción.

Ya es tiempo de que yo descienda de las nubes de la especulación intelectual, y considere las circunstancias específicas de este caso. He deseado sencillamente formar una perspectiva de objetividad, con plena conciencia de los derechos individuales del acusado y del interés social en perseguir la criminalidad en forma legítima y efectiva. Una vez formada tal orientación, consideremos algunos de los aspectos de la confesión prestada del 9 al 10 de octubre del 1950.

Antes de la confesión, el acusado había sido detenido ilegalmente, por varios días, sin mediar orden de arresto, sin haberse llevado al acusado a la presencia de un magistrado y sin haberse permitido al acusado que consultase con un abogado ni con sus amigos. Repudio ese procedimiento, que produce indignación en nuestro ánimo. Pero la cuestión que estamos investigando no es si tal procedimiento debe ser penalizado mediante la absolución del acusado. Lo que estamos comprobando es si la confesión fué voluntaria o involuntaria. Si, no obstante la ilegalidad del procedimiento, la confesión fué inherentemente voluntaria, ella no se transforma artificialmente en involuntaria porque el procedimiento no se haya ajustado al Código de Enjuiciamiento Criminal. Tal como se indica en la propia opinión de este Tribunal, el hecho en sí de que la detención hubiese sido ilegal no implica que la confesión hubiese sido involuntaria. Ello ha sido establecido por la Corte Suprema de los Estados

Unidos en casos recientes. *Gallegos* v. *Nebraska*, 342 U. S. 55, 60; *Stein* v. *New York*, 346 U. S. 156. Analíticamente, tal dictamen es correcto. La cuestión exacta a determinar en cuanto a la involuntariedad de una confesión por coacción psicológica se refiere al punto de si determinada presión impuesta sobre el declarante menoscaba en tal forma su resistencia mental, su libre albedrío y sus facultades mentales, que la confesión prestada no es un producto espontáneo de su voluntad. Dos factores son relevantes, la magnitud de la presión y la personalidad del presionado, en cuanto a su madurez, educación y fortaleza intelectual. La detención en sí puede constituir una especie de presión, pero no es una consecuencia inevitable de ella el que la voluntad del detenido haya quedado afectada. La detención puede ser un preludio de métodos "del tercer grado", pero puede muy bien ocurrir que la detención no vaya acompañada de tales métodos. La detención ilegal puede constituir una circunstancia relevante en la comprobación de si ha mediado coacción psicológica, pero el factor final es la determinación de cuál fué el efecto de la detención sobre los procesos mentales y la voluntad del detenido. Tal circunstancia pierde toda significación y relevancia cuando se demuestra, como en el caso de autos, que no obstante la detención ilegal, al prestarse la confesión el acusado estaba en una plena y cabal posesión de sus facultades mentales. Como surge de la propia reseña de los hechos contenida en la opinión de este Tribunal, al iniciarse y desarrollarse el interrogatorio de la noche del 9 de octubre, el acusado, claramente, estaba mentalmente alerta y con una completa comprensión de sus derechos. No hay indicio alguno de que él estuviese en forma alguna mentalmente agotado y ni siquiera surge de los autos que él sufriese la más leve debilidad mental. Demostró ser, a través de todo el interrogatorio, un hombre inteligente, astuto, perspicaz y enérgico en la defensa de sus intereses. Él confesó espontáneamente en el libre y consciente ejercicio de su voluntad.

Puede haber casos en que la detención esté rodeada de circunstancias que den lugar a la inferencia de que la voluntad del detenido ha quedado quebrantada, tales como la falta de alimentos, de sueño y de descanso. Tales circunstancias afectan indudablemente el organismo y el bienestar físico del detenido, y, por lo tanto, su mente y su voluntad. Precisamente la Corte Suprema de los Estados Unidos ha resuelto que la detención ilegal constituye una circunstancia significativa para demostrar que ha habido coacción cuando al detenido no se ha permitido dormir, descansar y alimentarse por un período prolongado de tiempo antes de prestar la confesión. *Watts* v. *Indiana*, 338 U. S. 49, 51, 52. Pero en otros casos en que la detención ha sido ilegal, pero el acusado ha tenido oportunidades adecuadas de satisfacer las necesidades elementales de su vida, se ha resuelto que la confesión es voluntaria no obstante la detención ilegal. *Gallegos* v. *Nebraska*, supra; *Stein* v. *New York*, supra. En el caso de autos, de la propia reseña de los hechos expuesta en la opinión de este Tribunal surge que, en todo momento durante su detención antes del interrogatorio que dió lugar a la confesión, Fournier descansaba, dormía y se alimentaba normalmente, todo lo que él desease. Por lo tanto, no hay margen en absoluto para la inferencia de que la detención ilegal hubiese tenido siquiera la tendencia a producir una confesión involuntaria. En vista de todo ello, de que la detención ilegal no debilitó, como cuestión de hecho, la voluntad de Fournier, y que las circunstancias que rodearon la detención no afectaron en forma alguna su bienestar físico y mental, la detención ilegal carece de toda significación y relevancia en la investigación del "issue" preciso ante nos, de la voluntariedad de la confesión. Por lo tanto, debe ser totalmente excluída como circunstancia relevante, ya sea en forma aislada o en conjunción con el interrogatorio, ya que, al llegar al momento del interrogatorio, la detención ilegal no había afectado a Fournier en forma alguna. En la opinión de este Tribunal se indica que el hecho en sí de la detención, sin hablar con abo-

gados ni amigos ni familiares, podía haber creado cierta reacción psicológica de Fournier, de sometimiento a la autoridad del fiscal y demás funcionarios, y de formación del deseo de confesar para poder terminar esa situación. Pero es que de la propia opinión de este Tribunal surge que, como cuestión de realidad específica, la detención no afectó la voluntad de Fournier, y, por lo tanto, ha quedado rebatida cualquier posible presunción o indiferencia en contrario. No hay el más leve indicio de que Fournier confesó porque él se consideraba indebidamente sometido a la voluntad del fiscal o porque él deseaba escapar de la situación de detención ilegal en que él se encontraba. El hecho de que él protestase de su detención no quiere decir que él prestó la confesión debido a su detención. La protesta demuestra precisamente lo contrario, una actitud, no de sometimiento y de debilidad, sino de resistencia enérgica. La energía de sus alegaciones demostraba el control completo de su voluntad.

En síntesis, hay margen para indignación moral por la detención de Fournier. Pero esa noble pasión no nos debe llevar a resolver que fué involuntaria una confesión que realmente y como cuestión de hecho fué voluntaria. Penalizar a los funcionarios responsables en alguna otra forma, que no sea incompatible con la realidad específica de los hechos tales como ellos ocurrieron. La moral pública puede lograrse mediante esas otras penalidades, pero no mediante la revocación de la sentencia a base de que fué involuntaria una confesión que realmente fué voluntaria. Deseo aclarar que estoy convencido de que no ha sido el móvil de los compañeros magistrados que integran la mayoría del Tribunal en este caso el de transformar la realidad de los conceptos a base de indignación. Como dije antes, la opinión mayoritaria está redactada en términos objetivos y serenos, pero el resultado a que se llega puede justificar las observaciones generales que he expresado, como cuestión de doctrina general, y no como crítica a la forma elevada en que está escrita la opinión de este Tribunal.

Procede considerar ahora la naturaleza del interrogatorio a que fué sometido Fournier en la noche del 9 de octubre de 1950, a los fines de comprobar si tal interrogatorio constituía coacción psicológica, esto es, si debilitó la voluntad de Fournier en tal forma que la confesión prestada por él fué involuntaria. Tal como se indica en la propia opinión de este Tribunal, el hecho en sí de que un interrogatorio sea persistente, pertinaz, agresivo y razonablemente continuo no implica que la confesión sea involuntaria. Eso fué precisamente lo que ocurrió en este caso. El interrogatorio duró solamente seis horas, cuando Fournier estaba en una actitud mental completamente adecuada, con plena libertad intelectual, mentalmente alerta, consciente de sus derechos, después que él había dormido, descansado y haberse alimentado, siendo él un hombre maduro, educado, inteligente, con experiencia de la vida, y con un conocimiento amplio de sus derechos y de su posición especial en este caso. El interrogatorio fué conducido por una sola persona, el Fiscal Viera Martínez, y no por una serie continua de inquisidores, cada uno con una mente fresca en pugna con la mente gastada del detenido. Tal como se indica en la opinión de este Tribunal, el propio Viera Martínez estaba más cansado y había dormido menos que Fournier, y, desde ese punto de vista, Fournier disfrutaba de una ventaja física y mental. Es claro que no hubo métodos de "tercer grado"; no hubo violencia ni tortura física, ni luces encendidas continuamente sobre el rostro del acusado. Viera Martínez nunca amenazó al acusado, ni le hizo promesas de clase alguna. No hubo métodos sutiles de tortura o coacción. En cuanto al factor tiempo, gran parte de las seis horas fué dedicada a preguntas irrelevantes que nada tenían que ver con el caso. Es muy probable que el interrogatorio sobre el caso en sí durase hasta menos de tres horas. Entonces, lo único que queda es un interrogatorio pertinaz y agresivo que, según se ha establecido por la jurisprudencia, no convierte la confesión en involuntaria. Se trataba sencillamente de un duelo intelectual entre

dos mentalidades alertas, decidiéndose finalmente Fournier a confesar. No hay indicios en los autos de que al decidirse Fournier a confesar, su mente estuviese agotada y su voluntad estuviese debilitada. Lo más que podría hacerse sería levantar una inferencia al efecto de que, del hecho de la agresividad del interrogatorio, surge el deterioro de la voluntad. Pero la regla establecida es precisamente la contraria, de que la persistencia en el interrogatorio no produce involuntariedad. Fournier no declaró en el juicio, y no hubo prueba directa de clase alguna, ya sea de labios del propio Fournier, o de otra fuente, sobre el efecto del interrogatorio sobre la voluntad de Fournier. Naturalmente, Fournier tenía derecho a no declarar. Pero la Corte Suprema de los Estados Unidos dijo lo siguiente, en el caso de *Stein* v. *New York*, supra, a la página 177, al hablar del silencio del acusado en cuanto a la voluntariedad de una confesión:

"En la determinación de la cuestión de coacción, al igual que en otras cuestiones, cuando el ministerio público ha presentado un caso ante el jurado, el acusado debe decidir entre la desventaja del silencio y la desventaja de declarar. La Constitución protege el derecho del acusado a permanecer en silencio; no le garantiza que pueda permanecer en silencio y al mismo tiempo retener las ventajas que él habría obtenido de él haber declarado."

Esto es, que es legítimo el observar que, al permanecer en silencio el acusado, no hubo prueba de que su voluntad se hubiese "muerto" como resultado del interrogatorio.

Este Tribunal resuelve que, "como cuestión de derecho", la confesión de la noche del 9 al 10 de octubre fué involuntaria. En ausencia de prueba específica del efecto concreto de las preguntas sobre el intelecto y la voluntad del acusado, el dictamen del Tribunal conlleva el criterio de que, de la naturaleza de las preguntas formuladas surge inexorablemente la involuntariedad de la confesión. No estoy conforme con esa proposición. Pero antes de entrar en algunos de los detalles del interrogatorio, conviene advertir que uno

de los factores esenciales en la determinación de si una confesión es o no voluntaria consiste en la personalidad del acusado. Fournier no era un muchacho joven, ignorante, tímido o analfabeto. Era, y es, un hombre maduro, educado, inteligente, hombre de negocios y agresivo en la defensa de sus intereses. Con esa personalidad, es mucho más difícil demostrar que el interrogatorio debilitó su voluntad y quebrantó su intelecto hasta el punto de convertir la confesión en involuntaria. De otro lado, no podemos olvidar que es deber de los fiscales el investigar, y que una parte muy importante de esta investigación es el interrogatorio del acusado. El acusado es la persona que está en mejores condiciones para conocer los hechos, para demostrar su inocencia si es inocente y para explicar la prueba que el fiscal haya podido obtener. El acusado tiene derecho a no declarar, pero ello no impide que el fiscal lo interrogue y trate de obtener una declaración, en forma legítima. La experiencia corriente es que el interrogatorio no puede siempre llevarse a cabo efectivamente en un plano de conversación cordial y amistosa. El fiscal muchas veces tiene que ser agresivo, sin violencia ni intimidación, y un método especialmente efectivo es el de confrontar al acusado con la prueba ya obtenida, para que el acusado la explique. Todo eso es parte de la rutina de una investigación, y por ello es que se ha resuelto que el hecho en sí del interrogatorio pertinaz no implica que la confesión obtenida sea involuntaria. En el caso de *Stein* v. *New York*, supra, la Corte Suprema de los Estados Unidos, a través del Juez Jackson, dijo lo siguiente a la página 184:

"Se alega que hubo coacción psicológica, como contención secundaria. Se insiste en que los hechos admitidos demuestran que hubo tal presión psicológica a través del interrogatorio, que la resistencia mental del acusado fué dominada o apabullada, siendo involuntaria la confesión. Por supuesto, un proceso de interrogatorio puede ser tan prolongado y continuo, especialmente cuando está acompañado de la privación de refrescos o descanso, que se logre una confesión involuntaria.

"Pero la investigación en cuanto a tal alegación tiene un punto distinto de partida. El interrogatorio no constituye inherentemente una coacción, tal como ocurre en el caso de violencia física. Los interrogatorios tienen valor social en la solución de los crímenes, mientras que la violencia física no tiene valor social. Por sus propias contestaciones muchos sospechosos se exoneran a sí mismos, y la información que ellos dan conducen frecuentemente a la persona que es realmente culpable. Por cierto, el interrogatorio de aquellos que conocen algo sobre los hechos constituye el medio principal de resolver los crímenes. El deber de divulgar información sobre un crimen recae sobre todos los ciudadanos. Es tan vital que una persona que se sabe que es inocente puede ser detenido, sin fianza, como un testigo esencial. Esta Corte nunca ha resuelto que la Enmienda Catorce prohibe a un estado el detener e interrogar a un sospechoso en forma razonable, que no constituya una coacción.

"Por supuesto, tales investigaciones tienen sus límites. Pero los límites no se definen meramente a través de caracterizar un interrogatorio como una "inquisición", lo que sólo añade al problema las emociones heredadas de la experiencia medieval. Los límites en cada caso determinado dependen de un proceso de pesar las circunstancias de presión contra el poder de resistencia de la persona que ha confesado. Lo que puede ser apabullante para el débil de voluntad y de mente podría ser totalmente inefectivo contra un criminal de experiencia.

"Stein y Cooper confesaron ambos sólo después de 12 horas de interrogatorio persistente y continuo. En cada caso esto se extendió a períodos de 32 horas, con intervalos para el descanso y la alimentación . . . También es cierto que el interrogatorio se condujo por varios funcionarios al mismo tiempo, y por distintos funcionarios en períodos distintos de tiempo. Pero no podemos decir que el uso de funcionarios sucesivos para hacer preguntas a los peticionarios durante los períodos de tiempo que hemos indicado fué tan opresivo que destruyó sus poderes de resistencia. Aunque hemos revocado convicciones basadas en confesiones obtenidas por interrogatorios de series de funcionarios, también hemos sostenido y confirmado convicciones en que ha mediado la técnica de 'series' (*relay*), cuando las circunstancias han sido distintas. Pero nunca hemos ido tan lejos como para resolver que la Enmienda Catorce requiere una proporción (*ratio*) de uno a uno entre los que interrogan y los prisioneros,

o que el interrogatorio prolongado de un prisionero automáticamente convierte la prueba que él da en algo prohibido constitucionalmente.

"La conciencia interna de haber cometido un asesinato y un robo, y de verse confrontados con prueba de culpabilidad que ellos no podían negar ni explicar, es suficiente para explicar el porqué ellos prestaron las confesiones. Estos hombres no eran jóvenes, débiles, ignorantes o tímidos. Tenían experiencia en las cosas de crímenes y de su descubrimiento, ni eran ellos estúpidos en cuanto a sus derechos. Al terminar el interrogatorio, el espectáculo de Cooper fijando los términos de su confesión, decidiendo por sí mismo con quién él negociaría, obteniendo lo que él deseaba como consideración por él decir lo que él sabía, reduce al absurdo su alegación de ahora de que su confesión fué involuntaria. Por supuesto, esas confesiones no pueden ser voluntarias en el sentido de que los peticionarios deseaban hacerlas, o que fueron completamente espontáneas como las que se hacen al cura, al abogado o al psiquiatra. Pero en ese sentido ninguna confesión es voluntaria.

"Las confesiones de Cooper y de Stein se hicieron obviamente cuando ellos se convencieron de que había terminado el baile y había llegado el tiempo de pagar al violinista . . . Ambas confesiones fueron 'voluntarias' en el único sentido en que lo puede ser una confesión prestada a la policía por una persona arrestada y sospechada. La corte estadual podía en forma apropiada resolver que no hubo coacción psicológica."

Consideremos algunas de las circunstancias que caracterizaron el interrogatorio. Entre otras cosas, el fiscal le dijo al acusado que él no tenía derecho a consultar y a ser ayudado por un abogado, en esa etapa del procedimiento. En ello el fiscal no incurrió en una falsedad. Tal como se indica en la opinión mayoritaria, este Tribunal ha resuelto que un acusado no tiene derecho a la ayuda de abogado en el curso de una investigación. Pero aun suponiendo que el fiscal le hubiese informado al acusado incorrectamente sobre el estado de la ley, ello no implica que la confesión hubiese sido involuntaria, o que hubiese sido obtenida mediante coacción psicológica. No creo que las manifestaciones del fiscal constituyan un fraude o una triquiñuela, pero aun suponiendo tal extremo,

ya se ha establecido la regla general al efecto de que una confesión no se ha convertido en involuntaria por el hecho de que haya sido obtenida por fraude o triquiñuelas, por más criticables que sean esas prácticas. 3 Wigmore 281, sec. 841, 3ra. ed. y casos allí citados, y véase al mismo efecto *Pueblo v. Alméstico*, 18 D.P.R. 320. Esta regla ilustra el contraste que siempre se debe advertir, entre el hecho de que el procedimiento utilizado sea altamente criticable, y el hecho, muy distinto, de que la confesión sea realmente involuntaria. Ya se ha determinado que la ilegalidad en los métodos utilizados no implica necesariamente el que la confesión sea involuntaria, ya que tal ilegalidad no significa, de por sí, el que la confesión no merezca crédito. 3 Wigmore 249, sec. 823, 3ra. ed. El hecho de informar al acusado que él no tiene derecho a la ayuda de un abogado durante el interrogatorio no significa el que la resistencia mental del acusado haya quedado quebrantada hasta el punto de que él deliberadamente preste una confesión falsa para evitar que continúe el interrogatorio. De todos modos, el acusado no creyó en las manifestaciones del fiscal y siempre insistió en que él tenía derecho a consultar con un abogado.

El fiscal le dijo al acusado, en varias ocasiones y en forma errónea, que él estaba obligado a contestar. El fiscal, más o menos, expresó las siguientes frases: "Ud. tiene que contestar . . . Hago la pregunta y pasan tantos minutos sin que el acusado conteste, etc." Esa forma de preguntar, aisladamente, es criticable, pero no surge de la totalidad del interrogatorio que tales tácticas, o tales manifestaciones, tuviesen efecto alguno sobre la mente o sobre la voluntad del acusado. Por el contrario, surge afirmativamente del interrogatorio que el acusado rechazó siempre en forma enérgica tales aseveraciones del fiscal y que siempre estuvo perfectamente consciente de que él tenía el derecho a no declarar. La prestación de la confesión no se debió al hecho de que el acusado finalmente llegase a la conclusión de que realmente él no tenía el derecho a abstenerse de declarar.

Aunque no es la misma situación, por analogía, en 3 Wigmore 263, sec. 832, se discute el problema de la indicación hecha al acusado, en un interrogatorio, de que él debería o tenía que declarar la verdad. Se dice lo siguiente:

"Como cuestión de principio, el consejo hecho por cualquier persona al efecto de que sería mejor decir la verdad, no puede posiblemente viciar la confesión, ya que, por propia hipótesis, lo peor que puede ocurrir es que traiga la verdad a la luz, y, por lo tanto, no hay riesgo alguno de que se acepte una confesión falsa. El declarante no está obligado a seleccionar entre el silencio y una confesión falsa que tenga ventajas poderosas; las ventajas se adhieren a la expresión de la verdad; y, por más tentadoras que supongamos que sean, no hay nada en la naturaleza de la tentación que implique que la declaración carece de credibilidad; porque si ha tenido alguna utilidad, ella ha sido la de hacer relucir la verdad. Sin embargo, se ha encontrado jueces con una escrupulosidad tan extraordinaria que excluyen confesiones prestadas después de tal consejo. El resultado práctico bajo tales decisiones es el de establecer una interpretación falsa y artificial, justamente criticada por el Juez Willes, al decir: 'Aparentemente se suponía en una ocasión que el decir "diga la verdad" quiere decir "diga una mentira". La opinión más sólida es la que se niega a excluir una confesión inducida por tal petición; y el peso de las autoridades en este país, aunque no en Inglaterra, repudian tal exclusión.' "

En la opinión de este Tribunal se le da énfasis al hecho de que el acusado fué confrontado con cierta prueba que había obtenido el fiscal, de naturaleza repulsiva, horrorosa, horrible y horripilante, y que ello era un factor importante en el establecimiento de una coacción psicológica. Pero de acuerdo con la propia teoría de defensa del acusado y de acuerdo con la confesión de San Antón, que este Tribunal resuelve que fué voluntaria, el acusado no solamente conocía esa prueba con anterioridad a la confesión de la noche del 9 de octubre, sino que él mismo había creado esa prueba al realizar los hechos posteriormente admitidos por él en forma indudablemente voluntaria. Para él no podía haber repulsión ni horror cuando él mismo había creado el horror. Su voluntad no

podía haber quedado afectada por ciertos objetivos horripilantes que ya él conocía previamente, y que se habían convertido en horribles debido a su propia actuación y al ejercicio previo de su propia voluntad. No creo que la sentencia deba ser revocada ni que la confesión deba ser tildada de involuntaria por el hecho de que se le pidiese al acusado que explicase una prueba que él mismo había formado y con la cual él había estado en contacto. Si el acusado no había quedado horrorizado antes, no debe haber margen para decir que él quedó horrorizado después, a menos que se diga que él sufrió una conmoción al averiguar que su crimen y sus actuaciones habían quedado descubiertas. Pero tal conmoción no constituye el aniquilamiento de la voluntad que se requiere para que se excluya una conmoción. Precisamente se ha indicado y se ha resuelto que la confrontación del acusado con la prueba constituye la explicación más legítima y más eficaz para el hecho de que el acusado preste una confesión, sin que tal confesión sea involuntaria. En el caso de Stein se resolvió, el 15 de junio de 1953, que la confesión de Stein y de Cooper se había prestado, no debido a la detención ilegal ni al interrogatorio prolongado, sino debido al hecho de que los acusados habían sido confrontados con la prueba y que, por lo tanto, la confesión era voluntaria porque los acusados se habían dado cuenta de que "el baile se había terminado y que había que pagar al violinista". Sobre el mismo extremo, se dice lo siguiente en 3 Wigmore 319, sec. 851:

"En primer lugar, una persona inocente siempre es ayudada por una pronta oportunidad de decir todo lo que sabe; cientos de personas que han sido objeto de sospechas son puestas en libertad todos los días porque lo que ellos dicen tiene todos los indicios de ser la verdad. Además, y más importante aún, toda persona culpable casi siempre está lista para confesar, con deseos de confesar, cuando se le arresta *y se le descubre*. Esta verdad psicológica, bien conocida por todos los jueces que presiden juicios criminales, parece que es ignorada por algunas Cortes Supremas. La presión nerviosa de la culpabilidad es enorme; es fuerte la carga del hecho realizado; el temor del descubrimiento

llena la conciencia, y *cuando viene el descubrimiento,* se alivia la presión; y el sentido profundo de alivio convierte la confesión en una satisfacción. En ese momento él lo dirá todo, y lo dirá con veracidad. *El prohibir que se solicite de él que preste la confesión,* para evitar ese alivio, *es actuar en forma contraria a la naturaleza humana.* Es natural, y debe ser legal, el obtener su confesión en ese momento, *el mejor momento.* Y ese procedimiento, de ser aprobado, salva al Estado de dilaciones y gastos en obtener su convicción después que él ha reaccionado de sus primeros sentimientos, ha cedido ante los consejos de sus amigos, y cae luego bajo el dominio del instinto humano natural de luchar por salvarse a sí mismo con la ayuda de tecnicismos." (Bastardillas nuestras.)

En este caso, el acusado formó la conciencia de que había sido descubierto (*detected*) cuando se le confrontó con la prueba. De ahí surgió el impulso natural de decir la verdad, en forma voluntaria, y no en forma coaccionada.

Es difícil para los fiscales, en muchos casos, el obtener o descubrir la prueba. Una vez lograda y descubierta, uno de los métodos más efectivos en la solución y persecución de los crímenes consiste en confrontar con esa prueba a un sospechoso que se niega a declarar. Si la persona sospechada es realmente inocente, dentro de las reacciones humanas naturales, a él no le afectaría esa prueba, aunque sea horripilante, ya que él no ha participado en la creación de ese horror, ni le afectaría el hecho de saber que el fiscal tiene en su poder esa prueba. Por lo menos, él podría tener una sensación desagradable de disgusto y repulsión ante la naturaleza intrínseca de la prueba, pero ella no lo afectaría, al inocente, hasta el punto de prestar una confesión falsa para que no se le siga exhibiendo una prueba con la cual nada ha tenido que ver. Pero si al verdadero culpable se le confronta con esa prueba, él podría muy bien tener el impulso natural y voluntario de confesar, ya sea por percatarse de que ha sido descubierto y que "su baile se ha terminado", siendo inútil toda evasión adicional, o ya sea por el remordimiento de una conciencia culpable, estimulado por la observación directa de los

objetos que han rodeado su crimen. Ese es el punto de vista realista y psicológico en cuanto a esta situación. Pero si se establece una regla mecánica de exclusión de las confesiones porque al acusado se le ha confrontado con la prueba, que, en la mayoría de los asesinatos es necesariamente horripilante, entonces se estaría destruyendo un medio efectivo de solución de los crímenes.

En términos generales, la regla bien establecida es al efecto de que la base y la razón de ser de la doctrina de exclusión de confesiones involuntarias consiste en el hecho de que determinada presión, o determinadas actuaciones que inducen la confesión, crean un riesgo sustancial de que tales confesiones sean falsas y carezcan de credibilidad (*untrustworthy*). 3 Wigmore 246, 248, secs. 822 y 823. Esto no quiere decir que un acusado pueda impugnar la voluntariedad de una confesión mediante su tentativa de demostrar que el contenido de la confesión sea falso. Lo que quiere decir es que el concepto en sí de la involuntariedad surge de aquellas circunstancias externas que den lugar a la probabilidad de que la confesión sea falsa. Ahora bien, he meditado en forma prolongada sobre este problema, y, aunque puedo llegar a la conclusión de que el fiscal no actuó del todo bien, no puedo llegar a la conclusión de que las circunstancias que rodearon la confesión de Fournier establecen el riesgo o la probabilidad de que la confesión fuese falsa.

Aunque respeto profundamente el criterio de los demás miembros del Tribunal, y aunque admiro la calidad objetiva de la opinión mayoritaria, no estoy de acuerdo con el método de análisis mediante el cual se llega al resultado de que la confesión fué involuntaria. Se indica que la detención ilegal, de por sí, no demuestra que la confesión fuese involuntaria, y que el interrogatorio prolongado, de por sí, no demuestra que la confesión fuese involuntaria. Pero se tiende a indicar que, aunque cada factor aislado no demuestra involuntariedad, la unión de los dos factores produce involuntariedad. Si no hay coacción psicológica bajo ninguno

de los dos factores, la unión de los dos factores no tiene que producir coacción psicológica. Naturalmente, la opinión se puede interpretar al efecto de que la detención ilegal produjo alguna presión de alguna magnitud, aunque no de suficiente magnitud por sí sola para dar lugar a involuntariedad, y que las circunstancias del interrogatorio crearon también alguna presión, aunque fuese aisladamente insuficiente, y que al añadir una presión a la otra, se crea una nueva presión, de mayor y suficiente magnitud. Pero la detención ilegal, como cuestión de realidad, no constituyó coacción ni presión de clase o magnitud alguna, ya que, en el momento posterior determinante, al iniciarse el interrogatorio, Fournier no había quedado afectado en forma alguna por la detención ilegal; estaba en buen estado de salud, descansado, alimentado, mentalmente alerta, en pleno control de su voluntad y de sus facultades mentales, y en un plano de defensa enérgica de sus derechos y de su personalidad, quedando destruída cualquier posible inferencia adversa que pudiese haber surgido de la detención ilegal. Como cuestión de realidad, del hecho en sí de la duración del interrogatorio (solamente seis horas) no surgió presión indebida de clase alguna que afectase la voluntad de Fournier. Tampoco surgió tal presión que debilitase la voluntad del hecho de que el fiscal le dijo a Fournier que él no tenía entonces derecho a la ayuda de un abogado, por lo que ya he indicado. La voluntad de Fournier se mantuvo firme no obstante la ausencia de abogado. Como cuestión de realidad, no hubo presión que menoscabase la voluntad porque el fiscal le dijo a Fournier que él tenía que declarar, cuando el propio Fournier rechazaba la veracidad de esa información, y no hubo presión indebida que menoscabase la voluntad de un inocente cuando se le confrontó a Fournier con una prueba que él ya conocía. No hubo unión de presiones indebidas y, aun de haberlas, la conjunción de ellas no era inherentemente suficiente para aniquilar la voluntad de Fournier hasta el punto de inducirlo a prestar una confesión falsa.

Consideremos ligeramente algunos de los casos resueltos por la Corte Suprema de los Estados Unidos en cuanto a la voluntariedad de confesiones cuando media la alegación de coacción psicológica. Digo ligeramente porque en la opinión de este Tribunal se discuten ampliamente todos esos casos. Los casos en que se resuelve que las confesiones eran involuntarias envuelven circunstancias completamente distintas a las que prevalecen en el caso de autos. Por ejemplo, en *Watts* v. *Indiana,* supra, el acusado fué interrogado persistentemente por varios funcionarios en series (*relays*) (aquí por uno solo) durante diversos períodos de tiempo continuos por espacio de *cinco días,* y en el último día se le preguntó de seis de la tarde a tres de la mañana. Los primeros dos días estuvo en una celda solitaria, llamada "el hoyo". No se le dió oportunidad ni para dormir ni para alimentarse adecuadamente. En *Turner* v. *Pennsylvania,* 338 U. S. 62, 63, 64, el acusado fué interrogado durante seis días, en diversos períodos de tiempo, por series de funcionarios, y en ocasiones fué interrogado por varios funcionarios juntos; cuando alguno de los policías tenía un tiempo libre, mandaba a buscar al acusado. En *Harris* v. *South Carolina,* 338 U. S. 68, 69, 70, el acusado fué interrogado por series de funcionarios en un cuarto pequeño donde había un calor agotador, relevándose los funcionarios unos a los otros. Se le interrogó toda la noche de un lunes, luego de la una y media de la tarde del martes hasta la una de la mañana, con una hora de descanso; el miércoles varios funcionarios lo interrogaron juntos por varias horas. Se le amenazó con arrestar a su madre. El acusado era un analfabeto. En otros casos, el acusado era, o analfabeto, o un muchacho joven, ignorante y tímido, sujeto a interrogatorios por varios funcionarios en series, y , por ejemplo, por 36 horas continuas con una luz sobre su cabeza. *Ashcraft* v. *Tennessee,* 322 U. S. 143. Tales casos son totalmente inaplicables al de autos. De otro lado, en otros casos, la Corte Surpema ha resuelto que las confesiones fueron voluntarias, aun bajo circunstancias más gravosas para el acu-

sado que el caso de autos. En *Lisenba* v. *California*, 314 U. S. 219, 238, se había detenido ilegalmente a un hombre maduro e inteligente, con experiencia en negocios, por períodos de tiempo más prolongados que en el caso de autos, tal, como se indica en la opinión mayoritaria. Se resolvió que la. confesión era voluntaria. En *Gallegos* v. *Nebraska*, supra, se trataba de un mejicano que trabajaba de peón en una finca, y no sabía hablar bien el inglés. Se le encerró en un cuarto pequeño por 21 horas, y se le preguntó por un período de cuatro días, en Tejas, por una hora cada día. En Nebraska, se le preguntó por tres funcionarios, a través de un intérprete.. La detención había sido ilegal. Se resolvió que no obstante ello, la confesión había sido voluntaria. En *Stein* v. *New York*, supra, la detención fué ilegal, y el interrogatorio fué más prolongado que el del caso de autos. Creo que es evidente que los casos de Lisenba, Gallegos y Stein son más aplicables en sus circunstancias al caso de autos que los de Watts, Turner, Harris y Ashcraft. Si fuéramos a resolver este caso a base de la jurisprudencia sentada por la Corte Suprema de los Estados Unidos, tendríamos que concluir que la confesión prestada por el acusado fué voluntaria.

Estoy completamente de acuerdo con la tesis expresada en la opinión de este Tribunal al efecto de que la segunda confesión prestada por el acusado en el Barrio San Antón en la mañana del 10 de octubre de 1950 fué voluntaria. Considerando esa opinión aisladamente, la prueba incontrovertida demostró paladinamente que en San ˙Antón el acusado estaba sereno, tranquilo, hablaba normalmente, su actitud era correcta, habló y actuó espontáneamente, y en forma gráfica demostró, a través de actos espontáneos, la forma y manera en que él había cometido el crimen, describiendo la escena y el crimen con lujo de detalles; las actuaciones del acusado eran completamente libres; se dejó retratar libremente al ir describiendo como él había cometido el crimen. He considerado esa confesión, en primer término, aisladamente, y estoy consciente de la regla de que, de haber dos confesiones

sucesivas, si la primera es involuntaria, debe presumirse que la segunda también es involuntaria. De acuerdo con mi tesis, no hay necesidad de aplicar tal regla a este caso, ya que la primera confesión no fué involuntaria. Pero aun suponiendo que lo haya sido, cualquier posible presunción de involuntariedad de la segunda fué rebatida, ya que es claro que al declarar en San Antón el acusado estaba sereno y tranquilo, y no estaba en forma alguna afectado por su alegada experiencia de la noche anterior. Lo que desearía enfatizar es que la propia actitud y conducta del acusado en San Antón, pocas horas después del primer interrogatorio, demuestran que en la noche anterior su voluntad no había sido afectada en forma alguna por coacción psicológica alguna. Por el contrario, él admitió en San Antón, ante los periodistas, en forma libre, espontánea y voluntaria, que él no había sido presionado por el fiscal en la noche anterior, que su primera confesión había sido voluntaria. Esa admisión es de extraordinaria importancia en cuanto a la realidad de lo que había ocurrido la noche anterior, teniendo en cuenta especialmente que este Tribunal resuelve que todo lo dicho por él en San Antón fué voluntario y digno de credibilidad, lo cual le da un gran valor probatorio a esa admisión del acusado, de que él no había sido coaccionado en la noche anterior. Aun independientemente de esa admisión, desde un punto de vista realista, no creo que se deba dejar sin efecto una sentencia y una convicción a base de que la confesión de la noche del 9 de octubre fué involuntaria, cuando pocas horas después, en San Antón, el acusado, fríamente, serenamente, con absoluta libertad de conciencia y de voluntad, explica su crimen con todo lujo de detalles, ante una multitud de periodistas. Esa realidad demuestra que no hubo coacción en la noche anterior, y demuestra especialmente que él no quedó afectado en forma alguna cuando se le confrontó con una prueba horripilante, cuando él mismo reproduce el horror pocas horas después, con entera frialdad, ante los fotógrafos. La confesión voluntaria de San Antón destruye la involuntariedad de la primera confe-

sión, ya que el propio acusado se encargó de demostrar, no sólo que las circunstancias que rodearon la primera confesión no habían creado riesgo alguno de falsedad, desapareciendo la base de la doctrina de involuntariedad, sino que también esa primera confesión, esencialmente, no había sido falsa.

La voluntariedad de la confesión de la noche del 9 de octubre quedó también demostrada por las manifestaciones del abogado del acusado, Lic. Rubén Gaztambide Arrillaga, en la tarde del 10 de octubre, pocas horas después de esa primera confesión, manifestaciones hechas en corte abierta al desistir el acusado, por medio de su abogado, de una petición de hábeas corpus que había sido presentada por él. El Lic. Gaztambide dijo, como se indica en la opinión, que no había podido ver al acusado por 80 horas, pero que finalmente el acusado le había dicho que él no había sido obligado por el fiscal a declarar ni a confesar; y que su confesión había sido enteramente voluntaria, y que el abogado afirmaba que la confesión había sido voluntaria. El Lic. Gaztambide Arrillaga, al expresarse en esa forma, estaba hablando en representación de su cliente, era el acusado el que estaba hablando. Las manifestaciones de Gaztambide eran admisibles en evidencia en este caso. No hay problema alguno de prueba de referencia, ya que la regla de la prueba de referencia no es aplicable a, ni excluye, las admisiones de un acusado hechas a través de un agente, como lo era Gaztambide del acusado, ya que, al conducir un litigio, el abogado de un acusado debe ser considerado como un agente del acusado, y sus admisiones son las admisiones del acusado, siempre y cuando que el abogado las haga en el curso de su empleo, esto es, de su autorización como tal agente. 4 Wigmore 43, sec. 1063, 3ra. ed. Pero se indica en la opinión de este Tribunal que las manifestaciones del Lic. Gaztambide Arrillaga no eran admisibles, porque no eran pertinentes. Estoy en desacuerdo con tal criterio, por los siguientes fundamentos:

(1) Estrictamente hablando, las manifestaciones de Gaztambide eran pertinentes a lo que se estaba ventilando en corte

en la tarde del 10 de octubre. Se trataba de una petición de hábeas corpus, y el propósito del abogado, autorizado por el acusado, era el de desistir de la petición. Uno de los fundamentos del desistimiento era el hecho de que se iba a radicar una acusación y que al acusado se le iba a señalar una fianza. Pero la acusación se iba a radicar porque la confesión se había prestado, y, por lo tanto, la confesión era pertinente al desistimiento, esto es, la confesión era pertinente al asunto sobre el cual hablaba el abogado en representación del acusado.

(2) El verdadero criterio que hace admisibles las manifestaciones de un abogado en representación de su cliente es el que el abogado haya actuado dentro del curso de su autorización. Gaztambide hablaba en el curso de su autorización porque lo que él dijo era un incidente de su facultad de conducir el litigio, (4 Wigmore 43, 44), esto es, era un incidente apropiado del desistimiento de la petición de hábeas corpus.

(3) Gaztambide actuaba dentro del curso de su autorización porque el acusado lo había autorizado a decir lo que dijo. Gaztambide manifestó que habían transcurrido 80 horas sin él haber hablado con el acusado, pero que el acusado finalmente habló con él y le indicó que la confesión había sido voluntaria. De ello se desprende que Gaztambide habló con el acusado en alguna ocasión del día 10 de octubre, poco después de la primera confesión, y que el acusado implícitamente lo había autorizado a decir que la confesión era voluntaria.

(4) Tratándose de un problema de pertinencia es conveniente advertir que, tal como se expresa en la opinión de este Tribunal, el acusado en el caso de autos se opuso a que se admitiera el documento que contenía las manifestaciones de Gaztambide, pero se negó a exponer los fundamentos de su objeción. Una objeción no puede ser considerada en apelación a menos que los fundamentos de ella se hayan expuesto en el tribunal de primera instancia. Este Tribunal no debe motu proprio subsanar la actitud del acusado al negarse a informar al tribunal sobre los motivos de su objeción.

(5) Partiendo del punto de vista de esta opinión disidente, de que las confesiones fueron voluntarias de por sí, si hubo error al admitir las manifestaciones de Gaztambide, tal error no pudo haber sido perjudicial, porque tales manifestaciones lo que hacen es corroborar la realidad ya establecida de que las confesiones fueron voluntarias.

(6) Consideremos la realidad del asunto. Un abogado que indudablemente representa a un acusado se para en corte y dice que, de acuerdo con lo manifestado por su propio cliente a él, al abogado de su cliente, las confesiones habían sido voluntarias. ¿Por qué esas manifestaciones no pueden tener valor probatorio?

(7) El acusado nunca declaró en corte que Gaztambide había hablado sin su autorización. No quedó rebatida la presunción de autorización.

Suponiendo la admisibilidad y valor probatorio de las manifestaciones del Lic. Gaztambide Arrillaga, no creo que debemos revocar la sentencia a base de que la primera confesión era involuntaria cuando el propio acusado le dice a su abogado que la confesión fué voluntaria, y el abogado ratifica esa voluntariedad en corte abierta. Repito que la revocación bajo tales circunstancias es contraria a las realidades de este caso. He indicado que no hay problema en cuanto a la regla de la prueba de referencia con respecto a las manifestaciones del Lic. Gaztambide Arrillaga. Se podría alegar que tales manifestaciones constituyen prueba de referencia doble, o sea, una doble violación a la regla. Sin embargo, yo entiendo que se trata de "excepción doble" a la regla de la prueba de referencia. Que al declarar Gaztambide sobre lo que le había informado el acusado él estaba declarando sobre admisiones del acusado, que no caen dentro de la regla de la prueba de referencia, y, al presentarse prueba en este caso sobre lo que había dicho Gaztambide en el procedimiento anterior, ello constituye una excepción a la regla ya que Gaztambide hablaba como un agente que actuaba dentro del curso de su autorización como agente.

Otro factor que robustece la tesis de que la confesión fué voluntaria estriba en el hecho de que, en el caso de autos, al exponer su teoría de defensa, el acusado tomó como base, y por lo tanto admitió en este mismo caso, la certeza de los hechos más importantes que fueron objeto de la confesión. El acusado adoptó la confesión y renunció a la alegación de involuntariedad. Si la doctrina de involuntariedad está predicada, como lo está, en el criterio de que las circunstancias que rodearon la confesión daban lugar a un riesgo sustancial de que la confesión fuese falsa, si luego el propio acusado, no sólo admite que los hechos que fueron objeto de la confesión eran ciertos, sino que los toma como base para su teoría de defensa, ello demuestra en forma poderosa, que al prestarse la confesión el acusado no fué indebidamente presionado para admitir hechos que el propio acusado luego proclama en corte abierta que son ciertos, y demuestra en forma impresionante que no existía riesgo alguno de que la confesión fuese falsa. Al él ratificar la certeza de los hechos, él también ratificó la virtualidad de la confesión que contenía esos hechos. Aun si la teoría de confesiones involuntarias se predicase en el privilegio contra la autoincriminación, él renunció a la efectividad de ese privilegio, y a los vicios que podían haber surgido de la alegada infracción de ese privilegio, al él aceptar espontáneamente, en corte abierta, la certeza de los hechos que él había divulgado.

En la opinión de este Tribunal se tiende a aceptar que la teoría de la defensa equivalía a una adopción de la confesión, pero se indica que la teoría de la defensa se refería solamente a algunos hechos confesados, pero no a otros hechos esenciales e incriminatorios que habían sido objeto de la confesión. No creo que el concepto de adopción se pueda fraccionar en esa forma. Si la teoría de la defensa implicaba un reconocimiento y admisión de que gran parte de la confesión había sido prestada voluntariamente, entonces el resto de la confesión, también fué prestada voluntariamente. La confesión formaba un solo cuerpo y una sola integridad, y no

podía ser fraccionada hasta el punto de decir que parte de la confesión fué prestada voluntariamente y la otra parte no fué prestada voluntariamente. El reconocimiento de voluntariedad debe extenderse a la totalidad de la confesión. No puede decirse que las circunstancias creaban un riesgo de falsedad en cuanto a parte de la confesión y que no había tal riesgo en cuanto a la otra parte. No debe permitirse que el acusado se coloque en la posición de alegar con éxito que parte de los hechos objeto de la confesión eran ciertos, en tanto le conviene al acusado, pero la otra parte de los hechos no era cierta, por no ser voluntaria la confesión, esto es, voluntaria en lo que pueda convenir al acusado e involuntaria en lo que no le pueda convenir. La ratificación de la parcialidad no puede ser parcializada.

Con respecto a un problema análogo, relativo a la confirmación de la confesión por el descubrimiento de la prueba de los hechos que fueron objeto de la confesión, Wigmore expresa su criterio personal en 3 Wigmore 338, sec. 857, en la siguiente forma:

"Se observará que, de acuerdo con la frase de Mr. Leach, 'tal parte de la confesión que se refiere estrictamente a los hechos descubiertos en virtud de ella', debe ser recibida; en otras palabras, la confirmación admite la parte confirmada, y solamente esa parte. Ahora bien, esto se aparta de la lógica del caso, porque una confirmación sobre unos puntos pertinentes o materiales, produce una amplia persuación en cuanto a la credibilidad de la totalidad. Casi no se puede suponer que, en ciertas partes de la confesión, terminó la ficción y empezó la verdad, y que por una coincidencia maravillosa las partes verdaderas eran exactamente aquellas que fueron confirmadas por una búsqueda posterior. Tal establecimiento de diferencias es puramente artificial, y no corresponde a ningún proceso mental real, ya sea del que confiesa o del que oye la confesión. Si vamos a dejar de desconfiar en cuanto a una parte, dejemos de desconfiar en cuanto a la totalidad."

Analizando con un poco de más detenimiento esa cuestión, tal como se indica en la opinión mayoritaria, el acusado ad-

mitió en su teoría de defensa la forma y manera en que él había matado a Iris Nereida, pero no expuso nada en cuanto a su conducta posterior a la muerte que había sido objeto de la confesión. Es evidente que él adoptó una parte esencia- lísima de la confesión, que él había matado a Iris Nereida. Hasta ese punto, según dice el Tribunal, pudo haber una adop- ción. Ahora bien, si la confesión fué voluntaria (por auto- definición del concepto de adopción), en cuanto a ese punto esencial, también tuvo que ser, necesariamente, voluntaria en cuanto al resto de la confesión. No podemos establecer una línea artificial entre la parte de la confesión que se refería a la muerte de Iris Nereida y la parte que se refería a la conducta posterior del acusado. Ahí tenemos el ejemplo de que el acusado admitió implícitamente la parte de la confe- sión que le convenía a su teoría de incapacidad mental o emo- cional, y no divulgó la parte que no le convenía, para su teoría, en cuanto a su conducta posterior. Esa táctica no debe que- dar justificada por este Tribunal.

De acuerdo con la tesis que yo he adoptado, de que ambas confesiones fueron claramente voluntarias, el juez no tenía que instruir al jurado sobre el efecto de una confesión invo- luntaria sobre una confesión posterior, ya que aquí no hay ninguna confesión involuntaria. Pero aún si se debía ad- vertir al jurado sobre tal extremo, el error, de haberlo, no fué objetado ni excepcionado ni planteado en apelación, y no sería perjudicial, primero, si este Tribunal llegase al criterio de que ambas confesiones eran claramente voluntarias, como cuestión de hecho y de derecho, y segundo, porque el resto de la prueba, aparte de las confesiones, fué suficiente para sos- tener la convicción.

Aun suponiendo que se haya cometido error al no instruir al jurado en cuanto al posible efecto de la primera sobre la se- gunda confesión, tal error no fué perjudicial. Estoy convencido de que no existe probabilidad pronunciada alguna al efecto de que tal omisión del Juez que presidió la vista pudo haber tenido efecto sustancial alguno en el veredicto, primero, porque se-

gún mi criterio, tanto la primera confesión como la confesión del Barrio San Antón fueron claramente voluntarias. El jurado tuvo ante sí todas las circunstancias relacionadas con la forma y manera en que se presentaron esas dos confesiones. No hubo contradicción alguna en la prueba en cuanto a las circunstancias que rodearon la presentación de esas dos confesiones. Aun si el juez hubiese instruído al jurado en forma adecuada en cuanto al posible efecto de la primera confesión sobre la segunda, yo creo que el jurado hubiese siempre llegado a la conclusión de que no hubo efecto alguno, ya que la prueba incontrovertida demuestra claramente que ambas confesiones fueron voluntarias. No se podría alegar que precisamente al jurado era a quien le correspondía comprobar tal voluntariedad o tal efecto, y que ésa no es función de este tribunal en apelación. Pero, como trataré de demostrar más adelante, la regla prevaleciente es al efecto de que para poder determinar si un error fué o no fué tan perjudicial que implique la revocación de la sentencia, este Tribunal debe preguntarse a sí mismo si las circunstancias del caso demuestran que era probable que el error tuvo un efecto perjudicial, esto es, si las circunstancias del caso demuestran que era probable que el jurado hubiese llegado a un resultado distinto de no haberse cometido error. Si todo el resto de la prueba presentada, independientemente de las confesiones, claramente era más que suficiente para demostrar la culpabilidad del acusado y para justificar un veredicto de culpabilidad y si este Tribunal llegase a la conclusión de que la prueba incontrovertida demuestra que ambas confesiones fueron voluntarias, entonces todas las probabilidades serían al efecto de que el hecho de darse una instrucción sobre la relación entre las dos confesiones siempre hubiera producido el mismo resultado, o sea, el mismo veredicto de culpabilidad y, por lo tanto, no procedería la revocación de la sentencia.

Ya se ha establecido que un tribunal en apelaciones no debe suponer que todos los errores son perjudiciales, debiendo el tribunal considerar la totalidad del expediente a los fines

de comprobar si el resultado ha sido sustancialmente correcto. *Nash* v. *United States*, 50 F.2d 1006. También se ha resuelto por la Corte Suprema de California, en el caso de *People* v. *González*, 24 Cal.2d 870, 151 P.2d 251, que corresponde al Tribunal Supremo determinar en apelación si la omisión de instruir adecuadamente al jurado sobre la voluntariedad de una confesión, y de instruir al jurado que esa es una cuestión a ser resuelta por el jurado, corresponde al Tribunal Supremo, repito, el determinar si tal omisión resulta en tal lesión sustancial a la justicia (*miscarriage of justice*) que la sentencia deba ser revocada. En ese caso de González se resolvió específicamente que cuando la prueba demuestra la culpabilidad del acusado más allá de una duda razonable, la omisión de instruir en cuanto a la voluntariedad de una confesión no produce tal lesión a la justicia que justifique una revocación de la sentencia ya que, en ese caso, según indica la Corte Suprema de California, el jurado hubiera llegado al mismo resultado si la confesión no se hubiese admitido en evidencia o si se hubiese instruído adecuadamente al jurado que era al propio jurado que le correspondía comprobar la voluntariedad de la confesión.

En el caso de *People* v. *Britton*, 6 Cal.2d 10, 56 P.2d 491, se resolvió que la negativa del juez de primera instancia de acceder a la petición del acusado de que instruyese sobre el valor de una confesión como prueba no era perjudicial y no producía revocación si había suficiente prueba para demostrar la culpabilidad del acusado. Se resuelve que era el deber del apelante el establecer con seguridad razonable que, de no haberse cometido tal error, el resultado en el tribunal de instancia hubiese sido distinto, y se indica por el Tribunal de California que, después de considerar toda la prueba, era tan improbable que el resultado hubiese sido distinto que era casi inconcebible el que se pudiese haber llegado a otro veredicto que no fuese el de culpabilidad.

En el caso de *Gore* v. *State*, 134 S.W.2d 36, se resuelve que la omisión de instruir al jurado sobre la ley aplicable a

confesiones. no es un error perjudicial si hay´otra evidencia de culpabilidad que justifique un veredicto de culpabilidad.

En el caso de *Rohlfs* v. *State*, 231 N.W. 266, se resuelve que la omisión de instruir al jurado al efecto de que una admisión debe ser deliberada o voluntaria no constituye error perjudicial cuando la prueba demuestra que la admisión era voluntaria y deliberada.

En un caso originado en Puerto Rico la Corte del Primer Circuito, en *García* v. *United States*, 10 F.2d 355, resolvió que cuando la prueba claramente justificaba un veredicto condenatorio, sólo procedería una revocación por un error grave en las instrucciones.

Aunque en el caso de *Kotteakos* v. *United States*, 328 U. S. 750, se revocó la sentencia por considerar que un error en las instrucciones había sido perjudicial, de acuerdo con las circunstancias especiales del caso, sin embargo, se establecen algunas normas generales que son útiles en la resolución del caso de autos. Por ejemplo, se define la doctrina del error no perjudicial al efecto de que tal doctrina constituye un control judicial de una acción arbitraria en el tribunal sentenciador, o un resguardo contra alguna injusticia esencial en el juicio, pero, al mismo tiempo, no debe ser aplicada en tal forma de concederle a un acusado que haya sido justamente convicto una multiplicidad de avenidas de escape, (pág. 760). También se indica que existe una diferencia entre un caso en que la prueba está balanceada, en donde se puede aplicar con más amplitud la doctrina del error perjudicial, y un caso claro de prueba casi unilateral contra el acusado, en cuyo último caso generalmente los errores no son considerados como perjudiciales (pág. 763). Se indica que si el error se refería a aquel mínimo de prueba que sea legalmente suficiente para condenar, procedería una revocación porque, de eliminarse tal prueba o tal error, el resto de la prueba no afectada por el error no sería suficiente siendo entonces el perjuicio sustancial. Se resuelve que cuando es altamente probable que el error tuvo un efecto o influencia sustancial en el veredicto,

debe revocarse la sentencia. En el caso de autos el error, de haberlo, en cuanto a la relación entre ambas confesiones no se refería a la otra prueba que era claramente suficiente para lograr un veredicto de culpabilidad. Es mi criterio que no existe una probabilidad pronunciada al efecto de que tal error tuvo efecto sustancial alguno en el veredicto ya que, en vista de la clara voluntariedad de ambas confesiones, y de la prueba abrumadora en contra del acusado, el veredicto siempre hubiera sido el mismo aun si se hubiese dado la instrucción que estamos ahora discutiendo.

En el caso posterior de *Fiswick* v. *United States*, 329 U. S. 211, se resuelve que si un error en las instrucciones tuvo alguna influencia sustancial en el resultado o si existen serias dudas sobre tal extremo, debe revocarse la sentencia aun si puede estar basada en prueba suficiente. Sin embargo, en la propia opinión se indica, en las páginas 218 y 220, que la prueba de culpabilidad no era fuerte y que el caso contra el acusado era débil por lo que el error tuvo una influencia sustancial en el resultado. En el caso de autos la prueba contra el acusado fué poderosa y se trataba de un caso fuerte y, en vista de ello y del carácter claramente voluntario de las confesiones, tengo que llegar a la conclusión de que el error no tuvo una influencia sustancial sobre el veredicto.

No deseo terminar esta opinión disidente sin citar lo que dijo la Corte Suprema de los Estados Unidos en cuanto a confesiones por voz del Juez Jackson, en el caso de *Stein* v. *New York*, supra, a las páginas 196 y 197:

"No deseamos desacreditar las doctrinas constitucionales que se han formado para proteger a los inocentes mediante el proceso de convertir esas doctrinas en avenidas técnicas de escape para los culpables."